**Nos. 14-1469, 15-1390 (consolidated)**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

**Craig Williams,**

*Appellant,*

-against-

**Secretary Pennsylvania Department of Corrections; Dorina Varner, Chief Grievance Officer; Tina Friday, Records Officer, in her Individual and Official Capacity; Jeffrey R. Rogers, Manager, in his Individual and Official Capacity; Tracy Shawley, Grievance Coordinator, in her Individual and Official Capacity; and Louis Folino, in his Individual and Official Capacity,**

*Appellees.*

**Shawn Walker,**

*Appellant,*

-against-

**Michael A. Farnan; Secretary Pennsylvania Department of Corrections; Superintendent Graterford SCI; Cindy G. Watson, and others to be named later,**

*Appellees.*

On Appeal from the United States District Court
for the Western District of Pennsylvania, No. 2:12-cv-00944
Before the Honorable Mark R. Hornak, and
On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:07-cv-04977
Before the Honorable R. Barclay Surrick

**CONSOLIDATED OPENING BRIEF OF APPELLANTS**

*-Counsel for Appellants on Inside Cover-*

**James J. Bilsborrow, Esq.**
**Weitz & Luxenberg, P.C.**
**700 Broadway**
**New York, NY 10003**
**T: (212) 558-5500**
**F: (646) 293-7937**
*jbilsborrow@weitzlux.com*

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................. vi

STATEMENT OF JURISDICTION ......................................................... 1

ISSUES PRESENTED ........................................................................ 1

STATEMENT OF RELATED CASES ..................................................... 1

STATEMENT OF THE CASE ............................................................... 2

I. FACTUAL BACKGROUND LEADING TO COMMENCEMENT
OF APPELLANTS' FEDERAL CIVIL RIGHTS LAWSUITS ...................... 4

   A. Craig Williams ....................................................................... 4

   B. Shawn Walker ....................................................................... 6

   C. The Pennsylvania Department of Corrections' Policy 6.5.8
   Capital Case Manual, Section 1 ................................................ 7

II. CONDITIONS OF CONFINEMENT FOR PRISONERS IN THE
PENNSYLVANIA DEPARTMENT OF CORRECTIONS ........................... 8

   A. The Pennsylvania DOC Undertakes an Individual Assessment
   and Management Approach to All Non-Death Row Prisoners ............ 8

   B. Conditions of Confinement for Inmates Assigned to Administrative
   Custody But Not Sentenced to Death ........................................ 10

   C. Conditions of Confinement Experienced by Appellants ............... 12

III. PROCEDURAL HISTORY LEADING TO THE INSTANT
CONSOLIDATED APPEAL ......................................................... 14

i

# TABLE OF CONTENTS
(continued)

A. Craig Williams ............................................................................14

B. Shawn Walker .............................................................................15

STANDARD OF REVIEW ......................................................................17

SUMMARY OF ARGUMENT ...............................................................17

ARGUMENT ...........................................................................................18

I. THE CONDITIONS OF CONFINEMENT EXPERIENCED BY
   APPELLANTS IMPLICATED A LIBERTY INTEREST PROTECTED
   BY THE DUE PROCESS CLAUSE .................................................19

A. Appellants' Conditions of Confinement Are Reminiscent of Those
   Found by the Supreme Court to Implicate a Liberty Interest Under
   "Any Plausible Baseline" ..............................................................20

B. Appellants' Conditions of Confinement Impose An Atypical and
   Significant Hardship In Comparison to Conditions of
   Administrative Custody in Pennsylvania ......................................25

II. PENNSYLVANIA'S AUTOMATIC, PERMANENT ASSIGNMENT
    OF APPELLANTS TO INDEFINITE SOLITARY CONFINEMENT
    VIOLATED PROCEDURAL DUE PROCESS ................................28

CONCLUSION ........................................................................................31

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Blackhawk v. Pennsylvania*,
381 F.3d 202 (3d Cir. 2004) ...............................................................17

*Chavarriaga v. New Jersey Department of Corrections*,
806 F.3d 210 (3d Cir. 2015) ...............................................................17

*Clark v. Beard*,
918 A.2d 155 (Pa. 2007).....................................................................15

*Commonwealth v. Walker*,
36 A.3d 1 (Pa. 2011) .............................................................................6

*Commonwealth v. Williams*,
615 A.2d 716 (Pa. 1992).......................................................................4

*Commonwealth v. Williams*,
782 A.2d 517 (Pa. 2001) (*Williams II*) ................................................5

*Commonwealth v. Williams*,
980 A.2d 510 (Pa. 2009) (*Williams III*)...............................................5

*Davis v. Ayala*,
--- U.S. ---, 135 S. Ct. 2187 (2015).....................................................3

*Fraise v. Terhune*,
283 F.3d 506 (3d Cir. 2002) ...............................................................19

*Griffin v. Vaughn*,
112 F.3d 703 (3d Cir. 1997) ...............................................................26

*Harden-Bey v. Rutter*,
524 F.3d 789 (6th Cir. 2008) ..............................................................24

*Jones v. Secretary Pennsylvania Department of Corrections*,
549 F. App'x 108 (3d Cir. 2013) ...........................................................2

iii

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................18, 28, 29, 30

*Powell v Weiss*,
    757 F.3d 338 (3d Cir. 2014) ....................................................19, 20

*Sandin v. Conner*,
    515 U.S. 472 (1995)..........................................................18, 21, 22

*Shoats v. Horn*,
    213 F.3d 140 (3d Cir. 2000) ..............................................................24

*Wilkerson v. Goodwin*,
    774 F.3d 845 (5th Cir. 2014) ............................................................24

*Wilkinson v. Austin*,
    545 U.S. 209 ...........................................................................passim

*Williams v. Pennsylvania*,
    130 S. Ct. 3353 (2010)........................................................................5

## STATUTES

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1983 ........................................................................1, 14, 16

61 Pa. Cons. Stat. § 4303 ......................................................2, 10, 12, 22

## OTHER AUTHORITIES

Commonwealth of Pennsylvania, Department of Corrections,
    Policy Statement, Policy Number DC-ADM 812 (Sept. 10, 2009),
    http://www.cor.pa.gov/Administration/Documents/DOC%20Policies/812%20In
    mate%20Visiting%20Privileges.pdf......................................................11, 12, 26

Commonwealth of Pennsylvania, Department of Corrections,

iv

Procedures Manual, Policy Number 11.2.1 (Jan. 21, 2011),
http://www.cor.pa.gov/Administration/Documents/DOC%20Policies/11.02.01
%20Reception%20and%20Classification.pdf ......................................................8

Michael Schwirtz & Michael Winerip,
*New York State Agrees to Overhaul Solitary Confinement in Prisons*,
N.Y. Times, Dec. 16, 2015, *available at*
http://www.nytimes.com/2015/12/17/nyregion/new-york-state-agrees-to-
overhaul-solitary-confinement-in-
prisons.html?hp&action=click&pgtype=Homepage&clickSource=story-
heading&module=second-column-region&region=top-news&WT.nav=top-
news&_r=0. ...........................................................................................................3

*Wilkinson v. Austin*,
545 U.S. 209 (2005), Joint Appendix 29, 2005 WL 273552..............................22

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Appellants in the instant matter were subject to several years of solitary confinement even after their punishment requiring such confinement was vacated. As modern science, public policy, and case is beginning to recognize, the conditions of solitary confinement are onerous and the damage lasting. That two inmates could be kept under such conditions of confinement long after their punishments were vacated raises serious constitutional concerns. Appellants respectfully request an opportunity to present oral argument on this matter, which raises a pressing concern over the treatment of inmates in this Circuit.

## STATEMENT OF JURISDICTION

Appellants in these consolidated appeals invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331, based upon alleged violations of the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over these consolidated appeals under 28 U.S.C. § 1291 because they are appeals from final judgments of dismissal disposing all claims. The district court in *Williams v. Wetzel*, No. 2:12-cv-00944 (W.D. Pa.), entered final judgment on January 22, 2014 (Dkt. 46), and Plaintiff filed a timely notice of appeal on February 21, 2014 (Dkt. 47). The district court in *Walker v. Farnan*, No. 2:07-cv-04977 (E.D. Pa.), entered final judgment on January 29, 2015 (Dkt. 38), and Plaintiff filed a timely notice of appeal on February 4, 2015 (Dkt. 39).

## ISSUES PRESENTED

Did the district courts err in denying Appellants' claims that their procedural due process rights were violated by their indefinite detention on death row in conditions of solitary confinement, which continued for years even after Appellants' respective sentences of death were vacated on collateral appeal?

## STATEMENT OF RELATED CASES

Appellants are aware of no related cases pending in this Court or any federal court of appeals. In an unpublished per curiam decision, this Court previously rejected a prisoner's Eighth Amendment challenge to his continued confinement

on death row following an order that vacated the prisoner's original death sentence. *See Jones v. Sec'y Pa. Dep't of Corrs.*, 549 F. App'x 108 (3d Cir. 2013). The instant appeal differs from *Jones* in that it raises a due process challenge to Appellants' solitary confinement on death row long after their penalties of death were set aside. Under these conditions, and in light of the atypical and significant hardships experienced by death-row prisoners in Pennsylvania, Appellants were entitled to a process permitting them relief from the conditions of death row when their sentences of death were vacated.

## STATEMENT OF THE CASE

In the early 1990s, Appellants were convicted of first degree murder and sentenced to death. Pursuant to Pennsylvania law, both were then permanently incarcerated in solitary confinement, during which almost "no person [was] allowed to have access to the inmate without an order of the sentencing court." 61 Pa. Cons. Stat. § 4303. Such is the mandate of death row. But here, after a number of years of litigation, each Appellant's death sentence was vacated on collateral review. The state did not appeal these post-conviction findings. Because Appellants sought further collateral review of their guilt-phase determinations, however, they remained on death row in solitary confinement, waiting for their post-conviction appeals to be finally exhausted. Here they stayed for the next several years, no longer sentenced to death but stuck on death row.

The conditions of Appellants' confinement were non-negotiable: death row inmates in Pennsylvania remain always and forever in solitary confinement. They were locked in their cells nearly twenty-four hours per day for years on end. And as Justice Kennedy recognized last Term in *Davis v. Ayala*, "[y]ears on end of near-total isolation exacts a terrible price." --- U.S. ---, 135 S. Ct. 2187, 2210 (2015) Kennedy, J., concurring). It is a price that contemporary society has only begun to recognize. Indeed, on the date of this filing, the State of New York announced that it would significantly overhaul conditions of solitary confinement statewide, drastically reducing the number of inmates in solitary confinement and ushering in reforms to allow group recreation and more contact with those outside a prisoner's cell. New York's reforms are but the latest acknowledgement of the severe price inflicted upon those subject to long-term conditions of solitary confinement.[1]

In *Wilkinson v. Austin*, the United States Supreme Court held that the Due Process Clause provides inmates a protected liberty interest in avoiding conditions of confinement that impose an "'atypical and significant hardship in relation to the

---

[1] Michael Schwirtz & Michael Winerip, *New York State Agrees to Overhaul Solitary Confinement in Prisons*, N.Y. Times, Dec. 16, 2015, *available at* http://www.nytimes.com/2015/12/17/nyregion/new-york-state-agrees-to-overhaul-solitary-confinement-in-prisons.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=second-column-region&region=top-news&WT.nav=top-news&_r=0.

ordinary incidents of prison life.'" 545 U.S. 209, 222-23 (2005) (citation omitted). The conditions under which Appellants Craig Williams and Shawn Walker were incarcerated clearly meet the *Wilkinson* standard. As Justice Kennedy, the State of New York, and countless others have recognized, death row conditions of solitary confinement create a liberty interest that demands some process to ensure its imposition is fair and just. At the very least, Appellants here were entitled to such process after their death sentences were vacated but their remaining claims were subject to continuing appeal. Appellants received no such process, instead subject to the "near-total isolation" that "exacts a terrible price." The Due Process Clause demands better.

## I.    FACTUAL BACKGROUND LEADING TO COMMENCEMENT OF APPELLANTS' FEDERAL CIVIL RIGHTS LAWSUITS

### A.    Craig Williams

On June 6, 1988 Appellant Craig Williams ("Williams") was convicted of first degree murder. JA-14. Williams was sentenced to death on January 29, 1990, and on October 9, 1992, his sentence was affirmed on direct appeal. JA-14; *see also Commonwealth v. Williams*, 615 A.2d 716 (Pa. 1992). As a result of this sentence, Williams was detained in solitary confinement on the capital case unit at SCI-Greene. JA-52 ¶ IV.C; JA-61 ¶ 6; 61 Pa. Cons. Stat § 4303 (stating that all death row inmates shall be kept in solitary confinement).

Williams sought relief under Pennsylvania's Post-Conviction Relief Act (PCRA). JA-14. The PCRA court dismissed the petition for post-conviction relief on December 4, 1997. JA-14. On PCRA review, however, the Pennsylvania Supreme Court vacated the PCRA court's order and remanded for further proceedings. *Commonwealth v. Williams*, 782 A.2d 517, 556 (Pa. 2001) (*Williams II*). Years of legal wrangling ensued. JA-14.

On June 8, 2006, the Commonwealth conceded that Williams was entitled to a new penalty phase hearing. *Commonwealth v. Williams*, 980 A.2d 510, 517 (Pa. 2009) (*Williams III*). The PCRA court granted Williams a new penalty phase hearing on July 11, 2006, but denied all guilt-phase claims raised in Williams' PCRA petition. *Id.* Williams appealed the PCRA court's disposition of his guilt-phase claims, JA-14, but the district attorney did not appeal the PCRA court's penalty-phase disposition, *see* JA-68 ¶ 3. Williams remained housed in solitary confinement on the capital case unit.

On October 2, 2009, the Pennsylvania Supreme Court affirmed the PCRA court's denial of Williams' guilt-phase claims. JA-14. The United Supreme Court denied *certiorari* on June 10, 2010. JA-14; *Williams v. Pennsylvania*, 130 S. Ct. 3353 (2010). On May 1, 2012, Williams was resentenced to life without parole and ordered "to be taken off death row forthwith and placed in general population." JA-88. Shortly thereafter, Williams was transferred to SCI-Albion, where there is

no death row. JA-15. In total, Williams spent nearly six years in solitary confinement from the time his sentence of capital punishment was vacated until the time he was resentenced to life in prison and transferred to general population.

### B.    Shawn Walker

Appellant Shawn Walker ("Walker") was convicted of first degree murder on March 3, 1992 and sentenced to death. JA-41. Pursuant to Pennsylvania law, Walker was then imprisoned on death row at SCI-Graterford. JA-41. He was placed in solitary confinement. JA-41.

Walker sought post-conviction relief from his first-degree murder conviction and death sentence. JA-42. On April 21, 2004, the PCRA court upheld Walker's conviction for murder, but vacated his sentence of death. JA-42. The Commonwealth initially appealed the PCRA court's penalty-phase determination, but sought leave to discontinue its appeal on May 15, 2007. JA-42 to JA-43; *Commonwealth v. Walker*, 36 A.3d 1, 5 & n.3 (Pa. 2011). This request was granted. *Walker*, 36 A.3d at 5 n.3. Walker appealed the PCRA court's guilt-phase findings, the litigation of which continued for the next several years. JA-43.

Walker's guilt-phase appeal languished in the collateral appeal stage until November 30, 2011, when the Pennsylvania Supreme Court affirmed the PCRA court's findings of guilt. JA-43; *Walker*, 36 A.3d 1. During the four-plus years that Walker's guilt-phase appeal was pending, but his penalty-phase determination was

6

not in contest, Walker made numerous requests to be transferred to general population. JA-42 to JA-43. Each request was denied. Four months after the Pennsylvania Supreme Court affirmed the PCRA court's guilt-phase findings, however, Walker was formally resentenced to life without parole and promptly transferred to general population. JA-43.

### C.    The Pennsylvania Department of Corrections' Policy 6.5.8 Capital Case Manual, Section 1

Appellants spent several years confined on death row between the time their respective sentences of death were vacated until their guilt-phase claims were ultimately affirmed. During this period, each Appellant made numerous requests for transfer off death row. Prison officials denied these requests pursuant to Pennsylvania Department of Correction (DOC) Policy 6.5.8 Capital Case Manual, Section 1. JA-90 to JA-91. According to this Policy, a death row inmate may not be transferred, under any circumstances, absent an order "modifying the sentence . . . to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, . . . ." JA-91. Neither Appellant received the requisite order modifying his sentence to one of life imprisonment until all post-conviction appeals were exhausted. This meant that in exchange for pursuing their guilt-phase appeals to finality, each Appellant was forced to endure years of continuing death-row confinement. All the while Appellants' death sentences had been vacated without adverse appeal.

7

As set forth below, DOC's policy thus subjected Appellants to atypical and significant hardship that is unique to those whose penalty-phase determinations are set aside but who opt to pursue guilt-phase appeals to finality.

## II. CONDITIONS OF CONFINEMENT FOR PRISONERS IN THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS

### A. The Pennsylvania DOC Undertakes an Individual Assessment and Management Approach to All Non-Death Row Prisoners

With the exception of inmates sentenced to death, the DOC classifies all other inmates into conditions of confinement on the basis of an individualized assessment designed to identify a security level appropriate to their exhibited behavior. When an inmate is transferred to the DOC, he or she is "initially classified upon reception and re-classified annually as part of the inmate's annual review process while in Department custody."[2] This classification and review process includes, *inter alia*, a medical assessment, psychological testing, basic education testing, risk screening, substance abuse testing, and a personalized interview.[3] Through these tests, DOC develops an initial inmate classification,

---

[2] Commonwealth of Pennsylvania, Department of Corrections, Procedures Manual, Policy Number 11.2.1 – Reception and Classification at 1-1 (Jan. 21, 2011) (hereafter "DOC Policy 11.2.1"), http://www.cor.pa.gov/Administration/Documents/DOC%20Policies/11.02.01%20 Reception%20and%20Classification.pdf. This policy document was not made part of the record below, but it is a publicly available policy of the DOC and highly pertinent to the instant matter. The Court should exercise its discretion and consider it.

[3] DOC Policy 11.2.1 at 2-2.

which consists of an evaluation of "an inmate's custody level, separations, programming needs, security needs, age, *housing needs*, and medical and psychological needs."[4] The inmate is thereafter selected for an appropriate facility placement.[5]

An inmate's housing status is reevaluated during his or her initial classification and each time the inmate is classified or transferred to a new facility.[6] Inmates may be housed in single cells or double cells based on an array of individualized risk factors and preferences.[7] Inmates who are deemed too dangerous to be housed in a double cell are entitled to at least annual reevaluation of their status.[8]

An inmate whose presence in general population would constitute a safety threat to himself or others is housed in "administrative custody" pursuant to DOC Policy 802. JA-108. Inmates may be assigned to administrative custody if, *inter alia*, they are in danger and cannot be protected through other means; they are a danger to themselves or others; they are instigating a disturbance or pose an escape risk; or they have been charged with violating facility rules. JA-113. In general, each of these conditions requires an individualized assessment of the inmate's

---

[4] DOC Policy 11.2.1 at 2-3 (emphasis in original).
[5] *Id.*
[6] DOC Policy 11.2.1 at 5-1.
[7] *Id.* at 5-1 to 5-4.
[8] *Id.* at 5-4.

situation. Inmates placed in administrative custody are entitled to a written explanation, JA-114, and periodic placement review, JA-118. Inmates who no longer pose a risk or whose behavior has improved may be released from administrative custody based upon an individualized assessment. JA-124 to JA-125.

Death row inmates, in contrast to all other offenders, are not individually assessed or classified. Rather, they are automatically assigned to "Security Level 5 Housing," JA-95, which by statute requires DOC to "keep the inmate in solitary confinement," 61 Pa. Cons. Stat. § 4303. Death row inmates may not be transferred from Level 5 Housing regardless of behavior or needs, and their status is never reviewed or reevaluated.

Indeed, once a sentence of death has been imposed, that designation is permanent and dispositive for DOC purposes. DOC policy precludes transfer of a death row inmate absent an actual order modifying his or her sentence. *See* JA-91. Thus, where an inmate's sentencing penalty has been vacated, but the modification of his or her sentence has been delayed by a continuing guilt-phase appeal, DOC policy requires that the inmate remain in solitary confinement on death row irrespective of individualized circumstances. *See id.*

## B.     Conditions of Confinement for Inmates Assigned to Administrative Custody But Not Sentenced to Death

Inmates who cannot be housed in general population, including death row inmates, are housed in administrative custody. The conditions of confinement for administrative custody inmates who are not sentenced to death differ dramatically from the conditions for those who are subject to the death penalty.[9] Administrative custody inmates are afforded opportunities to leave their cells for a variety of social, recreational, and educational purposes. JA-102 to JA-103. Such inmates are offered 60 minutes of exercise, five days per week. JA-102. They may receive weekday visitors. JA-102.[10] They are permitted leisure reading material, which may be requested on a weekly basis. JA-102.

Most importantly, the conditions of confinement applicable to administrative custody inmates are individualized based on demonstrated behavior. JA-102. Such inmates may obtain increased visiting privileges and telephone calls, access to

---

[9] The magistrate judge overseeing Williams' federal suit concluded, erroneously, that "the conditions of confinement for inmates held on death row are the same as those for inmates held in administrative custody for other reasons." JA-22. The DOC's policies, as well as the Pennsylvania statutes cited herein, including the solitary confinement statute, demonstrate that this finding is in error.

[10] DC-ADM 802.VI.F.d explains that inmates on administrative custody may receive visitors in accordance with DOC policy DC-ADM 812. That policy, which is not part of the record but is publicly available, clearly differentiates between the visitors administrative custody inmates and capital case inmates may receive. *See* Commonwealth of Pennsylvania, Department of Corrections, Policy Statement, Policy Number DC-ADM 812 – Inmate Visiting Privileges at 1-5 (Sept. 10, 2009) (hereafter "Policy DC-ADM 812"), http://www.cor.pa.gov/Administration/Documents/DOC%20Policies/812%20Inma te%20Visiting%20Privileges.pdf. Capital case inmates are prohibited from receiving most visitors. *Id.*

radio and television, work assignments, and "any other general population privileges except freedom to move about the facility and freedom to engage in programs with the general population." JA-103. As set forth in DOC's policies, additional privileges may be granted or revoked "based on a change in individual need, safety and security, or inappropriate behavior of the inmate." JA-103.

### C.    Conditions of Confinement Experienced by Appellants

Death row inmates are subject to solitary confinement as a matter of law. 61 Pa. Cons. Stat. § 4303. They are precluded from receiving any visitors aside from DOC staff, legal counsel or a spiritual advisor. *Id.*[11] Walker was subjected to a strip search each time he entered or exited his cell. JA-41. Walker was confined to his cell for almost twenty-four hours per day. JA-41 to JA-42. Although he was permitted limited access to the exercise yard, Walker did not avail himself of this opportunity for seven years because of the invasive strip searches to which he was subjected. JA-42. Walker ate his three meals a day inside his cell, and was evaluated for medical treatment while confined to his cell. JA-42.

Williams alleged that he was confined to his cell twenty-two hour per day; when he was not so confined, he was placed inside a cage either in the prison yard, law library or shower. JA-55. In this way, Williams never truly experienced freedom of movement like non-death row administrative custody inmates.

---

[11] Policy DC-ADM 812 states that capital case inmates may also be authorized to receive "members of the immediate family." *Id.* at 1-5.

Furthermore, Williams ate his meals inside his cell, received medical treatment inside his cell, and took whatever telephone calls he was permitted inside his cell. JA-55. He was expressly forbidden indoor recreation, vocational programs, and most educational programs. JA-55.

DOC policy expressly prohibited Williams and Walker from receiving the individualized treatment that other Pennsylvania inmates—even those in administrative custody—were permitted to receive. Indeed, both Appellants sought transfer from capital confinement following vacatur of each inmate's death sentence. Both were informed by DOC officials that Section 1 of Capital Case Procedures Manual 6.5.8 precluded transfer absent an order modifying their sentence to one of life imprisonment. Thus, for Appellants, there was no individualized assessment that guided their detention; DOC policy forbade it.

In this appeal, neither Williams nor Walker contends that DOC interpreted its policy incorrectly. Rather, Appellants assert that the DOC policy led to their years-long unconstitutional conditions of confinement. The Due Process Clause entitled each inmate to a fair opportunity to be transferred from the harsh conditions of death row once their capital sentences were vacated. Because DOC policy foreclosed that opportunity and subjected them to atypical and significant hardship in relation to incidents of ordinary prison life, their due process rights were violated.

13

## III. PROCEDURAL HISTORY LEADING TO THE INSTANT CONSOLIDATED APPEAL

### A.    Craig Williams

On July 11, 2012, Williams filed a pro se civil rights lawsuit in the Western District of Pennsylvania pursuant to 42 U.S.C. § 1983. JA-50; *see also* JA-13. Williams alleged that his confinement on death row for nearly six years following the ruling of the PCRA court vacating his sentence of death was a violation of the Fourteenth Amendment's substantive and procedural due process protections. JA-52. Williams spent the next several months unsuccessfully seeking leave of court to conduct discovery and obtain court-appointed counsel. *See* JA-2 to JA-7. Defendants moved for summary judgment on April 25, 2013, JA-7, and the magistrate judge issued a report recommending that the district court grant defendants' motion December 9, 2013. JA-8. The district court granted the motion for summary judgment shortly thereafter, and this appeal followed. JA-8.

The report and recommendation, which the district court adopted in full, found it dispositive that the DOC followed its policy set forth in Policy 6.5.8, Section 1 of the Capital Case Procedures Manual. JA-17 to JA-18. According to the magistrate judge, Williams' continued detention on death row, even after his death sentence was vacated, was caused by him alone, not the DOC's policy: "The delay in Plaintiff's re-sentencing proceeding was attributable to his appeal of the denial of the PCRA relief as to his guilt phase claims." JA-18.

14

The magistrate judge also concluded that Williams did not suffer a procedural due process violation because Williams "did not have a liberty interest in being housed in general population during the time he was waiting to be resentenced." JA-19. According to the magistrate judge, Williams' procedural due process contention was controlled by the decision of the Pennsylvania Supreme Court in *Clark v. Beard*, 918 A.2d 155 (Pa. 2007), which held that "it is entirely within the discretion of the DOC where to house a particular inmate." JA-20. The magistrate judge dispatched Williams' claim that his conditions of confinement were particularly onerous by finding, as a matter of fact, that "the conditions of confinement for inmates held on death row are the same as those for inmates held in administrative custody." JA-22. This conclusion is not supported by the factual record in Williams' case, the factual findings of the district court in Walker's case, or the publicly available policies of the DOC.

The magistrate judge also rejected Williams' substantive due process claim, finding that defendants had not subjected Williams to "arbitrary action." JA-23. The magistrate judge explained that prison officials denied Williams' request for transfer pursuant to a DOC policy supported by a legitimate penological purpose. JA-23 to JA-24. Williams does not challenge the lower court's substantive due process findings in this appeal.

**B.     Shawn Walker**

15

On April 24, 2008, Walker initiated his civil rights lawsuit by filing a *pro se* complaint in the Eastern District of Pennsylvania. JA-31 to JA-32. The district court thereafter appointed counsel and Walker filed an amended complaint pursuant to 42 U.S.C. § 1983. JA-33. In his amended complaint, Walker alleged that his prolonged detention in solitary confinement, even after his death sentence was vacated, constituted cruel and unusual punishment in contravention of the Eighth Amendment and a violation of due process. JA-197 to JA-198. At the time his amended complaint was filed, Walker was still confined on death row in solitary confinement. Accordingly, Walker requested monetary, declaratory, and injunctive relief. JA-198 to JA-200.

Defendants filed a motion for summary judgment on April 16, 2012. JA-34. On January 29, 2015, the district court granted defendants' motion. JA-40. The court recognized, and found as a matter of fact, that Walker's conditions of confinement were "much more restrictive than in the general population"; that Walker "was kept in solitary confinement" during his time in death row; that Walker was subjected to multiple strip searches whenever he left his cell; that his opportunities for human contact were "extremely limited"; and that Walker did not leave his cell for nearly seven years to avoid the invasive strip search procedures to which leaving his cell gave rise. JA-41 to JA-42.    Nonetheless, the district court rejected Walker's constitutional claims. The court concluded that even if Walker's

16

conditions of confinement violated his Eighth or Fourteenth Amendment rights, those rights were not clearly established during the period in question. JA-46. The court did not reach the constitutional question.

## STANDARD OF REVIEW

This Court exercises plenary review over a district court's grant of summary judgment. *Blackhawk v. Pennsylvania*, 381 F.3d 202, 206 (3d Cir. 2004). "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)).

## SUMMARY OF ARGUMENT

Supreme Court and Third Circuit precedent holds that prison inmates possess a state-created liberty interest to avoid assignment to conditions of confinement that impose atypical and significant hardship in relation to the ordinary incidents of prison life. In addition, this Court and sister courts have held that prolonged conditions of solitary confinement give rise to a state-created liberty interest. There is thus no question that the conditions of solitary confinement into which Appellants were placed gave rise to a liberty interest recognized by the Due

Process Clause. But even if their initial confinement did not give rise to such an interest, Appellants had such an interest at the moment their death sentences were vacated yet they remained house—for a period of years—on death row in solitary confinement.

Once a condition of confinement gives rise to a state-created liberty interest, the Court must assess the three considerations set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Here, Appellants' interest was substantial while the burden on the state to provide some process was minimal. Williams and Walker should have at the very least received some process after their death sentences were vacated. Instead, they were denied all process and remained in solitary confinement on death row. This complete denial of due process contravened Appellants' constitutional rights. Accordingly, the courts below should not have granted summary judgment in defendants' favor.

## **ARGUMENT**

The United States Supreme Court held, in *Sandin v. Conner*, 515 U.S. 472 (1995), and *Wilkinson v. Austin*, 545 U.S. 209 (2005), that inmates possess a state-created liberty interest in avoiding assignment to conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484). The automatic, permanent assignment of Appellants to restrictive

conditions of solitary confinement implicated a state-created liberty interest because these conditions (a) were more harsh than or identical to those the Supreme Court has held necessarily implicate a liberty interest under "any plausible baseline," and (b) imposed atypical and significant hardship when measured against "the ordinary incidents of prison life" in Pennsylvania. Furthermore, the conditions of confinement here were qualitatively exacerbated by the DOC's policy precluding a capital inmate from obtaining non-solitary conditions of confinement even where the inmate's sentence of death was vacated. Here, DOC's policy resulted in Appellants' unnecessary incarceration in solitary confinement for several years after their sentences were vacated on collateral appeal. This was unjust under the Due Process Clause.

## I.   THE CONDITIONS OF CONFINEMENT EXPERIENCED BY APPELLANTS IMPLICATED A LIBERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE.

To ascertain whether Appellants were deprived of due process by virtue of the conditions of their confinement, the Court must determine if "the nature of [Appellants'] interest is one within the contemplation of the 'liberty or property language of the Fourteenth Amendment.'" *Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014) (quoting *Jago v. Van Curen*, 454 U.S. 14, 17 (1981)). A protected liberty interest arises "either from the Due Process Clause or from state-created statutory entitlement." *Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002)

(quoting *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)). In this appeal, Appellants contend that they had a protected liberty interest that was created by the state. A prisoner is deprived of a state-created liberty interest where he or she is subject to a deprivation that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Powell*, 757 F.3d at 344 (quoting *Sandin*, 515 U.S. at 484).

### A.    Appellants' Conditions of Confinement Are Reminiscent of Those Found by the Supreme Court to Implicate a Liberty Interest Under "Any Plausible Baseline."

In *Wilkinson v. Austin*, the Supreme Court concluded that conditions at the Ohio State Penitentiary, which was a Supermax facility, contributed to an atypical and highly restrictive environment, giving rise to a state-created liberty interest. The Court explained that in the Ohio Supermax facility, "inmates must remain in their cells, which measure 7 feet by 14 feet, for 23 hours per day"; "[d]uring the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells"; cells "have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates"; "[a]ll meals are taken alone in the inmate's cell instead of in a common eating area"; and "[o]pportunities for visitation are rare and in all events conducted through glass walls. *Wilkinson*, 545 U.S. at 214; *see also id.* at 224. These conditions subjected inmates to "extreme isolation" and "deprived [them] of

almost any environmental or sensory stimuli and almost all human contact." *Id.* at 214.

The *Wilkinson* Court also found it significant that placement at the Ohio State Penitentiary was "indefinite and, after an initial 30-day review, is reviewed just annually." *Id.* at 224. Moreover, "placement disqualifie[d] an otherwise eligible inmate for parole consideration" during his confinement. *Id.* The Court explained that although "any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship." *Id.*

In *Sandin*, by contrast, the Supreme Court concluded that no liberty interest was implicated by a prisoner's segregated confinement for thirty days, imposed as discipline for the inmate's disruptive behavior. *Sandin*, 515 U.S. at 485-86. Under these facts, the *Sandin* Court found that the plaintiff's segregated confinement did not "present a dramatic departure from the basic conditions of [his] indeterminate sentence." *Id.* at 485. Indeed, in comparison to conditions experienced by similarly situated inmates, the degree of confinement in disciplinary segregation was not excessive "in either duration or degree of restriction," and a thirty-day disciplinary segregation was not a "major disruption in the inmate's environment." *Id.* at 486-87.

If *Sandin* and *Wilkinson* represent two ends of a spectrum, it is clear where this case falls. The conditions imposed on death row inmates in Pennsylvania—and Appellants in particular—were at least as severe, if not more so, than those determined to implicate a liberty interest in *Wilkinson*. Williams and Walker were confined in permanent solitary confinement. *See* 61 Pa. Cons. Stat. § 4303. Walker was strip-searched each time he exited and entered his cell, prompting him to remain in his cell for seven years. JA-41 to JA-42. Both Walker and Williams ate meals and received medical treatment while confined to their cells. JA-42; JA-55. Both spent nearly all of their time in the confines of their cells. When Williams left his cell, he remained confined to a cage even in the prison yard or shower. As the district court recognized in Walker's lawsuit, these conditions of confinement were "restrictive" and provided only "extremely limited" contact with anyone other than prison staff. JA-41 to JA-42.

When Williams and Walker received their death sentences, their placement in highly restrictive conditions of confinement was permanent. In contrast, at the Ohio Supermax facility at issue in *Wilkinson*, inmates were able to obtain reclassification to less-restrictive facilities or receive better conditions pursuant to individualized assessments. *Wilkinson*, 545 U.S. at 217, Joint Appendix 29, *Wilkinson v. Austin*, 545 U.S. 209 (2005) (No. 04-495), 2005 WL 273552 (U.S.). Similarly, all other Pennsylvania inmates housed in administrative custody are

likewise capable of receiving less onerous confinement conditions, or various inmate benefits, based upon individualized assessments performed by DOC. Appellants, in contrast, were precluded any such individualized treatment or reclassification. They were statutorily required to live in solitary confinement. Even vacatur of their sentences of death—the very imposition of which subjected them to death row conditions in the first place—could not alter their conditions of confinement.

The magistrate judge rejected Williams' procedural due process claim, flatly stating that "he did not have a liberty interest in being housed in general population during the time he was waiting to be resentenced." JA-19. This statement was based, in part, on a ruling by the Pennsylvania Supreme Court concluding that "it is entirely within the discretion of the DOC where to house a particular inmate." JA-20 (citing *Clark v. Beard*, 918 A.2d 155 (Pa. 2007)). As an initial matter, the magistrate judge's framing of the issue is incorrect. Williams' liberty interest was not in being housed in general population during the time he was awaiting resentencing. Rather, Williams (and Walker) had a liberty interest in avoiding the atypical and highly restrictive conditions of confinement of Pennsylvania's death row. Their liberty interest grew qualitatively more acute when the PCRA court vacated their sentences of death because those sentences were the sole rationale keeping Williams and Walker in indefinite solitary confinement.

The magistrate judge was also incorrect to rely on the Pennsylvania Supreme Court's decision in *Beard*. This Court, whose precedents control in this case, has previously recognized that an inmate's long-term, indefinite assignment to solitary confinement gives rise to a protected liberty interest. In *Shoats v. Horn*, the court found that an inmate detained for eight years in administrative custody, with no prospect of immediate release, was subjected to confinement giving rise to a liberty interest under the Due Process Clause. 213 F.3d 140, 144 (3d Cir. 2000). Like the Appellants here, the plaintiff in *Shoats* was confined to his cell for 23 hours per day, where he was forced to take meals and was prohibited from participation in educational, vocational, or other organizational activities. *Id.* These conditions, *Shoats* concluded, were "'atypical' in relation to the ordinary incidents of prison life." *Id.*

The *Shoats* decision is not alone; indeed, other courts of appeals have concluded that long-term conditions of solitary confinement similar to the conditions experienced by Appellants implicate a liberty interest under the Due Process Clause. *See, e.g.*, *Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014); *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008). The Fifth Circuit's approach in *Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014), is typical. There, the Fifth Circuit found that an inmate's long-term assignment to solitary confinement gave rise to a liberty interest because of the "duration of the solitary

confinement, the severity of the restrictions, and their effectively indefinite nature." *Id.* at 855. These authorities make clear that solitary confinement that is of essentially indefinite duration gives rise to a liberty interest. If anything, Appellants' conditions were worse—their death sentences had been set aside, yet they had no means to transfer from death row.

In asserting this argument, Appellants are aware of the Supreme Court's recognition in *Wilkinson* that different courts had reached different conclusions regarding "the baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223. Significantly, however, *Wilkinson* recognized that the conditions experienced by inmates at the Ohio Supermax were "an atypical and significant hardship under *any plausible baseline*." *Id.* (emphasis added). For the reasons set forth above, the conditions under which Williams and Walker were confined, which were at least equal to those experienced by Ohio Supermax inmates, were also an atypical and significant hardship under any plausible baseline. As such, Appellants' conditions of confinement gave rise to a protected liberty interest.

**B.    Appellants' Conditions of Confinement Impose An Atypical and Significant Hardship In Comparison to Conditions of Administrative Custody in Pennsylvania.**

The conditions of solitary confinement experienced by Williams and Walker also implicate a liberty interest because they impose an atypical and significant

hardship relative to the conditions experienced by inmates confined in administrative custody in Pennsylvania. Although the courts of appeals "have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant," *Wilkinson*, 545 U.S. at 223, this Court has typically compared the ordinary incidents of prison life to those conditions experienced by inmates confined in administrative custody. *See Griffin v. Vaughn*, 112 F.3d 703, 706-07 (3d Cir. 1997).

The confinement conditions experienced by Williams and Walker during their years-long incarceration on death row were qualitatively more extreme than those experienced by other inmates in administrative custody. Inmates in administrative custody are permitted myriad opportunities to leave their cells for social, recreational, and educational purposes. JA-102 to JA-103. They may receive weekday visitors not limited to their counsel or a spiritual advisor. JA-102; Policy DC-ADM 812 at 1-5. Administrative custody prisoners are permitted up to 60 minutes of exercise time on five days per week. JA-102. Unlike death row prisoners, they are not required to take all meals and receive all medical treatment inside their prison cell. Finally, and importantly, the conditions of confinement under which administrative custody inmates are housed is subject to regular review and reevaluation. JA-102 to JA-103. Where prison officials see fit, these inmates

may acquire additional privileges, access to entertainment and human interaction, and opportunity to engage in programs with the general population. JA-103.

These opportunities are foreclosed to inmates housed on death row, who are statutorily relegated to solitary confinement. 61 Pa. Cons. Stat. § 4303. Appellants' experience, as well as relevant DOC policies, suggests that nearly every waking hour of death row inmate's life occurs inside each inmate's prison cell. Even where an inmate has won a court ruling vacating his or her sentence of death—thereby displacing the very rationale for the inmate's permanent placement under the harsh conditions of death row—DOC policy precludes transfer to less onerous conditions. The unfairness of DOC policy is on full display in the instant matter; both Williams and Walker won vacatur of their death sentence *several years* before their guilt-phase appeals were concluded. It is simply unjust to require that they remain in solitary confinement while these appeals wind through the court system. As the magistrate judge in Williams' case implicitly recognized, this is de facto punishment—those who persist with their pursuit of appellate rights will suffer years of continued solitary confinement.

Appellants' conditions of confinement were therefore an atypical and significant hardship relative to the conditions imposed upon other inmates housed in administrative custody. This provides a second basis for the Court to conclude

that Appellants' conditions of confinement implicated a liberty interest under the Due Process Clause.

## II.    PENNSYLVANIA'S AUTOMATIC, PERMANENT ASSIGNMENT OF APPELLANTS TO INDEFINITE SOLITARY CONFINEMENT VIOLATED PROCEDURAL DUE PROCESS.

Where a due process liberty interest is implicated, as one is here, the state must provide some procedural protections before automatically—and permanently—assigning death row inmates like Williams and Walker to indefinite, years-long periods of solitary confinement. The precise contours of that process to which Appellants were entitled is governed by *Mathews v. Eldridge*, which requires courts to balance three distinct factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." 424 U.S. 319, 335 (1976). Indeed, even if Williams and Walker were not entitled to procedural protections *before* they were confined on death row, each inmate was surely entitled to such process after his death sentence was vacated but his guilt-phase collateral appeal continued. The state's failure to provide such process fails to comport with the considerations mandated by *Mathews*.

In *Wilkinson*, the Supreme Court explained that inmates have a genuine interest that is "more than minimal" in avoiding conditions of atypical and significant conditions of confinement. 545 U.S. at 225. Appellants' interest here was significantly more substantial than the prisoners in *Wilkinson* because their conditions of indefinite, solitary confinement exceed the conditions at issue in *Wilkinson*. What is more, each inmate (a) had affirmatively won court decisions vacating their sentences of death, but despite these victories (b) had no opportunity to be reclassified into less onerous conditions of confinement. Where the inmates in *Wilkinson* were eligible for periodic reclassification based on individual circumstances and characteristics, the solitary confinement faced by Williams and Walker was unchanging, even after each prisoner's death sentence was vacated. At the time of their confinement on death row—including the multiple years that each inmate remained on death row during collateral appeal—Appellants' interest in avoiding solitary confinement was substantial.

DOC's automatic assignment of near-irrevocable solitary confinement status to death row prisoners carries a substantial risk of error that could be mitigated through readily available procedural safeguards. *See Mathews*, 424 U.S. at 335. After both Williams and Walker received decisions vacating their punishments of death, each tried in vain to be transferred to less onerous conditions of confinement. Multiple requests by each inmate were rebuffed. Prison officials did

not justify their denials with individualized rationales; instead, they simply invoked DOC policy.

This DOC policy creates serious risks of error. Indeed, from the moment any non-death row prisoner enters the Pennsylvania DOC, he or she is subject to a battery of individualized tests and evaluations. These tests and evaluations allow DOC officials to classify and house the prisoner appropriately. DOC performs such an individualized assessment on all non-capital inmates, including those who are convicted of first degree murder and convicted to life without parole. Indeed, it is telling that as soon as both Williams and Walker received formal court orders modifying their sentences, each was immediately transferred to general population. Clearly, neither inmate would have been housed in solitary confinement indefinitely had they received a meaningful, individualized assessment of the sort performed on all other prisoners.

Finally, Pennsylvania's interest in withholding a reevaluation process from death row inmates is minimal. *Mathews* instructs that courts must weigh the state's interest in withholding process, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 335. Pennsylvania's interest here is insubstantial. Although the factual record is slim on this front, it is telling that DOC conducts an individualized assessment and regular reassessment of every

non-death row inmate incarcerated in the state. The state's assessment includes inmates with severe mental and behavioral problems, as well as those who pose escape risks. Some of these inmates surely spend lengthy periods of incarceration in administrative custody. Nonetheless, each is entitled to regular reevaluation of his or her conditions of confinement. Williams and Walker were foreclosed any such reevaluation, even after their death sentences were vacated. Again, it is telling that almost immediately after a formal court order was issued modifying each Appellant's sentence of death, both Williams and Walker were transferred to general population, where they now remain.

Under the factors set forth by the Supreme Court in *Mathews v. Eldridge*, Appellants had a meaningful interest in avoiding unnecessary placement in solitary confinement or, at the very least, had a meaningful interest in a reevaluation of this placement subsequent to the PCRA court decisions vacating their death sentences. The state's interest in foreclosing such reevaluation was minimal. A reevaluation process was therefore warranted by the Constitution.

It is beyond dispute that such process was not provided, and that both Williams and Walker spent years in death row confinement as a result. Appellants are entitled to return to the district court and present their case for monetary damages.

## CONCLUSION

For the foregoing reasons, the judgments of the district courts in these consolidated appeals should be reversed and remanded for further proceedings consistent with the Court's opinion.

Dated:   December 31, 2015
     New York, New York

          Respectfully submitted,


         */s/ James J. Bilsborrow*
         James J. Bilsborrow
         (NY Ref: #4702064)
         **WEITZ & LUXENBERG, P.C.**
         700 Broadway
         New York, NY 10003
         T: (212) 558-5500
         F: (646) 293-7937
         *jbilsborrow@weitzlux.com*

         *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that:

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief (as indicated by the word processing program Microsoft Word) contains less than 14,000 words, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because this brief has been prepared in the proportionally spaced typeface of 14-point Times New Roman.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Rule 28.3(d), I hereby certify that I am a member in good standing of the Bar of this Court.

## CERTIFICATE OF VIRUS SCAN

I certify, pursuant to Third Circuit Local Rule 31.1(c), that a virus detection program has been run on this file and that no virus was detected. The virus detection program was Symantec AntiVirus Software.

<u>CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS</u>

I certify, pursuant to Third Circuit Local Rule 31.1(c), that the text of the electronic brief is identical to the text of the paper copies.

<u>CERTIFICATE OF SERVICE</u>

I certify that on this date, December 31, 2015, I caused the foregoing Consolidated Opening Brief of Appellants and the Joint Appendices to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ James J. Bilsborrow*

Dated: December 31, 2015
New York, New York