Nos. 14-1469, 15-1390 (consolidated)

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

**Craig Williams,**

*Appellant,*

-against-

**Secretary Pennsylvania Department of Corrections; Dorina Varner, Chief Grievance Officer; Tina Friday, Records Officer, in her Individual and Official Capacity; Jeffrey R. Rogers, Manager, in his Individual and Official Capacity; Tracy Shawley, Grievance Coordinator, in her Individual and Official Capacity; and Louis Folino, in his Individual and Official Capacity,**

*Appellees.*

**Shawn Walker,**

*Appellant,*

-against-

**Michael A. Farnan; Secretary Pennsylvania Department of Corrections; Superintendent Graterford SCI; Cindy G. Watson, and others to be named later,**

*Appellees.*

On Appeal from the United States District Court
for the Western District of Pennsylvania, No. 2:12-cv-00944
Before the Honorable Mark R. Hornak, and
On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:07-cv-04977
Before the Honorable R. Barclay Surrick

**JOINT APPENDIX
CORRECTED VOLUME III OF III
PAGES JA-189 TO JA-288**

*-Counsel for Appellants on Inside Cover-*

James J. Bilsborrow, Esq.
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
T: (212) 558-5500
F: (646) 293-7937
*jbilsborrow@weitzlux.com*

*Counsel for Appellants*

# TABLE OF CONTENTS

## Volume I

**From the United States District Court Docket for <u>Williams v. Wetzel</u>, 2:12-cv-00944-MRH-LPL (W.D. Pa.)**

District Court Docket Sheet ........................................................................................JA-1

Notice of Appeal (Feb. 21, 2014) ..............................................................................JA-10

Memorandum Order Adopting Report and Recommendation (Jan. 22, 2014)..........JA-11

Report and Recommendation (Dec. 9, 2013).............................................................JA-13

**From the United States District Court Docket for <u>Walker v. Farnan</u>, 2:07-cv-04977-RBS (E.D. Pa.)**

District Court Docket Sheet ........................................................................................JA-30

Notice of Appeal (Feb. 4, 2015) ................................................................................JA-37

Order Granting Summary Judgment (Jan. 29, 2015).................................................JA-40

Memorandum In Support of Order Granting Summary Judgment (Jan. 29, 2015).................JA-41

## Volume II

**From the United States District Court Docket for <u>Williams v. Wetzel</u>, 2:12-cv-00944-MRH-LPL (W.D. Pa.)**

Complaint (July 11, 2012) ..........................................................................................JA-50

Defendants' Answer to Complaint (Nov. 14, 2012)...................................................JA-60

Defendants' Concise Statement of Material Facts Not In Dispute (Apr. 25, 2013)................JA-67

    Exhibit 1, Court of Common Pleas of Philadelphia County Criminal Docket CP-51-CR-0525631-1987 ...............................................................................................JA-72

    Exhibit 2, 6.5.8, Capital Case Procedures Manual Section 1 – Phase I, Inmates ........JA-90

    Exhibit 3, Administrative Custody Procedures DC-ADM 802, Effective Date February 12, 2007 ...............................................................................................JA-92

    Exhibit 4, Grievances and Final Appeal Decisions ................................................JA-126

Exhibit 5, DC-141 Part III Program Review Committee Action ................................ JA-155

Exhibit 6, Declaration of Shirley R. Moore-Smeal ..................................................... JA-173

Exhibit 7, Sentence Status Summary ........................................................................ JA-179

Plaintiff's Concise Statement of Material Facts ..................................................... JA-186

**Volume III**

**From the United States District Court Docket for <u>Walker v. Farnan</u>, 2:07-cv-04977-RBS (E.D. Pa.)**

Amended Complaint (Aug. 25, 2009) ...................................................................... JA-189

Defendants' Answer With Affirmative Defenses (Oct. 11, 2011) ......................................... JA-202

Defendants' Motion for Summary Judgment (Apr. 16, 2012) ............................................. JA-212

Exhibit 1 to Defendants' Motion for Summary Judgment (Apr. 16, 2012) ............... JA-230

Exhibit 2 to Defendants' Motion for Summary Judgment (Apr. 16, 2012) ............... JA-245

Exhibit 3 to Defendants' Motion for Summary Judgment (Apr. 16, 2012) ............... JA-268

Plaintiff's Response In Opposition to Defendants' Statement of Undisputed or Indisputable Facts ..................................................................................................... JA-282

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN T. WALKER,<br>　　　　　　　　*Plaintiff*,<br>　　*vs.*<br>MICHAEL FARNAN ET AL,<br>　　　　　　　　*Defendants*. | **CIVIL ACTION NO.: 07-4977  (RBS)**<br>**Non-Jury** |

## AMENDED COMPLAINT

Plaintiff Shawn T. Walker ("Walker" or "Plaintiff"), by and through his undersigned attorneys,
Obermayer Rebmann Maxwell & Hippel LLP, complains of defendants Michael A. Farnan, Jeffrey A.
Beard, David DiGuglielmo, and Cindy G. Watson (collectively, "Defendants"), as follows:

### Nature Of Action, Parties And Jurisdiction

1.　　This is a Section 1983 civil rights action, pursuant to 42 U.S.C. § 1983, seeking the
transfer of Plaintiff Shawn T. Walker from the restricted housing (solitary confinement) unit to the
general population at Graterford Maximum Security Prison. The Court of Common Pleas granted
Walker a new penalty phase hearing on April 21, 2004, effectively vacating Walker's death sentence.
Although the Commonwealth initially appealed the grant of a new penalty hearing, the
Commonwealth discontinued its appeal on May 11, 2007. The continued confinement of Walker in
the restricted housing unit, despite the absence of a sentence ordering Walker's execution, constitutes
a violation of his right of due process and right against cruel and unusual punishment. Walker seeks
an immediate transfer to the general population and compensation for his wrongful confinement in the
restricted housing unit.

2.　　Plaintiff Shawn T. Walker is an adult individual, currently incarcerated in the
Restricted Housing Unit at Graterford Maximum Security Prison.

4390384

3.     Defendant Michael Farnan is, upon information and belief, an adult individual, serving as Chief Counsel for Graterford Prison.

4.     Defendant Jeffrey A. Beard, Ph.D., is, upon information and belief, an adult individual, serving as the Secretary of the Department of Corrections, at Graterford Prison.

5.     Defendant David DiGuglielmo is, upon information and belief, an adult individual, serving at the superintendent of Graterford Prison.

6.     Defendant Cindy G. Watson is, upon information and belief, an adult individual, serving at the Chief Grievance Officer of Graterford Prison.

7.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims are based upon to 42 U.S.C. § 1983 and/or the United State Constitution.

8.     This Court has supplemental jurisdiction over the subject matter of any claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because any state law claims stated herein arise from a common nucleus of operative fact giving rise to the federal claims alleged in this case.

9.     Venue is properly laid in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) because defendants either reside or can be found in this district, and because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

### Walker's conviction and subsequent appeals

10.     On March 3, 1992, Walker was convicted of first degree murder and aggravated assault.

11.     On March 4, 1992, the jury returned a verdict of death.

4390384

2

12.    The convictions and death sentence were confirmed by the Pennsylvania Supreme Court on March 23, 1995. *Commonwealth v. Walker*, 540 Pa. 80; 656 A.2d 90 (1995).

13.    Walker subsequently challenged his convictions and death sentence under the Post Conviction Hearing Act, 42 Pa. C.S. § 9541 et seq.

14.    On April 21, 2004, the Court of Common Pleas of Philadelphia County denied Walker's post-conviction relief petition, with the exception of Walker's request for a new penalty hearing.  Thus, Walker's death sentence was vacated.

15.    Walker subsequently appealed the denial of guilt-phase relief.

16.    On June 1, 2004, the Commonwealth appealed the grant of a new penalty phase hearing.

17.    Following the appeal, Walker's classification was changed from "death sentence" to "awaiting sentencing" of the murder charge.

18.    While his classification changed, Walker has not been transferred from death row.

19.    On June 29, 2006, the Honorable William J. Mazzola issued a Memorandum Opinion supporting the denial of Walker's request for post-conviction relief.

20.    On May 11, 2007, the Commonwealth discontinued its appeal.

21.    No appeal is pending in connection with the grant of Walker's request for a new penalty phase hearing.

22.    On June 8, 2007, the Supreme Court of Pennsylvania denied a Motion for Resentencing.

**Walker has remained in solitary confinement on death row for over seventeen years, despite that his death sentence was overturned in April of 2004.**

23.    While Walker has been granted a new penalty hearing, and accordingly, his death sentence vacated, Walker remains confined in the Restricted Housing Unit.

24.    Walker has filed multiple grievances directly with the Department of Corrections, including on July 18, 2006,  December 1, 2006,  January 16, 2007, August 6, 2007, August 28, 2007,

4390384

3

September 20, 2007 and September 25, 2007, seeking redress, and specifically requesting that he be removed from the Restricted Housing Unit.

25.    Each of the grievances Walker filed with the Secretary's Office of Inmate Grievances & Appeals was denied.

26.    As a last resort, on November 27, 2007, Walker commenced the instant civil action by filing an application to proceed in forma pauperis with this Court.

27.    Walker filed a Complaint on April 24, 2008, seeking a transfer from the Restricted Housing Unit to the general population and compensation for his wrongful confinement on death row.

28.    Walker has spent years seeking redress for his retention in solitary confinement after his death sentence was vacated.

29.    Walker has been confined in the Restricted Housing Unit, also known as the "J Block", and known as and referred to as "death row", at Graterford for since March of 1992, over 17 ½ years.

30.    Since April 21, 2004, Walker has not been subject to a sentence of death. He has not, however, been removed from death row.

31.    Walker's solitary confinement is indefinite. .

32.    Because there is no death warrant, and accordingly, no scheduled date of execution, Walker should not be classified as a death row inmate and housed on death row.

**Walker's seventeen years in solitary confinement violates civilized standards of humanity and decency, and imposes atypical and significant hardship upon him.**

33.    Generally, a death sentence is to be carried out, or at a minimum scheduled, within 90 days of the placement of an inmate on death row.

34.    Death row at Graterford consists of 52 holding cells for inmates waiting execution.

4390384

4

35.    Walker has spent virtually his entire adult life on death row.

36.    Death row inmates at Graterford are held under very restrictive conditions, preventing virtually all communication between the general population and the outside world.

37.    Walker has been held in solitary confinement in a windowless, 7 foot by 12 foot cell, twenty-four hours each day, seven days each week, for over seventeen years.

38.    Walker receives all of his meals in his cell. Often times, the meals he receives are cold and/or inadequate.

39.    The front of the Walker's cell consists of iron bars which face into an open corridor, leaving Walker subject to the constant and unpleasant noise and odor of other death row inmates.

40.    Occasionally, passing inmates throw items, including feces, through the bars into Walker's cell.

41.    Every 30 days, Walker's cell is "tossed" by prison staff, inspecting for contraband.

42.    Every 90 days, Walker is relocated to a different cell. Before the rotation, the cells are not cleaned.

43.    He is permitted to shower and shave only three times weekly: Sundays, Tuesdays and Thursdays.

44.    He is subject to a strip search each time he is removed from and returned to his cell.

45.    Whenever Walker is transported to and from his cell, he is placed in handcuffs.

46.    When outside his cell, Walker is accompanied by a guard, even during sessions with his physicians.

47.    Weather permitting and so long as the unit is not in lock down, on Sundays, Tuesdays, Wednesdays, Thursdays, and Saturdays Walker is permitted outside in a caged area, referred to as the "dog cage", for 2 hours of "fresh air" and exercise. Because Walker is subject to full strip searches

whenever he leaves and returns to his cell to go to the "dog cage", Walker ceased going outside for exercise. Walker last went outside in July of 2008.

48.    The prolonged solitary confinement of Walker on death row has taken a toll on Walker's mental and physical well being.

49.    Walker spends much of his days pacing back and forth in his confined cell.

50.    Now, when he sits and/or lies down, Walker's body often shakes uncontrollably.

51.    Walker suffers from insomnia, due to the constant noise of other inmates, concern that someone will throw something through the bars and into his cell, and fear of being executed accidently.

52.    Due, in part, to exposure to dust, peeling paint, mold and other pollutants, Walker has developed allergies (Walker had no allergies when he arrived at Graterford in 1992) and takes Benadryl and Afrin daily, which only provides him partial relief.

53.    The ventilation system in the J Block is deficient, resulting in stagnant, putrid air and uncomfortable temperatures.

54.    The temperature in Walker's cell fluctuates with the outside temperature, and is extremely hot during the summer months.

55.    Heat is provided to the J Block beginning on a predetermined date, not based upon the outdoor temperatures. Therefore, atypically cold days in typically warm months yield cold and uncomfortable conditions.

56.    For over seventeen years, Walker has been held in solitary confinement on the J-Block, with virtually no contact with other inmates and the outside world.

57.    Walker is not permitted any contact or interaction with general population inmates.

58.    Walker's contact with the outside world is strictly limited.

59.    He is permitted only three telephone calls per week, lasting a maximum of 15 minutes each. All calls are made from inside Walker's cell. Walker is subject to discipline if any of one of his calls exceeds the 15 minutes allotted.

60.    Walker is allowed a maximum of four non-contact visits each month, totaling no more than three hours. For these visits, Walker and his guest's only method of communication is through a telephone receiver, with Walker locked in a closet-sized room, behind a reinforced sheet of glass, approximately 2 feet by 3 feet. Walker is not permitted physical contact with any of his visitors, under any circumstances.

61.    Walker is not permitted to participate in any of the educational or religious programs offered to general population inmates.

62.    Walker's access to books and reading materials is strictly limited. There is a small room referred to as the "library" which Walker occasionally may access. Because only 2 inmates are permitted in the library at a time and there are only 5 time slots available each day, to be shared among the 52 inmates currently on death row, Walker seldom is able to use the library. Reading materials are scarce. Most of the "library" books recently were removed and replaced with computers. While Walker is able to read, Walker does not know how to use a computer.

63.    Although his death sentence was vacated in 2004, over five years ago, Walker remains on death row, and subject to the harsh conditions of confinement on the J Block.

64.    Significant time spent in solitary confinement causes adverse psychological affects that can be long lasting and debilitating. Indeed, a special assistant to the Secretary of the Pennsylvania Department of Corrections compiled a report on effects of solitary confinement in 1998, and concluded that a prisoner would start to have adverse psychological effects after only 90 days of

solitary confinement. Walker is currently experiencing the long term and debilitating psychological effects as a result of his almost two decade long solitary confinement.

65.    Life for an inmate in general population at Graterford is extremely different than the solitary confinement to which Walker is subject. Some differences include *inter alia*: (a) inmates in general population are permitted outside access every day, and are not subject to strip searches to take advantage of outside activities; (b) inmates in general population have access to a gym, windows, and a library; (c) inmates in general population eat in a cafeteria with others; (d) inmates in general population are not constantly moved from cell to cell; (d) two inmates are housed in one cell; (e) inmates in general population are permitted to shower every day; (f) inmates in general population have access to telephones daily; (g) inmates in general population are granted greater access to visitors, and are permitted physical contact with visitors; (h) inmates in general population are permitted to smoke tobacco products; and (i) inmates in general population are permitted to attend classes, and sit for, a general education degree.

66.    Defendants knew of, condoned, and willfully and maliciously agreed to subject plaintiff to the harsh conditions of solitary confinement despite the overturning of his sentence and for no penological interest.

67.    Defendants have refused Walker's repeated requests to transfer to the general populations, allegedly because of an ongoing appeal the guilt phase, which is separate and distinct from the penalty phase of his case.

68.    Walker does not pose a disciplinary problem and/or a threat to himself or others within the penal system. Further, Walker has not been retained in solitary confinement after his death sentence as a result of disciplinary action.

69.    Defendants have done nothing to remedy their outrageous misconduct.

## CAUSES OF ACTION

### COUNT I
### Cruel and Unusual Punishment, under 42 U.S.C. § 1983

70.    Plaintiff incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

71.    At all times relevant hereto, Defendants were acting under color of law as agents of the Commonwealth, performing duties traditionally in the exclusive prerogative of the state.

72.    Defendants offending conduct violated the rights, privileges and immunities guaranteed to plaintiff under the Eighth Amendment.

73.    Defendants acted pursuant to a policy and/or custom of detaining inmates on death row in solitary confinement even after the inmate's death sentence has been overturned.

74.    The continued confinement of Walker on death row serves no penological interest.

75.    The continued confinement of Walker on death row is unnecessary and a wanton infliction of pain.

76.    The solitary confinement of Walker for an over 17 year period is inhumane.

77.    Upon information and belief, Defendants knew that Walker's protracted confinement would have debilitating impact on his mental and physical health and well-being.

78.    Defendants violated Walker's constitutional right against cruel and unusual punishment with wanton, outrageous, intentional and/or reckless disregard for the rights, health, security and well-being of Walker.

79.    The continued confinement of Walker on death row, for a period of over 17 years, has caused Walker severe emotional distress.

80.    Walker's solitary confinement for over seventeen years, despite that Walker's death sentence was vacated in April of 2004, constitutes a deliberate indifference to Walker's psychological heath, and is incompatible with society's evolving standards of decency.

81.    The aforesaid conduct of Defendants entitles Walker to compensatory damages, punitive damages and an award for reasonable attorneys' fees and costs of litigation, pursuant to 42 U.S.C. § 1988.  State tort remedies do not provide an adequate means for redress.

WHEREFORE, Plaintiff Shawn T. Walker, requests judgment in his favor and against defendants Michael A. Farnan, Jeffrey A. Beard, David DiGuglielmo, and Cindy G. Watson for compensatory damages in excess of $75,000.00, plus punitive damages, attorneys' fees, costs of suit, and such other relief as this Court may deem just and proper.

## COUNT II
### Violation of Due Process, under 42 U.S.C. § 1983

82.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

83.    Walker's detention in solitary confinement for over seventeen years imposes atypical and significant hardship on Walker in relation to the ordinary incidents of prison life.

84.    Walker has been placed in solitary confinement indefinitely.

85.    There is no process in place for which an inmate may seek transfer from death row to the general population after an inmate's death sentence has been vacated or overturned.

86.    While in solitary confinement for the past seventeen years, Walker has been deprived of most environmental and sensory stimuli, and of almost all human contact.

87.    Defendants' actions are arbitrary and conscience shocking.

WHEREFORE, Plaintiff Shawn T. Walker, requests judgment in his favor and against defendants Michael A. Farnan, Jeffrey A. Beard, David DiGuglielmo, and Cindy G. Watson for

4390384

10

compensatory damages in excess of $75,000.00, plus punitive damages, attorneys' fees, costs of suit, and such other relief as this Court may deem just and proper.

## COUNT III
### Declaratory and Injunctive Relief

88.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

89.    Defendants have held Walker in solitary confinement under the authority of 61 P.S. § 3003.

90.    Section 3003 requires that Defendants hold an inmate, indefinitely, in solitary confinement, even if the inmate's death sentence has been overturned.

91.    Defendants have refused to transfer Walker from solitary to general population pursuant to 61 P.S. § 3003 even though Walker's death sentence was overturned in April of 2004, over five years ago.

92.    The result of 61 P.S. § 3003 is that inmates, such as Walker, can and are held indefinitely in solitary confinement even where their death sentence is vacated.  Such results impose atypical and significant hardships on inmates in Pennsylvania, is arbitrary and conscience shocking, involves the unnecessary and wanton infliction of pain, are totally without penological justification, and result in grossly disproportionate punishments.

93.    An actual controversy exists between the parties, in that Plaintiff submits Defendants' reading of 61 P.S. § 3003 is erroneous and unconstitutional, and/or that the statute itself is unconstitutional.

84.    Walker seeks a determination under 28 U.S.C. § 2201 that 61 P.S. § 3003 violates the Eighth and Fourteenth Amendments and/or that Defendants' interpretation of this statute is erroneous and unconstitutional.

4390384

11

WHEREFORE, Plaintiff Shawn T. Walker, requests that the Court determine that 61 P.S. §

3003 is unconstitutional, and/or that the Court determine that Defendants are required to transfer

inmates under 61 P.S. § 3003 to the general population once a death sentence is vacated, and that the

Court enter an injunction requiring Walker's immediate transfer from solitary confinement to general

population.

**COUNT IV**
**Mandamus**

85.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.    Mandamus will lie to compel proper action where an official has abused his or her

discretion.

87.    Defendants' decision to keep Walker on death row for over seventeen years, despite

that his death sentence was vacated in April of 2004, is an abuse of discretion, is arbitrary, and is

based upon a mistaken view of the law.

WHEREFORE, Plaintiff Shawn T. Walker respectfully requests that the Court compel

Defendants to transfer Plaintiff from solitary confinement to the general population.

Respectfully submitted,

_____/s/ Mathieu J. Shapiro_____
Mathieu J. Shapiro, Esquire (Id. No. 76266)
Dawn M. Sigyarto, Esquire (Id. No. 91580)
Matthew A. Green, Esquire (Id. No. 91592)
Obermayer Rebmann Maxwell & Hippel, LLP
1617 JFK Boulevard, Suite 1900
Philadelphia, PA 19103
Tel. (215) 665-3000
Fax (215) 665-3165
Attorneys for Plaintiff,
Shawn T. Walker

Dated: August 25, 2009

4390384

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN T. WALKER,<br>                  *Plaintiff,*<br><br>  *vs.*<br>MICHAEL FARNAN ET AL,<br>                  *Defendants.* | CIVIL ACTION NO.:  07-4977  (RBS)<br>**Non-Jury** |

## CERTIFICATE OF SERVICE

I, Matthew A. Green, hereby certify that Plaintiff's Amended Complaint was

electronically filed, and was served on the below date, via ECF, on:

Randall J. Henzes
Deputy Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603

 

/s/ Mathieu J. Shapiro
Mathieu J. Shapiro, Esquire (Id. No. 76266)
Dawn M. Sigyarto, Esquire (Id. No. 91580)
Matthew A. Green, Esquire (Id. No. 91592)
Obermayer Rebmann Maxwell & Hippel, LLP
1617 JFK Boulevard, Suite 1900
Philadelphia, PA  19103
Tel. (215) 665-3000
Fax (215) 665-3165
Attorneys for Plaintiff,
Shawn T. Walker

Dated:  August 25, 2009

4405967

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER,                          :      CIVIL ACTION
                                       :
                     Plaintiff         :
                                       :
              V.                       :
Jeffrey Beard, ET AL.,                 :
                                       :
              Defendants               :      NO. 07-4977

**DEFENDANTS' ANSWER WITH AFFIRMATIVE DEFENSES
TO PLAINTIFF'S AMENDED COMPLAINT**

1.  This paragraph contains conclusions of law and requests
for relief which require no response.

2.  Admitted upon information and belief.

3.  Denied as stated.

4.  Denied as stated.

5.  Denied as stated.

6.  Denied as stated.

7.  This paragraph is a jurisdictional statement which
requires no response.

8.  This paragraph is a jurisdictional statement which
requires no response.

9.  Admitted upon information and belief.

10.  Admitted upon information and belief.

11.  Admitted upon information and belief.

12.  Admitted upon information and belief.

13.  Admitted upon information and belief.

14.  Admitted upon information and belief.

15.  Admitted upon information and belief.

16.  Admitted upon information and belief.

17.  Admitted upon information and belief.

18.  Admitted upon information and belief..

19.  Admitted upon information and belief.

20.  Admitted upon information and belief.

21.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 21 of the Amended Complaint.

22.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 22 of the Amended Complaint.

23.  Admitted.

24.  Admitted.

25.  Admitted.

26.  Admitted.

27.  Admitted.

28.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 28 of the Amended Complaint.

29.  Admitted.

30. Denied that Walker has not subject to a death sentence since April 21, 2004. It is admitted that Walker death sentence

was vacated. Walker, however, has a conviction that may subject him to a sentence of death. It is admitted Walker remains housed in the capital case unit at Graterford.

31.  Denied as stated. By way of further answers, if Walker is given a life sentence he may be removed from solitary confinement.

32.  Denied as stated.

33.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 33 of the Amended Complaint.

34.  Admitted.

35.  Admitted.

36.  Denied as stated.

37.  Denied as stated.

38.  Admitted that he receives his meals in his cell.  It is denied the meals he receives are cold and inadequate.

39.  Admitted that front of Walker's cell consist of iron bars which face into the open corridor. All remaining factual allegations are denied.

40.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 40 of the Amended Complaint.

41.  Denied as stated. By way of further answer, Walker's cell may be subject to a search every thirty days.

42. Admitted that every thirty days Walker is relocated to a different cell. All remaining factual allegations are denied.

43. Admitted.

44. Admitted.

45. Admitted.

46. Admitted.

47. It is admitted that Walker is allowed 2 hours of exercise a day for 5 days per week. All remaining factual allegations are denied.

48. Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 48 of the Amended Complaint.

49. Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 49 of the Amended Complaint.

50. Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 50 of the Amended Complaint.

51. Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 51 of the Amended Complaint.

52. Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 52 of the Amended Complaint.

53.  Denied as stated.

54.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 54 of the Amended Complaint.

55.  Defendants are without sufficient information or knowledge to form belief as to the truth of the  factual allegations contained in paragraph 55 of the Amended Complaint.

56.  Admitted.

57.  Admitted.

58.  Admitted.

59.  Admitted.

60.  Admitted.

61.  Admitted.

62.  Admitted.

63.  Denied as stated. By way of further answer, Walker is housed in "J" block on the capital case unit.

64.  Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 64 of the Amended Complaint.

65.  Admitted except inmates in the general prison population are not allowed to smoke.

66.  This paragraph is a conclusion of law which requires no response.

67.   It is admitted that Walker has requested to transfer to the general population and those requests have been denied because Walker's conviction could result in a death sentence.

68.   Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 68 of the Amended Complaint.

69.   Denied as stated.

70.   No response required.

71.   Admitted.

72.   This paragraph is a conclusion of law which requires no response.

73.   This paragraph is a conclusion of law which requires no response.

74.   This paragraph is a conclusion of law which requires no response.

75.   This paragraph is a conclusion of law which requires no response.

76.   This paragraph is a conclusion of law which requires no response.

77.   Defendants are without sufficient information or knowledge to form belief as to the truth of the factual allegations contained in paragraph 77 of the Amended Complaint.

78.   This paragraph is a conclusion of law which requires no response.

79.  Defendants are without sufficient information or knowledge to form belief as to the truth of the  factual allegations contained in paragraph 79 of the Amended Complaint.

80.  This paragraph is a conclusion of law which requires no response.

81.  This paragraph is a conclusion of law which requires no response.

82.  No response required.

83.  This paragraph is a conclusion of law which requires no response.

84.  Denied as stated.

85.  This paragraph is a conclusion of law which requires no response.

86.  Admitted.

87.  This paragraph is a conclusion of law which requires no response.

88.  No response required.

89.  Admitted.

90.  Admitted.

91.  Admitted.

92.  This paragraph is a conclusion of law which requires no response.

93.  This paragraph is a conclusion of law which requires no response.

94. This paragraph is a conclusion of law which requires no response.

95. No response required.

96. This paragraph is a conclusion of law which requires no response.

97. This paragraph is a conclusion of law which requires no response.

### AFFIRMATIVE DEFENSES

1. Defendants are entitled to qualified Immunization Plaintiff's Request for monetary damages for violation of his constitutional rights.

2. Plaintiff's has failed to state a claim upon which relief may be granted.

LINDA L. KELLY
ATTORNEY GENERAL


BY:   /s/RANDALL J. HENZES
      Randall J. Henzes
      Deputy Attorney General
      Identification No. 53256

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER,                          :     CIVIL ACTION
                                       :
                    Plaintiff          :
                                       :
              V.                       :
Jeffrey Beard, ET AL.,                 :
                                       :
              Defendants               :     NO. 07-4977

### Certificate of Service

I, Randall J. Henzes, Deputy Attorney General hereby
certify that a true and correct copy of Defendants' Answer with
Affirmative Defenses to Plaintiff's Amended Complaint was filed
electronically and is available for viewing and downloading from
the EFC system. I further certify that a true and correct copy
of said document was serviced on October 11, 2011 by Clerk
through means electronic to:

MATHIEU SHAPIRO mathieu.shapiro@obermayer.com

MATTHEW A. GREEN matthew.green@obermayer.com

                              LINDA L. KELLY
                              ATTORNEY GENERAL

                 By:   /s/RANDALL J. HENZES
                       Randall J. Henzes
                       Deputy Attorney General
                       Attorney I.D. No. 53256

                       Susan J. Forney
                       Chief Deputy Attorney General
                       Litigation Section

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER,                    :     CIVIL ACTION
                                 :
                Plaintiff        :
                                 :
        v.                       :
Jeffrey Beard, ET AL.,           :
                                 :
                Defendants       :     NO. 07-4977

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants Jeffrey A. Beard, Mike Farnan, David DiGuglielmo and Cindy Watson, by their attorney, Randall J. Henzes, Deputy Attorney General, hereby move this Court to enter judgment in their favor and against the plaintiff. In support of their motion, they rely upon the attached memorandum of law with exhibits attached thereto.

WHEREFORE, defendants respectfully request that judgment be entered in favor of the defendants and against the Plaintiff.

LINDA L. KELLY
ATTORNEY GENERAL

BY:  /s/Randall J. Henzes
     Randall J. Henzes
     Deputy Attorney General
     Identification No. 53256

     Gregory R. Neuhauser
     Chief Deputy Attorney General
     Chief, Litigation Section

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN WALKER, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| Jeffrey Beard, ET AL., | : | |
| | : | |
| Defendants | : | NO. 07-4977 |

### DEFENDANTS' MEMORADNUM OF LAW
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## I. STATEMENT OF THE CASE

Plaintiff Shawn Walker, an inmate currently incarcerated at the State Correctional Institution at Graterford, filed this civil action against former Secretary of the Pennsylvania Department of Corrections, Jeffrey Beard; former Superintendent at the State Correctional Institution at Graterford ("Graterford") David DiGuglielmo; former Chief, Grievance Officer Cindy G. Watson and former Chief Counsel for the Pennsylvania Department of corrections Michael Farnan. Walker alleges that he is currently housed in the Restricted Housing Unit ("RHU") at Graterford as a capital case inmate even though his death sentence was vacated by the Court of Common Pleas of Philadelphia County in April of 2004. He claims the decision to continue to house him in the RHU as a capital case inmate violates his constitutional rights. He seeks redress pursuant to 42 U.S.C. § 1983.

Defendants now move for summary judgment. In support of their motion, they rely upon the deposition of Shawn Walker date February

28, 2012, (Ex. 1); the deposition of Francis Joseph Field dated March 6, 2012; the declaration of Wendy Shaylor (Ex. 3) and this memorandum of law.

## II. STATEMENT OF UNDISPUTED OR INDISPUTABLE FACTS

1. In 1991, Walker was convicted of First Degree murder. Ex. 1, p. 7.

2. As a result of the conviction, Walker was sentenced to death. Id. p. 8.

3. Walker arrived at Graterford in March of 1992 and was placed in J-Unit which is Restricted Housing Unit ("RHU"). Id. p. 7.

4. The entire time Walker has been at Graterford he has never had a cellmate and has always been housed on J-Unit. Id. p. 9.

5. During his time at Graterford, Walker has been and is provided the opportunity to take a shower three times per week and he has taken advantage of the opportunity. Id. p. 11.

6. During his time at Graterford, Walker has been and is provided the opportunity to go to the exercise outside in the exercise yard five times per week; however, over the past seven years he decided not to go out for outdoor exercise. Id. Walker does and is allowed to exercise in his cell. Id. p. 12.

7. During his time at Graterford, Walker was and is provided three meals a day. Id. p. 12.

8. Walker is allowed to have a radio and television in his cell. Id.

9. Walker is allowed non-contact visits. Id. p. 13

10. Walker is allowed to sign up for sick call and obtain medical care when needed. Id. p. 12.

11. Walker is allowed to send mail. Id. p. 15.

12. Walker, while he does not have job, receives $15.00 dollars a month in idle pay. Id.

13. Walker has access to the law library. Id.

14. Walker has commissary privileges. Id.

15. Walker is provided with new T-shirts, socks and underwear every ninety days. Id. p. 18.

16. Walker has access to mental health treatment. Id.

17. Walker has his cell changed every ninety days. Id. p. 9.

18. Walker is given an opportunity to see the Program Review Committee once every ninety days while he is assigned in the Capital Case Unit. Id. p. 10.

19. Pursuant to Pennsylvania law, an offender, like Walker, who is convicted of first degree murder and sentenced to death must be housed in solitary confinement once the Governor signs the death warrant. See 61 Pa.C.S.A. § 4303.

20. Walker's death warrant was signed on July 12, 1995 and a second death warrant was signed on October 30, 1995[1].

21. All capital case inmates who are incarcerated at Graterford are housed on a wing on J-Unit. Ex. 2, p. 12.

---

[1] These dates were obtained from Pennsylvania Department of Corrections public web site under the tab Death Penalty Warrants by Governor.

3

22. J-unit is one of the three Restricted Housing Units at Graterford. Id. p. 13.

23. J-Unit also houses inmate who under administrative or disciplinary custody. Id. p. 16.

24. Capital case inmates who are housed on J-Unit have more privileges than inmates who are housed on J-Unit in disciplinary or administrative custody. Id.

25. On April 21, 2004, pursuant to a Post-Conviction Relief Hearing Act petition, in which Walker challenged both his first degree murder conviction and his sentence of death, the Court of Common Pleas of Philadelphia County upheld his first degree murder conviction but awarded Walker a hearing on the issue of whether his counsel was ineffective at the penalty phase for failing to adequately investigate and present specific mitigation evidence. See Commonwealth v. Walker, 36 A.3d 1, 5 (Pa. 2011).

26. Subsequently, Walker filed an appeal of the decision to deny his petition on his underlying conviction and the Commonwealth filed an appeal of the PCRA's court decision to grant plaintiff a hearing on the issue of whether his counsel was ineffective at the penalty phase for failing to adequately investigate and present specific mitigation evidence. Id.

27. On May 15, 2007, the Commonwealth withdrew its appeal of the PCRA's court decision to grant Walker a hearing on the issue of whether his counsel was ineffective at the penalty phase for failing

4

to adequately investigate and present specific mitigation evidence.
Id.

28. On August 6, 2007, Walker filed a grievance in which he
inquired why he was classified as a capital case and still in the RHU
even though he was not under a sentence of death. Ex. 3, ¶ 2.

29. On August 22, 2012, Tom Rowlands responded to the grievance
by informing him that Office of Chief Counsel has advised that
multiple appeals have been filed concerning his case and he must be
listed as a capital case until such time as all appeals have been
resolved. Id.

30. On August 28, 2007, Walker appealed the respond he received
from Tom Rowlands to Superintendent DiGuglielmo. Id.

31. On September 19, Superintendent Diguglielmo responded to
Walker's appeal by informing him that if his sentence is vacated and
is still under appeal, you remain in the capital case status. Id.

32. Walker then appealed DiGuglielmo's response to his grievance
appeal to the Secretary's Office of Inmate Grievances of Appeals.
Id.

33. On October 30, 2007, Cindy Watson, Chief Grievance Officer
for the Pennsylvania Department of Corrections responded to his
appeal by informing him that appeals were filed concerning his
vacated sentence and that one of those appeals is currently pending
and pursuant to DOC policy until all appeals are resolved you will
remained housed as a capital case inmate. Id.

5

34. On November 30, 2011, the Pennsylvania Supreme Court denied Walker's appeal of the order denying him post conviction relief with respect to his underlying conviction. Id.

29. On April 12, 2012, Walker was sentenced to life in prison without parole by the Court of Common Pleas of Philadelphia County[2].

## III. ARGUMENT

### A. STANDARD APPLICABLE TO A MOTION FOR SUMMARY JUDGMENT

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (setting forth the legal standard formerly found in Fed.R.Civ.P. 56(c)). Summary Judgment pursuant to Fed. R. Civ. P. 56 is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with specific facts showing that there is a genuine

---

[2] It is anticipated that Walker will be removed from the capital case unit and placed in the general prison population by the end of next week.

6

issue for trial." Matsushita, 475 U.S. at 586–87 (1986)(emphasis in original removed).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). Importantly, the nonmoving party cannot satisfy its requirement of establishing a genuine dispute of fact merely by pointing to unsupported allegations found in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, (1986). When the nonmoving party is the plaintiff, he must produce sufficient evidence to establish every element that he will be required to prove at trial. Celotex, 477 U.S. at 322.

### B.  PLAINTIFF'S CONFINEMENT DOES NOT VIOLATE THE EIGHTH AMENDMENT RIGHT

Walker claims that since his death sentence has been "vacated" that he should no longer be housed on the capital case unit at Graterford. Walker alleges that his confinement on the capital case unit at Graterford violates his Eighth Amendment rights.

To establish an Eighth Amendment 'conditions of confinement' claim, an inmate must allege that his conditions were so severe as to deprive him of an identifiable, basic human need. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). In order for conditions of confinement to be unconstitutional, they must be shown to be cruel and unusual under the Eighth Amendment, and the evidence must reveal widespread deprivation of the "minimal civilized measures of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

7

Unconstitutional punishment typically includes both objective and subjective components. The objective component requires an inquiry into whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" Wilson v. Seiter, 501 U.S. 294, 298 (1991).

Here, Walker admits that he has and is receiving the "minimal civilized measures of life's necessities". He receives three meals a day, has access to exercise outside of his cells five days a week and can exercise in his cell; is allowed to take a shower three times per week and has access to visitors, the law library, the commissary, medical treatment, mental health treatment and is provided new clothing every ninety days While he alleges that living in isolation on the capital case unit which can cause emotional distress, he has never sought any mental health treatment during his incarceration. See Ex. 1, p. 18. Additionally, he alleges that the air quality on the housing is poor and that there are mice and ants on the unit. He, however, does not claim that these living conditions have deprived him of an identifiable, basic human need.

In addition to failing to establish the objective component of his Eighth Amendment claim, Walker cannot establish the subjective component of the claim as well. The subjective component requires Walker prove that the prison official "knows that inmate faces a substantial risk of serious harm and disregards that risk by failing

8

to take reasonable measures to abate it." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). There is no evidence from which a reasonable juror could find that Beard, DiGuglielmo, Farnan or Watson were aware that Walker was being denied basic human needs while living on the capital case unit at Graterford. When Walker filed his grievance, he did not complain of being denied basic human needs while living on the capital case wing of J-Unit. Walker's main complaint was that since his death sentence was "vacated", he should not be housed on the capital case unit. This statement would not lead one to believe that Walker was being exposed to a substantial risk of serious harm. Accordingly, Walker's Eight Amendment claim must fail.

### C. WALKER'S CONFINEMENT DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

Walker claims that since his death sentence was "vacated" that he should no longer be housed on the capital case unit at Graterford. He claims that his confinement on the capital case at Graterford violates his due process rights under the Fourteenth Amendment.

Initially, it should be noted that a prisoner has no constitutional right to be housed in any particular part of a prison, <u>Meachum v. Fano</u>, 427 U.S. 215, 222 (1976). Equally, a convicted prisoner has no liberty interest in being house in a particular part of the prison that would be protected by the due process clause of the Fourteenth Amendment. <u>See Sandin v. Connor</u>, 515 U.S. 472, 483-484. Additionally, in Pennsylvania, an inmate does not have a right to be housed in a particular facility or in a particular area within

9

a facility. 37 Pa. Code § 93.11. Lastly, a Pennsylvania inmate whose death sentences has been vacated and is waiting resentencing does not have a protected liberty interest in being housed outside the capital case unit. Clark v. Beard, 918 A. 2d 155, 163 (Pa Cmwlth. 2007). Walker due process fails as a matter of law.

In denying the defendants' motion to dismiss plaintiff's amended complaint, this Court relied upon the Supreme Court decision in Wilkinson v. Austin 545 U.S. 209, 232 (2005). It appears the Court believes that it must determine whether the conditions of confinement that Walker experiences while living on the capital case unit impose atypical and significant hardship on him in relation to the ordinary incidents of prison life to determine if Walker has liberty interest that would be protected by the due process clause of the Fourteenth Amendment. This belief is misplaced.

Walker's claim is not about Walker being removed from the general prison population and placed in a more restrictive environment similar to the inmates in Wilkinson and Sandin. Rather, it is whether the defendants can house Walker as a capital case inmate while there were appeals pending regarding his first degree murder conviction. Therefore, Wilkinson has no application to this case.

Even if Wilkinson is applicable to the facts of this case, Walker's claim still fails as matter of law for three reasons. First, Walker has always been housed in the RHU at Graterford living under

10

the conditions that are described in the Section II of this memorandum. Those conditions are extremely less severe than those experienced by the plaintiffs in Wilkinson[3]. Second, Walker's confinement on the capital unit, unlike the plaintiffs in Wilkinson, is not indefinite. If Walker receives a life sentence, he will be removed from the capital case unit and placed in the general prison population. See Ex. 1, p. 30. Third, unlike the plaintiffs in Wilkinson whose parole eligibility was lost by being placed in the Ohio State Penitentiary ("OSP"), Walker's is not eligible for parole. Consequently, Walker's status as a capital case inmate does not impose an atypical significant hardship on him in relation to the ordinary incidents of prison life.

Even assuming that Walker had a liberty interest in being housed outside the Capital Case Unit while there were appeals pending regarding his first degree murder conviction, he received all the process he was due. His initial placement on the capital case unit resulted from him being found guilty of first degree murder and sentenced to death by a jury. During his continued confinement as a capital case inmate, he was given the opportunity to be heard every ninety days by the Program Review Committee at Graterford. See Ex. 1, p. 10. At times, Walker chose not to attend those reviews and at

---

[3] For example Walker is allowed outdoor exercise with another and the ability to speak to his fellow prisoners on the wing while the prisoners in Wilkinson have no such opportunities.

11

other times he did. Due process is satisfied by these reviews. Shoat
v. Horn, 213 F.3d. 140 (3d Cir. 2000).

Further, Walker filed several grievances over his continued
placement on the capital case while there were appeals pending
regarding his first degree murder conviction. See Document No. 14, ¶
24. He received responses to those grievances. Id. ¶ 25. The
consideration of his grievances is sufficient to constitute due
process since the Third Circuit has established that "the
Pennsylvania Department of Corrections' grievance procedure provides
an adequate post-deprivation remedy." Durham v. Dep't of Corr., 173
Fed.Appx. 154, 157 (3d Cir.2006) (citing Tillman v. Lebanon County
Correctional Facility, 221 F.3d 410, 422 (3d Cir. 2000)).
Accordingly, Walker cannot establish a due process claim under the
Fourteenth Amendment. Judgment, therefore, should be entered in favor
of the defendants and against Walker.

### D. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON WALKER'S CLAIMS FOR MONETARY DAMAGES

Qualified immunity [4] is premised upon "substantial societal
costs" entailed in opening government officials to suit for the
discretionary exercise of their public duties. Harlow v. Fitzgerald,
457 U.S. 800, 814 (1982). Public officials have a privilege of
qualified immunity to "protect them from undue interference with

---

[4] The Third Circuit recognizes the "compelling need for such protective
doctrine because of the severe chilling effect numerous suits for
damages would have on prospective officials." Acierno v. Cloutier,
40 F.3d 597, 615 (3d Cir.1994).

their duties and from potentially disabling threats of liability."
Wright v. City of Phila., 409 F.3d 595, 599 (3d Cir. 2005) (citation
omitted). Qualified immunity shields officials from civil damages
liability as long as their actions could reasonably have been thought
consistent with the rights they are alleged to have violated.
Anderson v. Creighton, 483 U.S. 635, 638 (1987). The privilege
affords "protection to all but the plainly incompetent or those who
knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341
(1986). Qualified immunity is not merely a defense to liability, but
also "an entitlement not to stand trial or face the other burdens of
litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).
Consequently, the importance of resolving qualified immunity issues
at the earliest possible stage in litigation is often stressed.
Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

State officials, in their individual capacities, are thus immune
from damage claims brought under civil rights law whenever a
reasonable person in their position could have believed that the
actions were proper in light of clearly established law. Anderson v.
Creighton, 483 U.S. at 640). In qualified immunity analysis, the
state officials' subjective intent is irrelevant. Doe v. Centre, 242
F.3d 437, 454 (3d Cir. 2001) (citing Anderson, 483 U.S. at 639);
Showers v. Spangler, 182 F.3d 165, 171-72 (3d Cir.1999); Grant v.
City of Pittsburgh, 98 F.3d 116, 123-24 (3d Cir. 1996), cert. den'd,
532 U.S. 919 (2001). Courts ask if each official acted reasonably,

13

not whether another reasonable, or more reasonable, interpretation of events can be constructed several years after the fact. Hunter v. Bryant, 502 U.S. at 228. Courts no longer must first consider if a constitutional right has been violated. Pearson v. Callahan, 129 S.Ct. 808 (2009).

Qualified immunity applies if a right has not been clearly established, because a reasonable person "could have believed that the challenged conduct was lawful under the circumstances." Blackhawk v. Pennsylvania, 381 F.3d 202, 215 (3d Cir. 2004). "Clearly established" means 'some but not precise factual correspondence' between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law." McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001).

Here, with respect to Walker's due process claim, reasonable prison officials in the position of the defendants could reasonably believe that Walker could be housed as a capital case inmate until all appeals were resolved regarding his first degree murder conviction. At time the Walker's filed his grievance which the defendants responded to, the Commonwealth Court of Pennsylvania on February 13, 2007 in Clark v. Beard, 918 A.2d 155 (Pa. Commw. 2007), rehearing denied. Apr. 10, 2007, held that inmates who have had their death sentenced vacated and are waiting resentencing have no liberty interest in being housed in the general prison population. In light of Clark, prison officials in the positions of the defendants could

14

reasonably believe that maintaining Walker as a capital case inmate was not unlawful. Similarly, at the time the defendants responded to plaintiff's grievance, Pennsylvania law, 61 P.S. § 3003[5] required that an inmate for whom the Department of Corrections has received a death warrant be kept in solitary confinement until infliction of the death penalty or until lawful discharge from custody. In light of this law, reasonable prison officials in the positions of the defendants could reasonable believe that they could maintain Walker as a capital case inmate while appeals were pending.

With respect to Walker's Eighth Amendment claim, reasonable prison officials in the position of the defendants could reasonably believe that Walker could be housed as a capital case inmate until all appeals were resolved regarding his first degree murder conviction without violating his Eighth Amendment rights. Nowhere in Walker's grievance does he complain about being denied any basic human needs. Walker did not provide any information from which a reasonable prison official could draw an inference that Walker was exposed to substantial risk of serious harm by being classified as a capital case inmate while there were appeals pending regarding his first degree murder conviction. Reasonable prison officials in the positions of the defendants could reasonable believe that they could maintain Walker's status as capital case inmate without violating the

---

[5] 61 P.S. 3003 was repealed and replaced with 61 Pa.C.S.A... § 4303 in 2009. The language of the statute, however, did not change.

15

law. Prison officials in the positions of the defendants reasonable believe that their actions and decisions were lawful. Accordingly, the defendants are entitled to qualified immunity on Walker's claims for money damages for violation of his constitutional rights.

## III. CONCLUSION

Based upon the foregoing, defendants respectfully request that their motion be granted.

LINDA L. KELLY
ATTORNEY GENERAL

BY:   /s/RANDALL J. HENZES
Randall J. Henzes
Deputy Attorney General
Identification No. 53256

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2136
Fax:       (215) 560-1031

16

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER,                              :        CIVIL ACTION
                                          :
                    Plaintiff             :
                                          :
            v.                            :
                                          :
JEFFREY BEARD, et al.,                    :
                                          :
                    Defendants   :        NO. 07-4977

## CERTIFICATE OF SERVICE

I, Randall J. Henzes, Deputy Attorney General, hereby certify

that on April 16, 2012, 2009, Defendants' Motion for Summary Judgment

was electronically filed and is available for viewing and downloading

from the ECF system. I further certify that a true and correct copy

of said document was served by electronic means to:

MATHIEU SHAPIRO mathieu.shapiro@obermayer.com

DAWN MICHELE SIGYARTO Dawn.Sigyarto@obermayer.com

MATTHEW A. GREEN matthew.green@obermayer.com


                    LINDA L. KELLY
                    ATTORNEY GENERAL

            BY:  /s/RANDALL J. HENZES
                    Randall J. Henzes
                    Deputy Attorney General
                    Identification No. 53256

# EXHIBIT "1"

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

   SHAWN T. WALKER,              : NO. 07-4977
3               Plaintiffs       :
                                 :
4          vs.                   :
                                 :
5  MICHAEL A. FARNAN,            :
      et al.,                    :
6               Defendants       :

7
            DEPOSITION OF SHAWN T. WALKER
8

9

10                    Taken at SCI GRATERFORD, located
11 at Route 29, Graterford, Pennsylvania, on Tuesday,
12 February 28, 2012, commencing at approximately
13 10:40 a.m., before Linda Beyerle, Court Reporter.

14

15

   APPEARANCES:
16

   OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP
17 BY:  DAWN M. SIGYARTO ESQ.
   1617 JFK Boulevard
18 Philadelphia, PA  19103
   (215) 665-3000
19 dawn.sigyarto@obermayer.com
   --- For the Plaintiff
20
              * * *
21
22       SLIFER, VOICE & SHADE
           A Veritext Company
23         4949 Liberty Lane
         Allentown, PA 18104
24          (610) 434-8588
25

Page 2

1 APPEARANCES: (Continued)
2
    OFFICE OF ATTORNEY GENERAL
3   BY: RANDALL HENZES, ESQ.
    21 South 12th, Street, 3rd Floor
4   Philadelphia, PA. 19107
    (215) 560-2402
5   rhenzes@attorneygeneral.gov
    -- For the Defendants
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       INDEX TO WITNESSES
2
    WITNESS                PAGE
3
    SHAWN T. WALKER
4
    By Mr. Henzes          4
5
6
7       NO EXHIBITS IDENTIFIED
8
            * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       (It is stipulated by and between
2   counsel for the respective parties that the sealing
3   of the deposition is waived, and that all objections
4   except as to the form of the question are reserved
5   until the time of trial.)
6               * * *
7       SHAWN T. WALKER, having been duly
8   sworn, was examined and testified as follows:
9               * * *
10      MR. HENZES: Federal rules apply.
11      MS. SIGYARTO: Yes. However,
12  we're reserving the right to read and sign.
13              * * *
14          EXAMINATION
15              * * *
16  BY MR. HENZES:
17      Q.  Mr. Walker, my name is Randall Henzes. I'm
18  with the Attorney General's offices, and I
19  represent the defendants in the lawsuit that
20  you've filed in the United States District Court
21  for the Eastern District of Pennsylvania in the
22  case Number 07-4977.
23          Today we're going to take your
24  deposition. And what's going to happen is that
25  I'm going to ask you a series of questions, and I

Page 5

1   want you to answer the questions to the best of
2   your ability. In answering the questions I hope
3   you'll just keep a couple things in mind. One is,
4   if you don't know an answer to a question, I don't
5   know is acceptable. I don't want you to guess as
6   to any answer. If you're going to make an
7   approximation or an estimation about a date or
8   time, I just ask that you kind of qualify your
9   answer that, I think it's then or I think it's
10  that time. If you don't understand for sure, you
11  don't have to answer the question.
12          If you shouldn't hear my
13  question, just ask me to repeat it.
14          If you shouldn't understand the
15  question, ask me to rephrase it. Bear in mind, if
16  you should answer the question, at least it's
17  going to be understood by myself that you
18  understood my question.
19          Do you understand all of that?
20  A.  Yes.
21  Q.  Keep in mind that your testimony here is
22  being taken under oath and that there's a
23  possibility of what's being recorded here today
24  and typed down by the court reporter can be used
25  in another -- at another part of this proceeding.

2 (Pages 2 - 5)

Page 6

1    Do you understand all of that?
2    A.    Yes.
3    Q.    Are you currently under the influence of any
4    prescription drugs that would render you incapable
5    of what's going on today?
6    A.    No.
7    Q.    Are you currently under the influence of any
8    illicit drugs -- that may sound like a silly
9    question -- but are you under any illicit drugs
10   that would make you incapable of understanding
11   what's going on today?
12   A.    No.
13   Q.    Currently under the influence of any
14   alcohol?
15   A.    No.
16   Q.    Can you think of any reason that would make
17   you not be able to answer my questions regarding
18   your conditions of confinement in the capital case
19   unit at Graterford and some of the underlying
20   reasons of why you're on that unit?
21   A.    No.
22   Q.    And bear in mind -- well, how is your health
23   today?
24   A.    My health?
25   Q.    Your health. Are you physically well enough

Page 7

1    to sit here for about an hour and a half to answer
2    my questions?
3    A.    Yes.
4    Q.    If at any point in time you need to take a
5    break, you need to use the facilities, whatever it
6    is, all I ask is if there's a question pending,
7    answer the question, and then we'll proceed with
8    the break.
9    A.    Okay.
10   Q.    Okay?
11   A.    Okay.
12   Q.    Just understand you have to speak loudly in
13   here because she is recording by a device what
14   we're saying in addition to typing things down.
15   So we've got to keep our voices up. Okay?
16   A.    Yes.
17   Q.    How old are you, sir?
18   A.    41.
19   Q.    When were you first housed at Graterford?
20   A.    I believe sometime in March of 1992.
21   Q.    And you came as a result of a conviction for
22   first-degree murder out of Philadelphia County?
23   A.    Yes.
24   Q.    And at the time your sentence was a -- for
25   lack of a better description, a death sentence?

Page 8

1    A.    Yes.
2    Q.    And when you came to Graterford, have you
3    always been housed on the capital case unit at
4    Graterford?
5    A.    Graterford doesn't have a capital case unit.
6    Q.    Were you always housed on J block?
7    A.    Yes.
8    Q.    The same wing on J block?
9    A.    No.
10   Q.    Over time, have you moved from wing to wing?
11   A.    Yes.
12   Q.    And over time, have you moved from cell to
13   cell?
14   A.    Yes.
15   Q.    Was there a time prior to, say, 1998 where
16   you were probably housed in the same cell for an
17   extended period of time?
18        MS. SIGYARTO:  What do you mean
19   by an extended period of time?
20   BY MR. HENZES:
21   Q.    While you were incarcated they kind of
22   changed how long inmates -- how long you would be
23   in your cell when you were in a capital case unit;
24   would that be a fair statement?
25   A.    I don't understand.

Page 9

1    Q.    When you first got into the system, you
2    weren't moved every 90 days, were you?
3    A.    No.
4    Q.    So there came a point in time when the
5    Department of Corrections' policy changed that
6    they started changing your cell every 90 days?
7    A.    Yes.
8    Q.    All right. And that's probably been in
9    existence for at least the last ten years?
10   A.    I don't know the exact time.
11   Q.    But it's more recently your cell is being
12   moved every 90 days?
13   A.    Yes.
14   Q.    Are you moving from wing to wing or could it
15   be within the same wing?
16   A.    It depends. It could be from wing to wing
17   or cell to cell on the same wing.
18   Q.    Are you currently housed with anybody? Do
19   you have a cellmate?
20   A.    No.
21   Q.    Have you ever had a cellmate?
22   A.    Not at Graterford.
23   Q.    Have you ever been sent to Greene?
24   A.    No.
25   Q.    And when we talk about your incarceration,

Page 10

1  I'm only talking about your time at Graterford.
2  So as long as you've been with the Department of
3  Corrections system, you've been housed in a single
4  cell?
5  A.    At Graterford prison?
6  Q.    Yes.
7  A.    Yes.
8  Q.    I guess there was time you spent time in
9  Philadelphia County?
10 A.    Well, when I was in the County I had a
11 cellmate.
12 Q.    Yes. That's what I'm trying -- I don't care
13 about the County.
14 A.    Okay.
15 Q.    I kind of figured that.
16        As long as you've been
17 incarcerated, do you see the PRC -- have you seen
18 the PRC once every 90 days?
19 A.    No. I don't see them once every 90 days.
20 Q.    Do you see them every 30 days?
21 A.    I don't, no. Are you asking what is their
22 policy?
23 Q.    Yes. Put it this way; Are you given the
24 opportunity to see them once every 90 days?
25 A.    Yes.

Page 11

1  Q.    Do you take advantage of that opportunity?
2  A.    Sometimes.
3  Q.    And on the capital case you're provided with
4  the opportunity to take four showers a week?
5  A.    No.
6  Q.    Three?
7  A.    Three.
8  Q.    Do you take advantage of that?
9  A.    Yes.
10 Q.    And you're allowed to exercise at least four
11 days a week?
12 A.    When you say exercise --
13 Q.    Go out to the yard.
14 A.    You go out to the yard, five times a week.
15 Q.    Do you take advantage of that?
16 A.    No.
17 Q.    Any reason why?
18 A.    Yes.
19 Q.    What's the reason why?
20 A.    I don't like the strip searches. There's a
21 policy that you have to be strip searched when you
22 leave and come to your cell. I don't like being
23 locked in dog cages, I don't like the environment
24 out in the yard also. So I don't go out there.
25 Q.    And when you say the environment, you're

Page 12

1  placed in a single exercise yard? It's probably
2  about 8 feet wide and about 20 feet wide?
3  A.    I don't know the measurements of it.
4  Q.    Have you ever gone out to the yard?
5  A.    Yes.
6  Q.    When you did stop going to the yard?
7  A.    Well, I went out to the yard, I believe this
8  year, once. For like seven years, I went out
9  there one time.
10 Q.    Would you exercise in your cell?
11 A.    Yes.
12 Q.    Has anybody told you you can't exercise in
13 your cell?
14 A.    No.
15 Q.    Do you have a radio?
16 A.    Yes.
17 Q.    Have they -- do you have a TV?
18 A.    Yes.
19 Q.    You're given three meals a day?
20 A.    Yes.
21 Q.    You can sign up for sick call whenever you
22 want?
23 A.    Yes.
24 Q.    And when you sign up, generally, are you
25 seen by the medical people?

Page 13

1  A.    Yes.
2  Q.    And, generally, it's between you and they'll
3  talk to you through the cell bars?
4  A.    Yes.
5  Q.    And have there been instances when your
6  condition required that you be transported up to
7  the infirmary?
8  A.    Yes.
9  Q.    And has that occurred?
10 A.    Yes.
11 Q.    And with regard to your visitors, do you get
12 visitors?
13 A.    Yes.
14 Q.    How often?
15 A.    It varies. Whenever somebody pop up.
16 Q.    When they told -- when you're told that
17 they're coming, do you take advantage of going to
18 the visit?
19 A.    Yes.
20 Q.    Are the visits non-contact?
21 A.    Yes.
22 Q.    And so you're on one side of the glass and
23 your visitors are on the other?
24 A.    Yes.
25 Q.    And to do that you have to go through the

4 (Pages 10 - 13)

Page 14

1  strip search procedure when you come out of the
2  cell?
3  A.  Yes.
4  Q.  And you're willing to go through that for
5  the visitor?
6  A.  Yes.
7  Q.  Same thing with the shower, you're strip
8  searched before the shower?
9  A.  Well, it's policy. Every time they take you
10  from your cell, you have to be subject to a strip
11  search. That's just their policy.
12  Q.  And you've probably been in Graterford for
13  approximately 20 years; would that be a fair
14  statement?
15  A.  Yes.
16  Q.  Have you had any misconducts?
17  A.  Yes.
18  Q.  Have you had any recently?
19  A.  No.
20  Q.  When I say recently, let's say the last two
21  years.
22  A.  No.
23  Q.  Three years?
24  A.  No.
25  Q.  Would it be a fair statement to say they

Page 15

1  were more towards the beginning of your
2  incarceration?
3  A.  Yes.
4  Q.  Are you allowed to write to whomever you
5  want?
6  A.  I haven't had any problems with --
7  Q.  Okay. That's a bad question.
8         Have you been limited in who you
9  can correspond with?
10  A.  No.
11  Q.  Do you have a job?
12  A.  No.
13  Q.  Do you get idle pay?
14  A.  Yes.
15  Q.  Do you know what that is?
16  A.  I guess the average is about $15 a month.
17  Q.  Do you have commissary privileges?
18  A.  Yes.
19  Q.  Do you take advantage of those?
20  A.  Yes.
21  Q.  Do you submit a written form and they bring
22  it to you?
23  A.  Yes.
24  Q.  Do you have access to the law library?
25  A.  Yes.

Page 16

1  Q.  How often do you go?
2  A.  It varies. You know, you have to sign up
3  for the law library, and they'll assign slots that
4  are available. It's not like you can go whenever
5  you want to go.
6  Q.  When you go to the law library, do you have
7  to go through the strip search policy as well?
8  A.  Yes.
9  Q.  When you go to the law library, how long are
10  the slots?
11  A.  Two hours.
12  Q.  Two hours?
13  A.  Yes.
14  Q.  Have you ever been denied the opportunity to
15  go to the law library when you've signed up?
16  A.  Yes.
17  Q.  How long ago?
18  A.  Not recently. A while ago. The jail might
19  have been locked down or something. So you can't
20  go.
21  Q.  Your fellow members on the housing unit that
22  you have -- would you consider them -- well, I'll
23  start with, an associate?
24  A.  No.
25  Q.  Would you consider them an acquaintance?

Page 17

1  A.  No.
2  Q.  What do you consider them?
3  A.  I consider them people that's housed in an
4  environment that I'm housed in.
5  Q.  Have you had any instances where you were
6  never given your meals for an extended period of
7  time?
8  A.  No.
9  Q.  Have you had any instances where you were
10  not given the opportunity to go out to the yard?
11  A.  I don't really go out to the yard. So I
12  don't have a yard problem.
13  Q.  Do the officers at least come by and ask
14  you, Shawn, do you want to go out today?
15  A.  No. You have to sign up. I mean, if you
16  want to go out, you have to be standing on your
17  gate when the officer comes by to sign up for the
18  yard.
19  Q.  So they announce, we're coming around for
20  the yard?
21  A.  Yes.
22  Q.  So you stand on the door and they'll write
23  down your name?
24  A.  Yes.
25  Q.  How often do they give you new clothing?

5 (Pages 14 - 17)

Page 18

1   A.   I believe it's every 90 days, T-shirts,
2   socks, underwear.
3   Q.   Are you evaluated yearly by a psychologist?
4   A.   I don't know. I don't recall ever being
5   evaluated by a psychiatrist.
6   Q.   Does somebody come down and talk with you
7   about your -- I guess for lack of a better word,
8   your status?
9   A.   You mean like a counselor?
10  Q.   Yes.
11  A.   They have counselors assigned to the unit
12  that makes rounds. But they don't, like, talk to
13  you about your situation, really, I guess. I
14  mean, if you got something you want to tell them,
15  I guess they'll listen or whatever.
16  Q.   Have you had the need to seek any mental
17  health treatment?
18  A.   Have I had the need to?
19  Q.   Yes.
20  A.   They can't do anything for me, so why would
21  I bother?
22  Q.   But you know what I'm saying? There's a
23  couple guys down on the housing unit that are a
24  little out there, wouldn't you say?
25  A.   Yes.

Page 19

1   Q.   For the most part, the unit that you live
2   on, are all capital case inmates housed there?
3   A.   Capital cases, administrative custody, and
4   disciplinary custody.
5   Q.   How about your wing, is it an all capital
6   case unit?
7   A.   It's not a unit. It's a wing inside the
8   unit.
9   Q.   Yes. The wing, you're on J block?
10  A.   Right.
11  Q.   You're currently housed on J block?
12  A.   Yes.
13  Q.   What wing are you on?
14  A.   I'm on A wing.
15  Q.   A wing?
16  A.   Yes.
17  Q.   To your knowledge, the guys on the left --
18  everybody else that's on the unit, are they all
19  capital case inmates?
20  A.   On the unit, no, not everybody.
21  Q.   No. I mean on the wing. Bad question.
22  A.   On the wing, yes.
23  Q.   For the most part, do you guys tend to
24  respect each other's --
25  A.   No.

Page 20

1   Q.   -- privacies?
2   A.   No.
3   Q.   No?
4   A.   No.
5   Q.   Is there talking back and forth all day?
6   A.   Yes.
7   Q.   How about at night? Do they at least have
8   enough sense to go to bed?
9   A.   No.
10  Q.   Do you participate in that?
11  A.   No.
12  Q.   Do you know who -- I'm assuming you guys
13  know who the problem children are, for lack of a
14  better description?
15  A.   I pretty much try to keep to myself and mind
16  my business and focus on trying to get out of
17  here.
18  Q.   Can you tell me the current status of your
19  criminal matter, at least as you understand it?
20  A.   A little more specific?
21  Q.   Well, it's my understanding that your death
22  sentence was overturned; is that a fair statement?
23  A.   Yes.
24  Q.   And that at some point when that became
25  overturned, you were pursuing trying to get the

Page 21

1   underlying conviction overturned; would that be a
2   fair statement?
3   A.   Yes.
4   Q.   And it's also my understanding that the
5   County of Philadelphia has dropped any appeals
6   relating to the overturning of the death sentence;
7   is that correct?
8   A.   Yes.
9   Q.   And it was my understanding, for a period of
10  time, that you were continuing to pursue your
11  appeal on the underlying conviction?
12  A.   Yes.
13  Q.   All right. And that was in existence since
14  at least 2004 that you were pursuing getting your
15  conviction overturned?
16  A.   I was pursuing getting my conviction
17  overturned since I was convicted back in '92.
18  Q.   Are you still pursuing appeals to get your
19  conviction overturned?
20  A.   Yes.
21  Q.   Are they still pending?
22  A.   Yes.
23  Q.   Do you know if the matter has ever been
24  heard by the Supreme Court of Pennsylvania?
25  A.   Yes.

6 (Pages 18 - 21)

Page 22

1  Q.  Are you waiting for a decision?
2  A.  The Pennsylvania Supreme Court came down
3  with a decision already.
4  Q.  And when did that happen?
5  A.  I believe it was November 30th, 2011.
6  Q.  And what was the result?
7  A.  They affirmed the lower court's decision.
8  Q.  So now, to your understanding, is they're
9  going through the process of determining what your
10 sentence will be?
11 A.  Yes.
12 Q.  And do you have any understanding, is the
13 Philadelphia County DA's office going to pursue
14 the death sentence, or are they offering you life?
15 A.  From what I was told, they had offered life
16 in the past in exchange for me giving up my
17 appeals, but I turned that down.  I don't know
18 what their position is now.
19      All I know is, like, in the past
20 ten years or so, they haven't been re-seeking the
21 death penalty on cases being sent back down, that
22 they pretty much consented to life imprisonment.
23      I don't know what they're going
24 to do with me.
25 Q.  And at least it was your understanding if

Page 23

1  you agreed to the life in prison and stopped — if
2  you were willing to give up your appeals on your
3  underlying conviction, they would agree to a life
4  sentence?
5  A.  Yes.
6  Q.  And it's always been your position to reject
7  that offer?
8  A.  Yes.
9  Q.  To your knowledge, do you know when that
10 offer was first given to you?
11 A.  I believe right after the judge made his
12 ruling to vacate the death sentence and maybe
13 sometime thereafter.
14 Q.  Now, when you say the judge, was there a
15 point in time you had to be -- there was a hearing
16 to determine whether or not your death sentence
17 was properly instituted, for lack of a better
18 description, and that was sent back by the Supreme
19 Court of Pennsylvania?
20      Who overturned your death
21 sentence?  That's a better question?
22 A.  The lower court.
23 Q.  The lower court based upon --
24 A.  Court of Common Pleas.
25 Q.  Based upon what?  Ineffective assistance of

Page 24

1  counsel?
2  A.  Yes.
3  Q.  And that was pursuant to a PCR?
4  A.  PCRA.
5  Q.  Postconviction?
6  A.  Yes.
7  Q.  Did you have a lawyer handling that for you?
8  A.  Yes.
9  Q.  And did the lawyer then pursue on
10 postconviction the underlying conviction?
11 A.  No.
12 Q.  No?
13 A.  No.  It was limited only to the death
14 sentence.
15 Q.  The death sentence?
16 A.  Yes.
17 Q.  And who was pursuing the conviction part of
18 it?  Yourself?
19 A.  The conviction part of it was put on hold
20 while we addressed the death sentence.  The judge
21 wouldn't entertain an appeal on the conviction, on
22 the other convictions.
23 Q.  Okay.  So after it was overturned, this
24 death sentence, you then pursued, I guess, another
25 postconviction on the actual conviction?

Page 25

1  A.  No.  Then I appealed to the Pennsylvania
2  Supreme Court to the convictions.  That wasn't
3  overturned.
4  Q.  By the judge pursuant to the PCRA matter?
5  A.  Yes.
6  Q.  Okay.  And just so we're clear, your PCRA
7  petitions regarding your death sentence is
8  completed?
9  A.  Yes.
10 Q.  And your PCRA regarding your underlying
11 conviction has been ruled upon saying that the
12 conviction is valid?
13 A.  Yes.
14 Q.  Okay.  And in terms of other appeals, I
15 guess you're pursuing a federal avenue?
16 A.  Yes.
17 Q.  Do you have someone from the federal
18 defender's office who is representing you?
19 A.  Yes.  Billy Nolas.
20 Q.  Has there ever been any time in your
21 incarceration when you were not given your meals
22 for an extended period of time?  And when I say
23 extended period of time, I mean two weeks.
24 A.  No.
25 Q.  Has there ever been a point in time during

7 (Pages 22 - 25)

Page 26

1  your incarceration when you were not at least
2  asked to go to the yard for at least a two-week
3  period?
4  A.  No.
5  Q.  Ever been instances at least for a two-week
6  period where you were denied the opportunity to
7  take a shower?
8  A.  Can you repeat that again?
9  Q.  Given the opportunity to take a shower.
10  A.  Have I been denied the opportunity?
11  Q.  For, like, over a whole two-week period that
12  you've gone without a shower for two weeks?
13  A.  Not two weeks, no.
14  Q.  There might have been instances where
15  they've missed your name on the list?
16  A.  No.
17  Q.  Would it be a fair statement to say that
18  whenever you were signed up to take a shower, most
19  of the time it occurred?
20  A.  I don't understand.
21  Q.  I'm just trying to get to regarding your
22  ability to take a shower. It's really dependent
23  upon the guards letting you out and taking you to
24  the shower, right?
25  A.  Yes.

Page 27

1  Q.  Have there been instances where for, like, a
2  two-week period of time where the guards wouldn't
3  take you to the shower?
4  A.  No.
5  Q.  Okay. Have there been instances where you
6  were not scheduled to see the PRC, to your
7  understanding?
8  A.  Not that I know of. I don't really keep
9  track of the PRC situation because I don't really
10  go out there.
11  Q.  When they -- do you tell them ahead of time
12  that you don't want to see them? When the guards
13  say, you know, Walker, the PRC wants to see you
14  and you say I don't want to go?
15  A.  They don't say the PRC wants to see you.
16  They ask you if you want to see the PRC.
17  Q.  Okay.
18  A.  And I would say no if I didn't want to go
19  out.
20  Q.  Have you had the opportunity to use request
21  slips to get some of your questions answered?
22  A.  Yes.
23  Q.  Have they been responding to the request
24  slips?
25  A.  Some of them.

Page 28

1  Q.  Some of them?
2  A.  Yes.
3  Q.  It might sound like a silly question because
4  I don't have to live it, but would it be fair to
5  say that the major problem you have with where
6  you're housed, besides the fact of being housed
7  where you're housed, is that you're locked in the
8  cell 23 out of the 24 hours a day?
9  A.  Yes. That's the major problem.
10  Q.  When you go out to the yard, when you went
11  out to the yard, were there other inmates in the
12  next yard over?
13  A.  Yes.
14  Q.  And do you on occasion have conversations
15  with the guys on the wing --
16  A.  Yes.
17  Q.  -- just regarding the Eagles, Sixers?
18  A.  Yes.
19  Q.  Are you an Eagles fan?
20  A.  No.
21  Q.  Cowboys?
22  A.  No.
23  Q.  Giants?
24  A.  No.
25  Q.  Who?

Page 29

1  A.  I don't have --
2  Q.  You don't have one?
3  A.  No.
4  Q.  How about baseball?
5  A.  I watch baseball, but I don't have any
6  particular team.
7  Q.  Basketball?
8  A.  I like basketball.
9  Q.  Sixers?
10  A.  Bulls.
11  Q.  Bulls. Now you're showing your age. You're
12  about the time Jordan was winning was the time you
13  ended up here. Everybody is a frontrunner, just
14  remember that. Probably in the '80s it was Magic
15  and the Lakers, right, when you were a little kid?
16  A.  Okay.
17  Q.  Right? Because you weren't a Bird fan. You
18  couldn't have ever been a Celtics fan coming from
19  Philadelphia?
20  A.  Sounding like we're getting a little off
21  track here.
22  Q.  Let me digress. I apologize.
23     Do you know when your next court
24  hearing is regarding your conviction?
25  A.  Regarding the conviction?

8 (Pages 26 - 29)

Page 30

1  Q.  Yes.
2  A.  I don't have a court hearing regarding the
3  conviction.  I have a court hearing regarding the
4  sentence.
5  Q.  The sentence.
6  A.  Status is for next month, the 15th.
7  Q.  The 15th.
8       Would it be fair to say that, at
9  least it's at least your understanding that if you
10  accepted their offer of the life sentence, that
11  you'd been be released from the capital case unit?
12  A.  I don't know, I would think that I would,
13  but I don't know.
14  Q.  I mean, is that your understanding that --
15  A.  My understanding is that they got me down
16  here without a death sentence or withdrawing any
17  DC time, and they haven't released me.  So what's
18  to make me think they would release me if I do --
19  Q.  Have you known any of your fellow capital
20  case inmates who have gotten their -- accepted a
21  life sentence, have they left the unit?
22  A.  I've seen guys leave the unit, yes.
23  Q.  Have you ever been asked to transfer to
24  Greene?
25  A.  No.

Page 31

1  Q.  Have they ever asked you if you wanted to go
2  to Greene?
3  A.  No.
4  Q.  For the most part, how would you say you get
5  along with the staff?
6  A.  They don't bother me and I don't bother
7  them.
8  Q.  And your cell is changed every 90 days?
9  A.  Yes.
10  Q.  Do you know the date it's going to happen,
11  or do they just come by and say it's time to
12  change?
13  A.  You have a general idea from the last time
14  you moved, but they may come earlier or they may
15  come maybe a day or two later than the actual 90
16  that you should move on.
17  Q.  When you're moved, everybody else is moved;
18  would that be a fair statement?
19  A.  No.
20  Q.  When you're moved, two or three other people
21  are moved?
22  A.  It varies.  I mean, some people move and
23  some people don't move.  It varies.
24  Q.  Would it be fair to say that your 90 days is
25  a little different than the guy next to you?

Page 32

1  A.  Could be.
2  Q.  Has your cell been subject to random cell
3  searches?
4  A.  Yes.
5  Q.  Have you seen the other cells been subject
6  to random cell searches?
7  A.  Yes.
8  Q.  Has your cell been subject to at least a
9  search to make sure that you don't have too many
10  boxes or stuff like that?
11  A.  Yes.
12  Q.  Have you seen the other people's cells, the
13  same thing?
14  A.  I don't know what they're searching for when
15  they go into other people's cells.
16  Q.  Have there been instances where other
17  people's cells have been searched but yours has
18  not been?
19  A.  Yes.
20  Q.  How would you describe the noise level in
21  the unit?
22  A.  It varies from time to time.  You know,
23  maybe noisy at nighttime.  Sometimes it may be
24  noisy during the daytime.  Depends on what's going
25  on.

Page 33

1  Q.  When was the last time you went out to the
2  yard?
3  A.  It's been a while.
4  Q.  Okay.
5  A.  I can't give you an exact date.
6  Q.  How do you pass the time in your cell?
7  A.  How do I pass the time in my cell?
8  Q.  Yes.  What do you do?  What's your daily
9  routine?  That's a better question.
10  A.  There really isn't much for me to do in my
11  cell.  I may read.  I may write.
12  Q.  Generally, what time do you get up?
13  A.  6:00 in the morning.
14  Q.  Do you get up, or is that when they tell you
15  you have to get up and stand for count?
16  A.  That's usually around the time they come
17  through for count time.
18  Q.  Do you have to stand for count or are you
19  allowed to stay in your bunk?
20  A.  Sometimes.  It depends on who the officer is
21  that comes around to take count.
22  Q.  How would you describe the heat in your
23  cell?
24  A.  The heat in my cell?
25  Q.  Yes.

Page 34

1    A.    I don't have a heater in my cell.
2    Q.    Okay. How about the heat on the unit?
3    A.    It varies.
4    Q.    It varies?
5    A.    Some days it's cold. Some days it's hot.
6    It depends on what's going on on the unit.
7    Q.    Would it be a fair statement to say that if
8    it's like today, a relatively mild winter day, the
9    conditions on the unit are okay?
10   A.    It would be hot because the heat doesn't
11   fluctuate with what's going on outside. So if
12   it's supposed to be cool and it's not, then you're
13   stuck with a hot unit.
14   Q.    Right. How about in the summertime?
15   A.    In the summertime it's hot. We don't have
16   any air conditioning in the unit.
17   Q.    Are there any windows in your cell?
18   A.    We don't have windows in the cell, and the
19   windows that are on the unit, they don't open or
20   close. They're like cemented to the wall or
21   sealed into the wall because I guess there's
22   supposed to be a central air unit, but the central
23   area doesn't work.
24   Q.    How is your health? Do you have any health
25   conditions that need to be addressed?

Page 35

1    A.    I have allergies, bad back, migraines.
2    Q.    Do you know why you have a bad back?
3    A.    Probably from being locked up in that cell
4    for two decades.
5    Q.    Where does it hurt in your back?
6    A.    Lower back.
7    Q.    Have you talked to the medical people about
8    your back?
9    A.    I've seen them if it gets really bad.
10   Q.    Do they give you pain medication?
11   A.    Motrin.
12   Q.    Does it come and go?
13   A.    Yes.
14   Q.    Are there days when maybe you exercised too
15   much that it hurts?
16   A.    No. I don't exercise to that extreme.
17   Q.    Your allergies, do they give you any
18   medication for your allergies?
19   A.    Yes.
20   Q.    What do they give you?
21   A.    Right now, I usually just get the Benadryl.
22   Sometimes the Afrin, but I haven't had that
23   lately.
24   Q.    What kind of allergies?
25   A.    I guess from the dust in the unit, because

Page 36

1    the unit is unbelievably dusty. I guess that's
2    what causes it.
3    Q.    Does it cause you to sneeze?
4    A.    Yes.
5    Q.    Is that why they give you the Benadryl?
6    A.    Yes.
7    Q.    Has there ever been a situation where it was
8    so dusty that you couldn't breathe?
9    A.    I wouldn't say I couldn't breathe, but I had
10   trouble breathing.
11   Q.    Did you sign up for sick call on those days?
12   A.    No.
13   Q.    Are there particular days that are more
14   dusty than the other?
15   A.    No. It's just pretty dusty all the time.
16   Q.    They have workers that come and clean the
17   unit? Put it this way: They have workers that
18   are supposed to come and clean the unit?
19   A.    Yes.
20   Q.    Okay, I understand that. Some are better
21   than others?
22   A.    Exactly.
23   Q.    Does it vary from wing to wing the level of
24   dust?
25   A.    I've been put on all the capital case wings,

Page 37

1    and they all seem to be pretty bad. The dust is
2    bad.
3    Q.    Do you have any issues with mice?
4    A.    Yes, they have mice.
5    Q.    Generally, when do you see them?
6    A.    At night.
7    Q.    Are they kind of brazen that they just kind
8    of --
9    A.    Yeah.
10   Q.    They just stare right at you?
11   A.    They just come on out.
12   Q.    How about, do you have any issues with
13   insects?
14   A.    Ants.
15   Q.    Ants?
16   A.    Ants real bad.
17   Q.    Do you complain to the officers regarding
18   the ants?
19   A.    Doesn't do any good. They can't do anything
20   about it. They have an exterminator that comes
21   through. But...
22   Q.    So an exterminator comes up once a week, do
23   you know?
24   A.    Maybe once a month.
25   Q.    How about the mice?

10 (Pages 34 - 37)

Page 38

1  A.  What about them?
2  Q.  Do they have someone trying to address the
3  mice?
4  A.  I don't know what they be doing.  Whatever
5  they be doing, it's not working.
6  Q.  Have you asked to put any traps in your
7  cell?
8  A.  No.
9  Q.  Have they offered to put any traps in your
10  cell?
11  A.  No.
12  Q.  Do you have any understanding what life is
13  like in the general prison population?
14  A.  A little.
15  Q.  And would that come from guys that are sent
16  down to the restricted housing unit because of DC
17  time?
18  A.  Yes.  No.  No.  Well, actually, like, from
19  the barber.  The barber comes down, and you talk
20  to the barber, and he comes from the general
21  population.
22  Q.  How often do you usually get your hair cut?
23  A.  Once a month.
24  Q.  Do you still get it once a month?
25  A.  No.

Page 39

1  Q.  You do it yourself?
2  A.  Yes.
3  Q.  They give you razor blades to do that
4  with -- a razor I should say?
5  A.  Yes.  During the shower.
6  Q.  And they give you soap?
7  A.  Pardon me?
8  Q.  You get soap?
9  A.  Yes.
10  Q.  I apologize for being rude there.
11      Does the barber indicate to you
12  there's also a mice problem in general population?
13  A.  Never asked.
14  Q.  How about an ant problem?
15  A.  I don't know.  Didn't ask.
16  Q.  Did you ask, is it hot in the general
17  population like it is down here?
18  A.  No.
19  Q.  How about, is it cold like it is down here?
20  A.  No.
21  Q.  Do you have any family members that
22  communicate with you by letter?
23  A.  Yes.
24  Q.  Do those family members also provide you
25  with some money in your commissary account?

Page 40

1  A.  Yes.
2  Q.  Have you offered -- do you use the exchange
3  system for the magazines and the newspapers?
4  A.  Exchange system?
5  Q.  Yes.  They used to have where you can give
6  them four magazines and they'd give you four
7  magazines back.
8  A.  I'm not aware of that.
9  Q.  Do you have reading material in your cell?
10  A.  Yes.
11  Q.  Are they magazines that you get through the
12  mail?
13  A.  No.
14  Q.  Where do you get the reading material?
15  A.  I get the reading material from, like,
16  lawyers from legal cases and things like that.
17  Q.  Do you do any pleasure reading?
18  A.  No.
19  Q.  When you went to yard, did they ever put you
20  in the big yard down in the unit there?
21      MS. SIGYARTO:  What's the big
22  yard?
23      MR. HENZES:  Well, there's the
24  little yard --
25      MS. SIGYARTO:  So it's something

Page 41

1  other than the cage?
2      MR. HENZES:  Well, there's also
3  an area where they can put two or more people.
4  Sometimes they put one guy out there.
5      MS. SIGYARTO:  And it's referred
6  to as the big yard?
7      MR. HENZES:  Well, it's a big
8  yard down there.
9  BY MR. HENZES:
10  Q.  Actually, there's a basketball court down
11  there, isn't there?
12  A.  Yes.
13  Q.  Did they ever put you in that one?
14  A.  Yes.
15  Q.  Do they give you a basketball?
16  A.  Yes.
17  Q.  Have you ever used it?
18  A.  Yes.
19  Q.  When was the last time you used it?
20  A.  Ten years ago maybe.
21  Q.  Ten years ago?
22  A.  Yes.
23  Q.  And just so we're clear, you stopped going
24  to the yard because you didn't like being strip
25  searched for whatever reason?

11 (Pages 38 - 41)

Page 42

1  A.    Strip searched. Environment overall.
2  Q.    What do you mean by the environment? The
3  way the yard is constructed?
4  A.    The way the yard is constructed. The people
5  that's out there in the yard.
6  Q.    Aren't they the same people that are in the
7  housing unit?
8  A.    Yes. Exactly.
9        MR. HENZES: Mr. Walker, I have
10 nothing further, I appreciate your time, sir.
11       THE WITNESS: No problem.
12       (Deposition was concluded at
13 11:18 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1
2
3
4
5
6        February 28, 2012
7
8
9
10       I hereby certify that the
11 evidence and proceedings are contained fully and
12 accurately in the notes taken by me of the testimony
13 of the within witness who was duly sworn by me, and
14 that this is a correct transcript of the same.
15
16
17
   Linda Beyerle
18 Court Reporter and Notary Public
19
   The foregoing certification does not apply to any
20 reproduction of the same by any means unless under the
   direct control and/or supervision of the certifying
21 reporter.
22
23
24
25

Page 44

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over
5  carefully and make any necessary corrections. You
6  should state the reason in the appropriate space on
7  the errata sheet for any corrections that are made.
8
9        After doing so, please sign the
10 errata sheet and date.
11
12       You are signing same subject to the
13 changes you have noted on the errata sheet, which will
14 be attached to your deposition.
15
16       It is imperative that you return the
17 original errata sheet to the deposing attorney within
18 thirty (30) days of receipt of the deposition
19 transcript by you. If you fail to do so, the
20 deposition transcript may be deemed to be accurate and
21 my be used in court.
22
23
24
25

Page 45

1        - - - - - - -
2        E R R A T A
3        - - - - - - -
4
5  PAGE      LINE          CHANGE
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12 (Pages 42 - 45)

Page 46

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4        I,          , do hereby
 5  certify that I have read the foregoing pages
 6    to   and that the same is a correct transcription
 7  of the answers given by me to the questions therein
 8  propounded, except for the corrections or changes in
 9  form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
13  Date          Signature
14
15
16  Subscribed and sworn to before me this
17      day of
18
19  My commission expires: March 4, 2015
20
21
22
23
24
25
```

13 (Page 46)

# EXHIBIT "2"



# Compressed Transcript of the Testimony of
# FRANCIS JOSEPH FEILD, JR., 3/6/12

**Case:** Walker v. Farnen, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

SHAWN T. WALKER,
                        : CIVIL ACTION
        Plaintiff,      :
                        :
   - vs -               :
                        :
MICHAEL A. FARNEN, et   :
al.,                    :
                        : NO. 07-cv-4977
        Defendants.     :

Oral deposition of FRANCIS JOSEPH
FEILD, JR., taken at State Correctional Institute
of Graterford, 1 Prison Road, Graterford,
Pennsylvania, on Tuesday, March 6, 2012,
beginning at approximately 10:51 a.m., before Laura
Wilson, Professional Court Reporter and Notary
Public.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1600 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

---

**Page 2**

1   APPEARANCES:
2
3   OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP
    BY: DAWN SIGYARTO, ESQUIRE
4   1617 John F. Kennedy Boulevard
    19th Floor
5   Philadelphia, PA 19103
    (215) 665-3000
6   -- Representing the Plaintiff
7
    PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
8   BY: RANDALL HENZES, ESQUIRE
    21 South 12th Street
9   4th Floor
    Philadelphia, PA 19107
10  (215) 560-2138
    -- Representing the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1                    INDEX
2   WITNESS                          PAGE
3   FRANCIS JOSEPH FEILD, JR.
4     By Ms. Sigyarto                  4
5     By Mr. Henzes                   75
6
7                  EXHIBITS
8   NUMBER      DESCRIPTION          PAGE
9     (No exhibits were marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 4**

1           (It is hereby stipulated and agreed
2   by and between counsel for the respective
3   parties that reading, signing, sealing,
4   filing and certification are waived; and
5   that all objections, except as to the form
6   of the question, are reserved to the time
7   of trial.)
8            - - -
9           FRANCIS JOSEPH FEILD, JR., after
10  having been duly sworn was examined and
11  testified as follows:
12           - - -
13           EXAMINATION
14           - - -
15  BY MS. SIGYARTO:
16      Q.  Good morning.
17      A.  Good morning.
18      Q.  My name is Dawn Sigyarto.  And I'm here
19  this morning to ask you a few questions.  I'm
20  defending or representing Shawn Walker in a case
21  that is pending before the Eastern District of
22  Pennsylvania.  Have you been deposed before?
23      A.  I have.
24      Q.  Okay.  And when was the last time that you

---

                                    1  (Pages 1 to 4)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

---

Page 5

1  were deposed?
2      A.  Within the last year.
3      Q.  Okay.  And in what context?
4      A.  One of the inmates -- I think one of the
5  inmates was claiming that we were discriminating
6  against him.
7      Q.  Okay.  I'm going to go over just some
8  general ground rules for today's deposition, so
9  that you and I are on the same page.  Basically,
10 this is a question-and-answer session.  I'm going
11 to ask you a series of questions, and I'm going to
12 request that you provide a response.  You'll note
13 that there's a stenographer here that is keeping a
14 written record of everything that is being said.
15 So, it is important that all of your responses are
16 verbal.  Please don't look at me in a knowing way
17 or use gestures unless you follow up with a verbal
18 response.  Okay?
19     A.  I understand.
20     Q.  Because it is difficult for the court
21 reporter to transcribe when we are both speaking at
22 the same time, if you could wait until I complete
23 my question, even if you can anticipate what I'm
24 going to ask, I request that you do that.  And I'll

---

Page 6

1  try to give you the same courtesy and not
2  interrupt.  Okay?
3      A.  I'll try.
4      Q.  You are under oath, so it is important
5  that you tell the truth.  If I ask you a question,
6  however, and you do not know the answer, it's
7  perfectly acceptable to say you don't know.  Okay?
8      A.  Okay.
9      Q.  What I'm not interested in is guesswork.
10 So, please do not guess.  If at any point you are
11 making an estimation of something, such as time or
12 distance, just let me know that you are estimating.
13 Is that fair?
14     A.  That's fair.
15     Q.  If you don't hear or don't understand a
16 question that I ask, please just let me know and
17 I'll make an attempt to rephrase it in a more
18 understandable way.  Okay?
19     A.  Fair enough.
20     Q.  If you answer a question that I've asked,
21 I will assume that you both heard the question and
22 understood the question.  Is that fair?
23     A.  It is.
24     Q.  Okay.  This is not an endurance test, so

---

Page 7

1  in the event that you would wish to take a break
2  for any reason, just let us know and we certainly
3  are willing to accommodate that.  The only
4  restriction being that if there is a question
5  pending, I'm going to request for you to answer the
6  question and then we will take a break.  All right?
7      A.  Okay.
8      Q.  Are you currently taking any medication or
9  do you have any condition which would impair your
10 ability to respond to my questions accurately and
11 truthfully?
12     A.  No.
13     Q.  Have you had any alcohol or drugs in the
14 last 24 hours?
15     A.  Yes.
16     Q.  Will your consumption of alcohol or drugs
17 prevent you from responding and answering my
18 questions truthfully and accurately?
19     A.  No.
20     Q.  Have you ever been convicted of a crime
21 involving dishonesty, such as fraud or theft?
22     A.  No.
23     Q.  Okay.  Can you please state your full name
24 for the record?

---

Page 8

1      A.  It's Francis Joseph Feild, F-E-I-L-D,
2  Junior.
3      Q.  Have you been known by any other names?
4      A.  Skip.
5      Q.  Any other names?
6      A.  Frank.
7      Q.  Prior to coming to your deposition this
8  morning, did you do anything in preparation?
9      A.  I did.
10     Q.  And what did you do in preparation?
11     A.  I read the 6.5.8 policy.
12     Q.  And what is the 6.5.8 policy?
13     A.  It covers capital case inmates.
14     Q.  And just generally, what with respect to
15 capital case inmates does the policy address?
16     A.  It addresses their general needs and how
17 to deal with them on a daily basis, the kind of
18 privileges that they have and things like that.
19     Q.  Is the 6.5.8 policy published?
20     A.  It is.
21     Q.  Do you know whether it is accessible on
22 the website?
23     A.  It is.
24     Q.  Did you review any other documents other

---

2  (Pages 5 to 8)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

**Page 9**

1  than the 6.5.8 policy?
2     A.  No.
3     Q.  Did you do anything else in preparation
4  for your deposition today, other than reviewing
5  that one -- that single policy?
6     A.  No.
7     Q.  Can you just tell me generally what your
8  educational background is?
9     A.  I have a bachelor's -- BA degree in
10  psychology from Holy Cross College from 1972.
11    Q.  And are you currently working?
12    A.  Yes.
13    Q.  And for whom do you work?
14    A.  I work for the department of corrections,
15  Pennsylvania Department of Corrections.
16    Q.  And in what capacity do you work for the
17  department of corrections?
18    A.  I'm major for unit management.
19    Q.  Major for?
20    A.  Major for unit management at the State
21  Correctional Institution at Graterford, where we
22  are now.
23    Q.  And for what period of time have you held
24  that position?

**Page 10**

1     A.  Since I think September of 1992.
2        MR. HENZES:  Major?
3        THE WITNESS:  Yes.
4        MR. HENZES:  '90?
5        THE WITNESS:  '92 -- no, I'm sorry.
6     I'm sorry.  2002.
7  BY MS. SIGYARTO:
8     Q.  2002.
9        MR. HENZES:  That's better.
10  BY MS. SIGYARTO:
11    Q.  And from 2002 to date, have you worked at
12  Graterford?
13    A.  I have.
14    Q.  Prior to 2002 where did you work?
15    A.  I was at Graterford my whole career.  I
16  was a unit manager prior to being a major, I was a
17  unit manager for about nine years.
18    Q.  In your position -- in your current
19  position as the major for unit management, what are
20  your job responsibilities?
21    A.  I supervise the unit managers of all the
22  housing units.
23    Q.  And how many unit managers are there?
24    A.  We've lost some positions.  I believe

**Page 11**

1  right now I have about ten positions that are
2  filled or need to be filled.
3     Q.  As the major for unit management, are you
4  out in the field, so to speak, in the actual prison
5  or is your position predominantly in an office
6  space?
7     A.  I spend a lot of time in the office but I
8  also spend a lot of time, as do all the
9  administrative staff, walking around the
10  institution and doing inspections.
11    Q.  In addition to overseeing the unit
12  managers, do you have -- are there other job
13  responsibilities that you have?
14    A.  Yes, there are.
15    Q.  And what job responsibilities do you have
16  other than what we've already covered?
17    A.  There's another major, major of the guard,
18  he and I tend to share responsibilities.  We have
19  different days off, so I also oversee the custody
20  force.
21    Q.  What is the custody force?
22    A.  The correctional officers, the captains,
23  and lieutenants, and sergeant, COs.  I'm also a
24  member of one of the program review committees, one

**Page 12**

1  of our program review committees in J unit, the RHU
2  unit, the housing unit that houses the capital
3  cases.
4     Q.  In connection with the restrictive housing
5  unit, how many cells are within that unit?
6     A.  That I don't know offhand.
7     Q.  Are you able to estimate for me?
8        MR. HENZES:  Well, there's two
9     restricting housing units.
10       THE WITNESS:  Eight times thirteen.
11       MS. SIGYARTO:  Okay.
12       MR. HENZES:  That's for J block?
13       THE WITNESS:  J block.
14  BY MS. SIGYARTO:
15    Q.  Is there more than one restricted housing
16  unit at Graterford?
17    A.  There are.  There is another restricted
18  housing unit, L block.  There's also another L5
19  unit, custody level five inmates are in restricted
20  housing.  There's a smaller L5 unit for -- that's
21  called the secure special needs unit, which houses
22  about 13 inmates who have mental illnesses along
23  with behavioral issues.
24    Q.  Is that at capacity at 13 inmates --

3  (Pages 9 to 12)

Walker v. Farnen, et al.                              FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 13

1    A. Yes.
2    Q. -- for the special needs unit?
3    A. Pretty much, yes.
4    Q. Is the special needs unit also referred to
5    as the L5 unit?
6    A. Not by many people, but it is -- that's
7    what it is.
8    Q. Okay.
9    A. We have to run it according to L5 policy.
10   Q. Is there any other restricted housing unit
11   at Graterford that is referred to as the L5 unit
12   other than the special needs inmates?
13   A. No, just J, L, and that SSNU.
14   Q. I'm sorry?
15   A. Just L, J, and that SSNU.
16        MR. HENZES: L means level five,
17   it's a status of an inmate's level of
18   security within the department of
19   corrections. So, five is the most secure.
20   Somebody could be a level two, they would
21   be the least secured. So, when he refers
22   to L5 -- so, you can have an L5 person
23   living on J unit, L unit, or even secure
24   unit.

Page 14

1        MS. SIGYARTO: Okay.
2    BY MS. SIGYARTO:
3    Q. Are the housing conditions generally
4    different between J block, the L5 block and the L5
5    unit for special needs?
6    A. Yes.
7    Q. Okay. Let's talk about the J block. Do
8    you know how many inmates are housed within the J
9    block currently?
10   A. No, not today. I can guess.
11   Q. Are you able to estimate?
12   A. I think it's around 100.
13   Q. And is that at capacity, around that
14   number?
15   A. I believe so, pretty much.
16   Q. Are the units in J block designed for a
17   single inmate?
18   A. Some of them are.
19   Q. So, are there cells within the J block
20   where more than one inmate is housed?
21   A. Yes.
22   Q. Are you able to tell me the dimensions of
23   the single person cells within the J block?
24   A. No, but they would be the same size as the

Page 15

1    other cells.
2    Q. Are the cells within the J block the same
3    dimensions as those in the general population?
4    A. That I couldn't tell you.
5    Q. In terms of those who are housed on the J
6    block, do all of the inmates housed on the J block
7    have a sentence of death?
8    A. No.
9    Q. And what other type of inmate is housed
10   within the J block?
11   A. Inmates that have -- are being housed
12   under disciplinary or administrative custody
13   status.
14   Q. In the event that an inmate is within the
15   J block on a disciplinary or has disciplinary
16   custody status is there a -- like, a maximum
17   duration of time that they can remain on the J
18   block?
19   A. Theoretically, they stay there for as long
20   as they have a disciplinary custody time to serve.
21   If they continue to get misconducts within the
22   unit, once they are housed there, they could
23   theoretically continue to serve their certain DC
24   time.

Page 16

1    Q. Disciplinary and administrative custody,
2    are they different?
3    A. They are.
4    Q. And what is the distinction between the
5    two?
6    A. There are fewer privileges if you are
7    housed under disciplinary status.
8    Q. Such as, what do you lose if you are on
9    disciplinary status?
10   A. You would not have access to normal
11   telephone calls unless PRC approved. PRC is the
12   program review committee. You would not have
13   access to your radio or television or things like
14   that. Your commissary privileges would be
15   restricted.
16   Q. For an inmate who is on J block under a
17   sentence -- under a death sentence, would --
18   assuming that the inmate did not commit some
19   offense under which they are subject to a
20   disciplinary order, would they have the same type
21   of restrictions in terms of the limitation of
22   certain privileges?
23   A. They would have more privileges than other
24   folks in DC or AC status, yes.

4   (Pages 13 to 16)

**Walker v. Farnen, et al.**                                    **FRANCIS JOSEPH FEILD, JR., 3/6/12**

Page 17

1    Q.  Within the J block, are there -- is there
2    more than one wing?
3    A.  Yes.
4    Q.  Are the inmates sectioned off?  So that,
5    for example, there is a row where there are all
6    death row inmates, and then perhaps another section
7    where it is all disciplinary inmates?
8    A.  Yes.  The capital case inmates are
9    separated from the other inmates in the RHU.  I
10   mean, even when they get -- even if they should be
11   serving common and they have certain disciplinary
12   time, they would still be in a capital case wing.
13   Q.  In the event a death row inmate committed
14   some offence whereby they were subject to
15   discipline, would they be removed from their cell
16   to another cell within the J block?
17   A.  They might be.
18   Q.  Would that be standard or it would depend?
19   A.  It would depend.  We have to move them
20   around anyway, periodically.
21   Q.  Are you able to tell me just generally
22   what sort of offenses an inmate would commit in
23   order to put them in the disciplinary unit on J
24   block?

Page 18

1    A.  They would have to get a sanction from the
2    hearing examiner, which would give them
3    disciplinary time, it could be anything, refusing
4    an order, to assault.
5    Q.  And do you know the -- like, the longest
6    length of time for a single offense that someone
7    could be subject to as a disciplinary action?
8    A.  Each specific charge can't -- can only be
9    sanctioned up to 90 days of disciplinary time.  If
10   an event occurs three or five more charges, then
11   the hearing examiner has the authority to impose 90
12   days for each infraction, should she choose to do
13   so.
14   Q.  Are the inmates within the J block
15   distinguished in some matter, in terms of their
16   clothing to separate death row inmates from those
17   that are there for administrative or disciplinary
18   reasons?
19   A.  No, I'm pretty sure they are not.
20   Q.  Within the J block, are the cells
21   uniformed from one to the next?
22   A.  Yes, except for the amount of beds.
23   Q.  So, some have more than one bed?
24   A.  Correct.

Page 19

1    Q.  Are there cells within the J block that
2    can accommodate more than two inmates?
3    A.  No.
4    Q.  In terms of the general population are
5    there cell that can accommodate more than two
6    inmates?
7    A.  No.
8    Q.  You may have answered this already, but
9    what is the capacity of the general population?
10   A.  That's debatable.  Right now, today, I
11   think I remember 3,600.  That changes depending on
12   the population for the entire department.
13   Q.  Do you know how many is the maximum that
14   Graterford can accommodate in general population?
15   A.  I would be guessing, around 3,700.
16   Q.  And the current inmate population in
17   general population, to the best of your estimation,
18   is around 3,800 inmates?
19   A.  That would include the RHUs as well.
20   Q.  Okay.
21   A.  Currently, it's around 3,584, something
22   like that.
23   Q.  And about 100 on the J block?
24   A.  I'm guessing, 100 on J.  Around 144, I

Page 20

1    think, today on L.
2    MR. HENZES:  The captain, she should
3    know.
4    BY MS. SIGYARTO:
5    Q.  Are there --
6    A.  In fact, I have the numbers for today.
7    Today's total population is 3,574.  L block is 175,
8    J block is 92, and SSNU is 11.
9    Q.  Are there distinctions in terms of the
10   conditions between the L block and the J block?
11   A.  No.
12   Q.  How about comparing the J block to the L5
13   unit for special needs inmates, are the cells more
14   or less the same?
15   A.  Yes.
16   Q.  Are there death row inmates housed
17   anywhere other than the J block at Graterford?
18   A.  Yes.
19   Q.  And what -- where else can they be housed?
20   A.  SCI Green.
21   Q.  No, I don't mean other prisons.  I mean,
22   specifically here.
23   A.  In Graterford, do we house death row
24   inmates anywhere in the institution?

5  (Pages 17 to 20)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

| Page 21 | Page 23 |
|---|---|
| 1  Q.  That's right. | 1  lights that are -- that the staff control. |
| 2  A.  No.  I'd have to say, unless -- | 2  Q.  And in terms of the electric that you |
| 3  Q.  Okay. | 3  referenced, are there actual outlets that the |
| 4  A.  -- unless there is a mental illness | 4  inmate has access to? |
| 5  involved, and they need to be placed in a mental | 5  A.  Yes. |
| 6  health unit, which we have a mental health unit | 6  Q.  How about in terms of general population, |
| 7  here. | 7  what are the cells within the general population |
| 8  Q.  Okay.  And that's different than the SMU, | 8  equipped with? |
| 9  L5 special needs unit? | 9  A.  They have -- not concrete, but metal beds, |
| 10  A.  Yes.  I think you meant to say the SSNU, | 10  which we put mattress on.  They also have the |
| 11  because we do have a SMU, that's another -- special | 11  standard in-cell toilets, sink combination.  They |
| 12  management unit, we don't have one here.  But we | 12  have cabinets, metal cabinets that you can see |
| 13  have at other institutions. | 13  through.  Most of them are -- in general |
| 14  Q.  Okay. | 14  population, are attached to the wall.  And I think |
| 15  A.  But the mental health unit is -- an inmate | 15  a lot of them have desks in -- the newer units have |
| 16  would have to be committed there under the mental | 16  desks that are part of the wall, setting off the |
| 17  health laws.  And I don't think -- the last inmate | 17  wall like they do in J block. |
| 18  we had, Ronny Logan, he's not here.  I'm not sure, | 18  Q.  For the general population, does the sink |
| 19  he may be up at the FDC in Wayne. | 19  also have hot and cold water? |
| 20  Q.  Okay. | 20  A.  Yes. |
| 21  MR. HENZES:  You have one in your | 21  Q.  And do inmates within the general |
| 22  infirmary, too. | 22  population have electrical outlets that they can |
| 23  THE WITNESS:  We do? | 23  access? |
| 24  MR. HENZES:  Death row infirmary, | 24  A.  Yes, and cable outlets. |

| Page 22 | Page 24 |
|---|---|
| 1  look it up. | 1  Q.  Are there cable outlets within the J |
| 2  THE WITNESS:  Okay, okay. | 2  block? |
| 3  MR. HENZES:  You know what I'm | 3  A.  Yes. |
| 4  talking about? | 4  Q.  How about in terms of lighting within the |
| 5  THE WITNESS:  I stand corrected.  I | 5  general population, do they have lighting? |
| 6  think they get that sick in hospice. | 6  A.  Same thing, yeah.  They have wall lights |
| 7  MR. HENZES:  Well, the other guy | 7  that they control.  And they can also have desk |
| 8  came back. | 8  lamps. |
| 9  BY MS. SIGYARTO: | 9  Q.  In terms of personal belongings that an |
| 10  Q.  In terms of the cells within the J block, | 10  inmate can have, what is an inmate permitted to |
| 11  what furnishings are in the cell -- provided in the | 11  have within the J block, i.e., can they have a TV, |
| 12  cell? | 12  a radio? |
| 13  A.  We have a concrete slab bed that we put a | 13  A.  A capital case inmate? |
| 14  mattress, I think concrete table that juts out. | 14  Q.  Yes. |
| 15  There's also a portable chair.  And there's, you | 15  A.  Yes, they can have a TV and radio. |
| 16  know, the toilets, sink, combination.  Lighting, | 16  Q.  A fan? |
| 17  electricity. | 17  A.  Yes. |
| 18  Q.  With the sink, is there hot and cold | 18  Q.  How about if they want to smoke |
| 19  water? | 19  cigarettes, can they have cigarette? |
| 20  A.  Yes. | 20  A.  No.  There's no smoking in the L5 units. |
| 21  Q.  For the lighting within the cells within | 21  There's no smoking in any of the units, but other |
| 22  the J block, do the inmates have the ability to | 22  inmates can purchase tobacco and smoke in the yard. |
| 23  turn on and off the lights? | 23  L5 unit inmates cannot purchase tobacco. |
| 24  A.  They do, but I believe there is night | 24  Q.  Do capital case inmates have access to |

6  (Pages 21 to 24)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 25

1  like a commissary, where they can purchase things?
2      A.  They have a capital case commissary list
3  that they can purchase off of.
4      Q.  And other than cigarettes, can you think
5  of other things that are available to the general
6  population that are not purchasable by those within
7  the J block?
8      A.  I believe boots are not permitted.
9      Q.  Boots?
10     A.  Boots.  And those are the only two items
11 that I can think of that differentiate the two.
12     Q.  How about razors?  Can you buy a razor to
13 shave, for example?
14     A.  Razors have to be purchased on a
15 one-to-one basis.  When they go to the commissary
16 in general population, they turn in the old razor
17 and get the new razor.  With L5 inmates, I'm not
18 sure.  I know we restrict razors in the L5 unit.
19 But I'm not sure -- I'm pretty sure -- I'm not sure
20 but capital case inmates may have to ask for a
21 razor to use and not keep it in their cell.  But
22 again, I'm not sure about that.
23     Q.  Does the commissary sell food items?
24     A.  They do.

Page 26

1      Q.  And do capital case inmates have access to
2  food items in the commissary?
3      A.  Yes, they do.
4      Q.  In terms of the general population, are
5  those within -- housed within the general
6  population, are they allowed to have a TV?
7      A.  Yes.
8      Q.  A radio?
9      A.  Yes.
10     Q.  A fan?
11     A.  Yes.
12     Q.  Are there personal belongings that are
13 permitted within the general population that are
14 prohibited from the J block, that you can think of,
15 other than cigarettes?
16     A.  Anything that's permitted to capital case
17 cell inmates has to be scrutinized for security
18 reasons.  So, for example, I was talking to the
19 inmate manager about their access to art supplies,
20 he doesn't permit them to have led pencils.  So, in
21 a capital case inmate when you are requesting
22 certain things, those requests would be scrutinized
23 individually and determined whether or not
24 something is safe to bring into the environment.

Page 27

1      Q.  Are those within the J block allowed to
2  have any computer-type device?
3      A.  No.
4      Q.  Are they permitted within the general
5  population?
6      A.  No.
7      Q.  Are those within the J block permitted to
8  subscribe to a cable service for TV?
9      A.  Yes.  There's one cable service for the
10 institution.  They can purchase cable, if they have
11 the funds to do so.
12     Q.  Are the channels available to those on the
13 J block different from what's available to those on
14 general population?
15     A.  No, they are the same channels.
16     Q.  Are those within the J block permitted to
17 order things, such as subscribe to magazines and
18 have them delivered?
19     A.  Yes.
20     Q.  Is that permitted within the general
21 population as well?
22     A.  Yes.  And subject to the same scrutiny.
23     Q.  Do those within the J block have access to
24 a library?

Page 28

1      A.  They do.  There is a mini law library
2  within the unit itself.
3      Q.  And do you know the procedure if one of
4  the inmates wants to utilize the law library?
5      A.  The two to ten shift lieutenant maintains
6  a log.  Capital case inmates are able to request to
7  use the library and their -- the log is kept for
8  who has went.
9      Q.  Are there -- If an inmate signs up to use
10 a library, is there a specified time allotment that
11 they have?
12     A.  Yes.
13     Q.  And what is the maximum time that they can
14 spend in the library on a single visit?
15     A.  That I'm not sure.  I think it's a couple
16 of hours, but I'm not sure.
17     Q.  For those on -- the capital case unit, the
18 death row inmates, how many times in a week are
19 they permitted to go to the library?
20     A.  That would depend on how many other people
21 want to use it as well.
22     Q.  And in terms of transporting a death row
23 inmate from their cell to the library, what would
24 be the procedure for that?

7 (Pages 25 to 28)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

**Page 29**

1     A. The officer would come to his cell and
2  cuff him and take him to the library.
3     Q. Would he be strip searched?
4     A. I believe so, I'm not sure.
5     Q. And in the library itself, would he remain
6  cuffed and shackled?
7     A. No, I don't think -- I think the cuffs are
8  taken off. Yeah, the cuffs are taken off, like if
9  he was taken to the yard.
10     Q. At any given time how many inmates are
11  permitted to use the library within the J block?
12     A. Capital case inmates, two of them, if they
13  agree to go together they are permitted, so long as
14  they are phase one,
15     Q. What does that mean, phase one?
16     A. Phase one is -- phase two is when you get
17  the execution warrant signed by the governor.
18     Q. Okay.
19     A. At which point he's allowed those
20  privileges, but he can only go by himself. Most of
21  the inmates are phase one most of the time, if they
22  want to couple up with a certain other capital case
23  inmate, he can request that.
24     Q. Within the law library on the J block, are

**Page 30**

1  there law books or are there computers?
2     A. I believe there's a computer as well as
3  law books.
4     Q. Are the inmates permitted to check out the
5  books?
6     A. No, I don't think they are. One of the
7  things they have to make sure is when they are
8  leaving, they don't take any pages with them.
9     Q. And when a death row inmate, after their
10  time in the library, when they return to their
11  cell, are they strip searched?
12     A. They should be, yes.
13     Q. In terms of the general population, do
14  general population inmates also have a library?
15     A. They do.
16     Q. And can an inmate within the general
17  population access the library whenever they wish or
18  are there certain hours?
19     A. There's certain hours that it is open.
20  And they need a pass to go down.
21     Q. Do you know how many general population
22  inmates are permitted within the general population
23  library at any given time?
24     A. I don't, but it is a big library.

**Page 31**

1     Q. How does a general population inmate go
2  about getting a pass for the library?
3     A. They can send a request to the librarian.
4  And if they have something from the courts,
5  indicating it is an emergency, they can show it to
6  the unit manager, and they can call the librarian
7  to get it scheduled.
8     Q. Do inmates within the J block have access
9  to any kind of educational course?
10     A. Yes.
11     Q. And what is available to those on the J
12  block?
13     A. They would be able to get into GED
14  classes, ABE classes, tutoring through the
15  principal. They would request their services and
16  the school principal would make arrangements. They
17  could also request postsecondary education.
18     Q. And this is for death row inmates?
19     A. Yes.
20     Q. Are there any distinctions between the
21  educational course opportunities available to death
22  row inmates versus those within the general
23  population?
24     A. Well, I'm not sure exactly how to make

**Page 32**

1  that -- how to respond to that. I guess you would
2  have to compare -- there's classroom work that --
3  classroom settings that general population can go
4  into and capital cases can't, It's all in cell.
5  So, if you want to say that that's a distinction,
6  well maybe it is. But I'm not sure -- I guess -- I
7  would imagine that the courses that are being given
8  through the teachers and the principal would be
9  similar -- have similar content.
10     Q. If a death row -- when a death row inmate
11  enrolls in some educational course, is the course
12  conducted within their cell, or do they transport
13  in similar to take the class?
14     A. Control within the cell.
15     Q. Do death row inmates have access to
16  religious services?
17     A. They have access to religious tapes. I'm
18  not sure how many actually take advantage of that,
19  but that's part of the policy.
20     Q. In the general population, are there
21  religious services that are held for inmates?
22     A. Yes.
23     Q. And do those within the general population
24  also have access to the tapes that you referenced?

8  (Pages 29 to 32)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 33

1    A.  I'm not sure what kind of tape library
2  they would need to have, if they have the actual
3  group interactions.
4    Q.  Within the J block, is there any outside
5  ventilation coming into the cells, the individual
6  cells?
7    A.  I know there's a ventilation system.  And
8  I would just assume that, yes, the outside air is
9  being brought in and being filter.
10   Q.  Are there windows in the J block?
11   A.  There are.
12   Q.  And are there windows in the cells?
13   A.  No.
14   Q.  The windows that are within the J block,
15 do they open?
16   A.  No, it's a closed unit.
17   Q.  In terms of the venting system, is that
18 through which heat and/or cooling is provided?
19   A.  Yes.
20   Q.  Is there air conditioning within the J
21 block?
22   A.  Yes.
23   Q.  Does the system work?
24   A.  Usually.  Most things in an old

Page 34

1  institution usually work and when they don't, we
2  fix them.  It's an ongoing process.
3    Q.  In terms of the heating, is there a
4  specified date of the year that the heat is turned
5  on or does the heat come on based on the
6  temperature of the exterior of the building?
7    A.  Another difficult question to answer.  The
8  maintenance manager would be able to give you
9  specific dates, I'm sure there are.  It comes to my
10 attention when inmates start complaining about it's
11 too hot or too cold, depending on the season.  I
12 know our heating system takes -- once you start the
13 system up, it takes a while for everything to get
14 heated up.  And it's also regulated by the outside
15 temperature and the inner temperature.  So, the
16 system is trying to -- the economics on how it
17 works.  But in the beginning of the fall and
18 winter, when the heat first comes on, we have to
19 use radiator keys to bleed all the radiators and
20 all the -- there's radiators in all the cells of
21 the general population, the old site anyway.
22   So, it takes a while.  It takes
23 three or four weeks.  And we have to tell the
24 inmates, you have to be patient, it's coming on.

Page 35

1  And after a while you stop hearing the complaints
2  and everything is fine.  And then we reach a point
3  in the year like this and it will start to get warm
4  again.  So -- but, yes, to answer your question,
5  there are days I assume that process starts, but
6  it's not like in your house when you turn on the
7  heat and it warms up in five minutes.
8    Q.  Are the heating -- the type of heating
9  that you use in the J block, is it different from
10 what is used in general population?
11   A.  Yes.
12   Q.  Okay.  How is it different?
13   A.  Well, it's not a radiator heat.  It's -- I
14 believe, the heating and air conditioning elements
15 are on the roof.  That's usually where the
16 maintenance people go when they are fixing it and
17 trying to repair things.
18   Q.  So, within the J block there are not
19 individual radiators within the cells?
20   A.  Correct.  The newer construction --
21 there's many phases in the institution itself, the
22 newer construction has heating similar to what's on
23 J block.
24   Q.  The newer structure?

Page 36

1    A.  Yes.
2    Q.  Okay.
3    A.  Well, with the exception -- well, I have
4  to correct that, too.  Because the new side doesn't
5  have air conditioning, it is an exchange of air
6  only.  The new side is F, G, H, and I blocks, the
7  smaller units.
8    Q.  Do the inmates in the J block have any way
9  to control the temperature within their cell?
10   A.  No.
11   Q.  How about in terms of general population,
12 do they have any way to control the temperature?
13   A.  No.
14   Q.  Is there air conditioning within the
15 general population units?
16   A.  No.  Except for the infirmary, which is
17 over the MHU, SNU -- I'm sorry.  The MHU, SSNU, and
18 we now have a combination POC cell YAO unit, young
19 adult offenders, POC cells.  So, those three --
20 those three units are all housed in the same area.
21 They get the air conditioning that the infirmary
22 has.
23   Q.  What does POC stand for?
24   A.  Infirmary cells.  Single inmates infirmary

9  (Pages 33 to 36)

Walker v. Farnen, et al.                          FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 37

1  cells.
2      Q.  In terms of the death row inmates, how are
3  showering dealt with?  How often can they take a
4  shower?
5      A.  The showers are run daily.  And I assume
6  they all have opportunity, if they want.
7      Q.  Every day?
8      A.  I assume, but I'm not sure about that.
9      Q.  And in the event a death row inmate opts
10  to utilize the shower, what is the procedure for
11  taking them?
12      A.  The officer exercise the same security
13  measures as they would whenever they take an inmate
14  out of the cell.
15      Q.  Does that include a strip search exiting
16  their cell, and when they are finished with their
17  shower, they are strip searched a second time?
18      A.  I believe so.
19      Q.  When a death row inmate is showering, are
20  their handcuffs and shackles removed?
21      A.  I believe they are, yes.
22      Q.  And do they have control over the water
23  temperature and the water stream, or does someone
24  else shower them?

Page 38

1      A.  No, they have — the controls are inside
2  the shower.
3      Q.  Is there a certain amount of time that a
4  death row inmate is allotted to utilize a shower?
5      A.  I can't tell for sure.  I'm sure they must
6  have some kind of system set up for that.
7      Q.  And are there amenities within the shower,
8  like soap?
9      A.  Soap is available, yeah.  If they need it,
10  there are bars that are stacked up outside the
11  shower.
12      Q.  Do the death row inmates use the same
13  shower facilities as those used by the general
14  population?
15      A.  Same type?
16      Q.  Same type.
17      A.  Yes.  Except that there are individual
18  shower heads.  In the general population, the new
19  side, has individuals back to back.  But the J
20  block, they are actually enclosed.  And the old
21  side of the general population, there are multiple
22  shower heads that they can use.
23      Q.  Like a row?
24      A.  Right.  Like, two rows of each shower.

Page 39

1  And four rooms on the bridge.
2      Q.  I'm sorry.  For general population, are
3  the inmates permitted to use the showers every day,
4  if they desired?
5      A.  If they can, yeah.
6      Q.  And are they opened all day long?
7      A.  No, they are not.  The unit manager
8  determines when the shower schedule — what the
9  shower schedule is going to be when they are
10  accessible.  But they also make — take into
11  account inmates that are coming back from jobs in
12  which they are filthy and dirty, and then give
13  those guys a chance to shower.
14      Q.  For the death row inmates, is showering
15  restricted to a certain time of day?
16      A.  They have schedules, too.
17      Q.  Is more than one death row inmate
18  permitted to go to the shower at the same time?
19      A.  Not in the same shower.
20      Q.  Well, yes, but do they send them —
21      A.  I believe so.  If there's a shower at the
22  end of each row of cells, 13 cells and then a
23  shower, back to back, another 13 cells and a
24  shower.

Page 40

1      Q.  When an inmate from death row is taken to
2  the shower, are they guarded by two men or two
3  guards?
4      A.  No.  They are — each shower is visible
5  from the control bubble.  There's a central control
6  bubble and then circular wheel design of cell rows.
7  And the shower are in direct view from the officers
8  inside the control bubble.
9      Q.  And when an inmate from the death row area
10  is inside the shower, is it locked so they can't
11  exit?
12      A.  Yes.
13      Q.  How about in terms of the grooming of
14  inmates, haircuts; are haircut accommodations
15  provided for those on death row?
16      A.  Yes.
17      Q.  And how often?
18      A.  That I couldn't tell you.
19      Q.  How about shaving?
20      A.  They would do that themselves.
21      Q.  In the general population is there a
22  barber?
23      A.  There is, there is a barbershop.
24      Q.  And are general population inmates

10  (Pages 37 to 40)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 41

1   permitted to go at their leisure, or whenever the
2   shop is open?
3       A.   They are allowed to go -- I think it's
4   once every 30 days they are permitted to cut, which
5   they keep track of.  There's two barbershops,
6   there's one for the old side and there's -- the new
7   side is kept semi separated from the old side and
8   they have a barber that goes down there every day.
9       Q.   Between the new and the old side, are
10  general population inmates whose cell is on the old
11  side, are they able to navigate to the new side to
12  use --
13      A.   No.
14      Q.   Okay.  In terms of life on the J block, is
15  there a certain schedule that is kept, like they
16  get up at a certain time, they do -- not role
17  call -- but counting a specified time?
18      A.   Sure.
19      Q.   And do you know the schedule?
20      A.   Offhand, no.
21      Q.   Do you know generally what takes place
22  within the J block on a regular day?
23      A.   Well, we count them.  We wake them up and
24  count them and start showers and yards.  I couldn't

Page 42

1   give you the exact times that all that happens.
2   I'm not there on a daily basis to see it all
3   happen.
4       Q.   Okay.
5       A.   I just know it does.
6       Q.   In terms of the counting of the inmates
7   within the death row area, does that occur one time
8   each day or more than once?
9       A.   More than once.
10      Q.   And how many times a day does it typically
11  occur?
12      A.   That would be the same time as all the
13  other inmates are counted.
14      Q.   When on death row, the inmates are
15  counted, do they have to rise from their bed or
16  their chair and stand at the bar, or what is the
17  procedure?
18      A.   For standing counts, they are supposed to
19  be standing at their bar.  At the entrance of their
20  cell, by the bars.
21      Q.   Are the lights -- the over all lights that
22  the inmates don't have control over, do those come
23  on at a certain time?
24      A.   That I couldn't tell you.  I would assume

Page 43

1   that they would, for night lights.
2       Q.   And their eating times, breakfast, lunch,
3   dinner, are those at specified times --
4       A.   Yes.
5       Q.   -- for general population -- not general
6   population, death row?
7       A.   I would assume it would be the same as
8   everybody in the unit.  The same as everybody in
9   the institution.
10      Q.   Okay.  What times are breakfast, lunch,
11  and dinner?
12      A.   I'm guessing six o'clock.
13      Q.   A.m.?
14      A.   Yeah.  Around 10:30, eleven o'clock for
15  lunch.  And around five o'clock for supper.
16      Q.   So, with a breakfast time at 6:00 a.m.,
17  what time generally are the death row inmates
18  expected to rise out of their bed for role call?
19      A.   Well, let me go back.  It's six o'clock is
20  the first standing count, and then they start
21  feeding breakfast after that.  Now, they also have
22  to wait for their food to be delivered.  So,
23  whenever their food gets there, I guess, is when
24  they are serving it.

Page 44

1       Q.   And for death row inmates, they eat within
2   their cell?
3       A.   Yes.
4       Q.   Do they get choices on what food they are
5   presented with?  They fill out a card and say I
6   want this?
7       A.   No one does.  They get a tray and these
8   trays have partitions in it, and so the culinary
9   staff fill up the trays, they put a top on the
10  tray, put them in a Cambro, the Cambro is brought
11  out of the truck.  And then the officers distribute
12  those trays.  They are all the same.
13      Q.   And in the general population, I'm
14  presuming there's a cafeteria?
15      A.   Yes.  There are dining rooms for every
16  unit.
17      Q.   And when the general population inmates go
18  to the cafeteria, can they choose what they want?
19      A.   No.  We thought about doing that at times,
20  but it has not worked out.
21      Q.   If they are very hungry, can they return
22  to get another helping in the general population?
23      A.   I'd have to say no.  We click their
24  tickets.

11  (Pages 41 to 44)

Walker v. Farnen, et al.                          FRANCIS JOSEPH FEILD, JR., 3/6/12

**Page 45**

1    Q.  So, for general population, they get like
2  a lunch chip?
3    A.  We just started instituting the whole
4  department, we have meal cards that are good for a
5  week.  They go from Sunday to Saturday night
6  dinner, and each time an inmate gets their meal,
7  they punch their cards.  Now, some of the
8  institute -- not every area of the institution has
9  to do that, I don't think.  They don't have meal
10  cards for the RHUs or the E block, which has a high
11  turnover population or A block, which is another
12  section that's high turnover, but everybody else
13  does.  So, we make sure they only get one meal.
14    Q.  Are -- between meal times, are there snack
15  time for the general population?
16    A.  Snack time, whenever you want to eat any
17  commissary snacks that you have in your area.
18    Q.  Okay.
19    A.  And also, general population can take a
20  piece of fruit out of the dining hall with you, if
21  you wish.
22    Q.  Is that same privilege available to those
23  on death row, if they want a piece of fruit?
24    A.  They can keep their piece of fruit in

**Page 46**

1  their cell or put it back on the tray, if they
2  want.
3    Q.  For those housed within J block, the death
4  row inmates area, are they permitted to exit their
5  cells?  I mean, if they go to the library, they can
6  exit their cells, any other reasons they can exit
7  their cell?
8    A.  If they have a job, they can exit their
9  cell.
10    Q.  For those within the J block, they can
11  exit their cells?
12    A.  Capital cases can have jobs of cleaning
13  the wings, if they wish.  Some inmates like to get
14  out of the cell and work, other inmates choose to
15  stay in their cells and not work.
16    Q.  Are there other job opportunities other
17  than cleaning the wing?
18    A.  Their own wing, no.
19    Q.  For those within general population, are
20  there job opportunities?
21    A.  Yes.
22    Q.  And what job opportunities are available
23  for those within the general population?
24    A.  Block work.

**Page 47**

1    Q.  What is that?
2    A.  Block worker is a janitor in the housing
3  unit.
4    Q.  So, that would be similar?
5    A.  Exactly.  That's the only similar job that
6  they could have.  They could also work in the
7  kitchen.
8    Q.  The barbershop?
9    A.  And the barbershop.  Well, if they are in
10  barber program, that's -- that's a training
11  program, so that's a little bit different.  There's
12  also culinary art school, there's also inmates
13  there.  They are working there but they are also
14  students there.  And we have factory jobs, they
15  make clothing.
16    Q.  Is that on site or are they transported
17  somewhere?
18    A.  No, it's all within the unit -- it's all
19  within the institution.  We have correctional
20  industry shops that are on the other side of the
21  main corridor, opposite the housing units, clothing
22  shop, hosiery shop.
23    Q.  Are there goods that are --
24    A.  Shoe shop.

**Page 48**

1    Q.  -- made available only to inmates at
2  Graterford, or are they actually sold to the
3  general public?
4    A.  It's correctional industries, they -- we
5  don't make anything for the general public.  But
6  correctional industries can manufacture goods that
7  are used by the correctional inmates only.  We are
8  not permitted to compete with labor units.
9    Q.  How about the laundry, can they work in
10  the laundry?
11    A.  Most jobs have custody level that you have
12  to achieve in order to get that job.  Block
13  workers, you can be custody level four, which is
14  the lowest custody level for an inmate in general
15  population.  If you think of level five and they
16  have a lot less freedom.  Level four is the next
17  one where we are keeping an eye on you, and we
18  don't want you to have access to knives in the
19  kitchen or the better paying jobs in the
20  correctional industry.
21    Q.  For those within the capital case unit
22  that work cleaning the wing, are they compensated
23  for their work?
24    A.  I'm not sure.

12  (Pages 45 to 48)

Walker v. Farnen, et al.                                          FRANCIS JOSEPH FEILD, JR., 3/6/12

## Page 49

1  Q.  For general population, for those that are
2  employed in some capacity within the institution
3  itself, are they compensated?
4  A.  Yes.
5  Q.  Does it vary depending on what their work
6  assignment is?
7  A.  Yes.  And most jobs start out at $0.19 an
8  hour, and then it differs depending on the type of
9  work.
10  Q.  Okay.  So, we were talking about different
11  ways in which a capital case unit inmate is
12  permitted to exit their cell.  We talked about
13  going to the library, the shower, and now potential
14  work opportunity.  Are there other avenues, which
15  an inmate can get out of their cell in the death
16  row section?
17  A.  Get out of their cell?
18  Q.  Like, exercise?
19  A.  Sure, yard.
20  Q.  How often is a death row inmate permitted
21  to utilize the yard?
22  A.  Two hours a day, five days a week.
23  Q.  And when you say "the yard," what does
24  that mean?

## Page 50

1  A.  Outside enclosed areas, where they can
2  bring handballs or tennis balls or basketball or
3  games.  They're fenced in individual yards or
4  bigger yards for things like baseball and handball.
5  And they are in-between the housing -- the cell
6  blocks.
7  Q.  Okay.  For death row inmates, can more
8  than one inmate go to the yard at the same time?
9  A.  Yeah.  They can all go at the same time,
10  they may not all be in the same area, there are
11  different cages.  There are individual cages and
12  group cages.
13  Q.  What if they wanted to, say, play a game
14  of handball, could they coordinate and get all ten
15  people in the same yard?
16  A.  Not ten people, no.  I think the most you
17  can have in the yard at the same time is two.
18  Again, I'm guessing.  But it would make sense based
19  on the restrictions of the law library.
20  Q.  And for these outside enclosed structures,
21  do you know how large they are?
22  A.  Again, it would be a guess.  Maybe
23  six-by-ten feet, something like that, for the
24  individuals.  And the bigger ones, maybe 10-by-20,

## Page 51

1  Q.  Are there any that have like a basketball
2  court?
3  A.  I believe there's a basketball court.
4  Q.  And the death row inmates can access the
5  basketball court?
6  A.  They should.  I'm pretty sure they are
7  able to access any of those.  I spoke to the unit
8  manager this morning, he did say they had a
9  basketball.
10  Q.  A basketball that they could use?
11  A.  Yes.
12  Q.  How about in terms of general population
13  inmates, do they have access to a yard where they
14  can play basketball or baseball?
15  A.  Yes.
16  Q.  And --
17  A.  Structured activities and non-structured
18  activities.  We have a huge main yard, which the
19  outer wall is divided into handball courts and the
20  very back of the main yard is a big weightlifting
21  section.  There's also volleyball, there's a
22  baseball field, baseball diamond, there's football,
23  there's also a football field utilizing the same
24  space.

## Page 52

1  Q.  Are there scheduled games, like there's
2  teams and leagues within the general population?
3  A.  Yes.  Yeah, the activities department
4  monitors all of that, schedules it, and sets it all
5  up.
6  Q.  The death row inmates are not permitted to
7  participate in those --
8  A.  No.
9  Q.  -- teams?
10  A.  No.
11  Q.  Are the death row inmates given like
12  different clothes that they can wear when they are
13  outside when they're, you know, playing handball or
14  basketball?
15  A.  They have access to the same cocoa brown
16  sweat suits that the other inmates do.  And I
17  believe they can have shorts, too, cocoa brown
18  shorts.
19  Q.  Are there other activities which would
20  enable a death row inmate to exit their cell other
21  than the ones that what we talked about?
22  A.  For visits.
23  Q.  For visits.  How many times in one month
24  can a death row inmate receive a visitor?

13  (Pages  49  to  52)

Walker v. Farnen, et al.                    FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 53

1    A.  I believe it is one per week.
2    Q.  And how long can the visit be?
3    A.  It's supposed to be for two hours, unless
4  things get crowded.
5    Q.  And in terms of the accommodations for
6  that visit, where is the inmate placed?
7    A.  There are two areas we use for capital
8  case inmates.  One is a separate building, which
9  is -- there's an officer in the building, there
10  are -- I think there are about five different
11  visiting cubicles.  The visitor would be brought in
12  first and locked in their section, and the inmate
13  is brought in and they get locked in their section,
14  and talk to each other through the screen.
15    Q.  And have a phone receiver?
16    A.  I'm not sure if it is a phone or not.
17  It's been a few years since I've been in there.
18    Q.  But the inmate for death row is separated
19  by the reinforced glass?
20    A.  Yes.
21    Q.  There's no contact?
22    A.  Right.  And it's the same set up that they
23  have upstairs.  There's a handicap visiting are
24  that also does overflow for the capital cases.

Page 54

1    Q.  Are there certain individuals that are
2  prohibited from visiting a death row inmate?
3    A.  Well, any visitor would have to be on
4  their approved visiting list.  So, if anyone they
5  wanted to have on there, they would submit the name
6  and it would be approved or not.
7    Q.  Do you know the process for approving
8  someone to be on the list?
9    A.  Or disapproving them, no.
10    Q.  How about for general population, in any
11  given week how many visits are they permitted?
12    A.  One per Sunday of the month.
13    Q.  I'm sorry?
14    A.  One per each Sunday of the month.
15    Q.  So, same number of visits?
16    A.  Basically the same.
17    Q.  But only on Sunday?
18    A.  No, no.  If you have five Sundays, you get
19  five visits.  That's all.
20    Q.  Oh, I understand.  Okay.  And how long are
21  the visits for the general population inmates
22  permitted to be?
23    A.  If there's no overcrowding, it can run the
24  length of the time of the visit -- visiting hours.

Page 55

1    Q.  Oh, so it could be -- what are the
2  visiting hours?
3    A.  There's evening visits on Thursday,
4  Friday, Saturday, and Sunday.  Morning visits, I
5  think, it's eight to three.  If they arrive after
6  11, they have to wait between 11 to 1, they don't
7  have access.  But if they get there before then
8  they should have acces and they can stay until
9  three o'clock.
10    Q.  And the inmate could --
11    A.  And the evening is six o'clock on.
12    Q.  And the inmate could bypass lunch and stay
13  with their visitors?
14    A.  If they wish.
15    Q.  And those visits, what sort of facility
16  are they conducted in, like a big conference room?
17    A.  Big open room with a raised desk platform
18  and officers seated throughout the room.
19    Q.  And the -- I mean, of course no
20  inappropriate contact, but are the general
21  population inmates permitted to, you know, touch --
22    A.  Contact?
23    Q.  -- their visitor?
24    A.  Yes, they are allowed to have contact

Page 56

1  visits, as long as it is not inappropriate, which
2  we have to monitor.
3    Q.  And are there certain individuals who are
4  not permitted to appear as visitors for those
5  within the general population?
6    A.  They have to have an approved visiting
7  list.  And some inmates are not permitted minors,
8  depending on the events that they have.  Other
9  inmates, if they want minors on their visiting
10  list, they have to have permission from the parent
11  or guardian.  So, there's procedures in place for
12  that.
13    Q.  Okay.  Are there other activities or
14  privileges that would enable a death row inmate to
15  exit their cell?
16    A.  To see the program review committee.
17    Q.  What is the program review committee?
18    A.  PRC is made up of deputy -- it's
19  adminstrative staff.  Our PRC on J block is
20  myself, the major, plus deputy for facility
21  management, plus a CCPM, a correctional
22  classification program manager; those three along
23  with unit staff may be present.  And the inmates
24  are brought in to the room and they have an

14  (Pages 53 to 56)

Walker v. Farnen, et al.                          FRANCIS JOSEPH FEILD, JR., 3/6/12

**Page 57**

1  opportunity to discuss their concerns or problems
2  or anything. And if -- capital case inmates are
3  scheduled every 90 days, if they refuse to come to
4  see the PRC, in six months we will go to their
5  cells just to see them and ask if they are all
6  right.
7      Q.  Is there a similar process for those
8  within the general population?
9      A.  Well, I think if they get a misconduct
10  they go to RHU or if are in administrative custody,
11  yes, there is a program review committee -- there
12  is a program review committee for each level five
13  housing.
14      Q.  So, those that aren't level five, level
15  four and below they don't have an automatic PRC?
16      A.  There's no PRC for them.
17      Q.  Okay.
18      A.  No, they have unit staff they can go to.
19          MR. HENZES:  Level four and below
20      inmates wouldn't be in the restricting
21      housing unit. It's only a process for
22      people who restricted housing unit.
23  BY MS. SIGYARTO:
24      Q.  For the inmates on death row, are they

**Page 58**

1  moved from a cell on any scheduled, like, rotation?
2      A.  Yes.
3      Q.  And how often does that occur?
4      A.  I'm not sure. I think it is 90 days, 60
5  to 90 days.
6      Q.  And are the units -- are the cells within
7  the restricted housing unit, are they cleaned on
8  any routine basis?
9      A.  The inmates have access to cleaning
10  materials, they do it. They have access to that
11  weekly.
12      Q.  So, the inmates are responsible for
13  cleaning their own cell?
14      A.  I believe so.
15      Q.  Is there any, like, person other than the
16  inmate that would go in and cleanse the cell?
17      A.  I can't think of any reason why. Unless
18  they had -- well, if the inmate was leaving the
19  unit for some reason and somebody had to clean the
20  cell up. Once his property is out of there, maybe
21  one of the janitors would be cleaning it, I
22  imagine.
23      Q.  When the inmates on death row are rotated
24  on that every 90-day rotation, is the cell that

**Page 59**

1  they are placed in, is it cleaned? Or they moved
2  into it and is responsible for cleaning it?
3      A.  I'm not sure, but I would imagine they
4  would come in and have to clean it.
5      Q.  Who would have to clean it?
6      A.  The person moving in.
7      Q.  For general population, is there a -- some
8  outside service or inmates who are working within
9  the prison, do they come through and clean the
10  cells?
11      A.  Can you repeat that? General population?
12      Q.  Yes. General population, are their cells
13  cleaned?
14      A.  They clean their own cells.
15      Q.  Is there anyone other than the inmates
16  themselves that clean in the general population?
17      A.  Only for special cases. We have some
18  special needs units where we keep extra clothing on
19  hand and everything else. So -- yeah, but inmates
20  are encouraged to maintain their own cleanliness
21  standard.
22      Q.  And there on the death row section, there
23  are -- they have access to supplies to perform the
24  cleaning?

**Page 60**

1      A.  I'm pretty sure they do.
2      Q.  And what do they have access to?
3      A.  Spray bottles, brushes.
4      Q.  Are investigative searches of the cells of
5  those on death row performed on any scheduled
6  basis?
7      A.  I'm not sure about that.
8      Q.  Are the inmates on --
9      A.  I'm sorry, I think every cell is -- does
10  have -- we keep track of all the cells that, you
11  know, we check. I think there is a schedule for
12  all of them to be checked.
13      Q.  And are those within the J block subject
14  to, like, random searches of their cell?
15      A.  I'm guessing yes, just like everybody
16  else.
17      Q.  How about random subjects of their person,
18  those on death row?
19      A.  Are they subject to that?
20      Q.  Yes.
21      A.  Well, I mean, everybody else is subject to
22  that, so I would imagine they would be, too.
23      Q.  For the general population, are the
24  cells -- are the inmates moved from one cell to the

15  (Pages 57 to 60)

Walker v. Farnen, et al.                          FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 61

1    next on any scheduled basis?
2        A.   No.
3        Q.   And are the cells -- like, investigative
4    searches performed on the cells on a schedule?
5        A.   Yes.
6        Q.   And how often does that occur?
7        A.   I couldn't tell you, but there is a
8    random --
9            MR. HENZES:   Now, you are talking
10       about two different things.  Anybody's
11       cell, if they are subject to an
12       investigation, could be searched.  The
13       random cell search is something that the
14       department of correction requires pursuant
15       to policy.  They will pick a day and search
16       B block, and they will say, okay, search
17       these 15 cells.  Where internal security
18       may have information that cell B102, the
19       guy could have drugs; that would be an
20       investigative search.  The random would be
21       one day they just go in there and they
22       just pick ten cells and just flip through.
23   BY MS. SIGYARTO:
24       Q.   Okay.  For those within the general

Page 62

1    population, what's their -- like, the daily
2    routine, they get up at six and they have to stand
3    next to their cell door?
4        A.   To get counted.
5        Q.   To get counted.  And then do the doors
6    open and they can leave their cells?
7        A.   They open the door by sections and let
8    them to go breakfast.
9        Q.   And once the doors open in the morning,
10   can they remain -- assuming there's not some sort
11   of event, which would require them to return, like
12   an emergency of some sort -- can they remain
13   walking around the prison?
14       A.   No.  They actually go to their meals and
15   then they go back to the unit and get back in the
16   cells, and then activities are called, jobs are
17   called, collection called, schools called, things
18   like that.  So, there's a schedule for all of that.
19       Q.   If the inmate within general population
20   doesn't sign up for something, do they then remain
21   in their cell for the duration of the day?
22       A.   They could.
23       Q.   For those within general population, if
24   they just want to go into the yard, do they have to

Page 63

1    sign up for that?
2        A.   No.
3        Q.   And are there hours of the day for general
4    population, when they are sort of free to roam?
5        A.   Well, we have blackout or yard.
6        Q.   What does "blackout" mean?
7        A.   "Blackout" is if they don't have access to
8    the yard, they -- like inclement weather, for
9    instance, we'll call blackout, inmates can play
10   table games on the tables in the -- within the
11   housing unit.
12       Q.   And --
13       A.   -- or watch TV in, you know, the housing
14   unit outside of their cells, or they can just
15   mingle with guys, do what they want.
16       Q.   Is there a certain time of day when they
17   are required to return to their cell?
18       A.   Yeah, there's a schedule for all of that.
19       Q.   And how about in the evening time?
20       A.   Same thing.
21       Q.   Do you know what time they have to get
22   back, like when their cells are locked for the day?
23       A.   I believe nine o'clock, 9:00 p.m.
24       Q.   Do the death row inmates have access to a

Page 64

1    phone?
2        A.   They do.
3        Q.   And how often can they use it?
4        A.   Three 15-minute calls a week, I believe,
5    not counting attorney calls.
6        Q.   And are those collect calls?
7        A.   Yes.  Or they can have a phone pass and
8    buy a phone pass at the commissary, I believe, in
9    that case the inmates can do that in general
10   population.
11       Q.   Is the phone brought to their cell?
12       A.   Yes.
13       Q.   And is the cord long enough they can move
14   into their cell or do they have to move next to the
15   bar?
16       A.   I think it's long enough they can go into
17   their cell.
18       Q.   How about for general population, do they
19   have access to phones?
20       A.   The phones are set up on phone banks for
21   most of the units.  Each bank has four cells per
22   side, so a bank of eight.
23       Q.   Like, little prison booths?
24       A.   No, but yeah.  I mean, the phone -- it's a

16   (Pages 61 to 64)

Walker v. Farnen, et al.                          FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 65

1   small partition -- you don't want to enclose it.
2       Q.  Oh, okay.
3       A.  You know what I mean?  So, you give them a
4   little bit of privacy there.
5       Q.  Okay.  I understand.  They are like
6   partitions between the next, but no door?
7           MR. HENZES:  Similar to a phone bank
8       at the airport.
9   BY MS. SIGYARTO:
10      Q.  And often can the -- for what period of
11  time are they accessible to the general population?
12      A.  We've made them more accessible.
13      Q.  Meaning what?
14      A.  Well, they can make as many calls as
15  they --
16      Q.  Have the money to do?
17      A.  Yeah.
18          MR. HENZES:  Pretty much.
19  BY MS. SIGYARTO:
20      Q.  Back to the visits.  When a death row
21  inmate has a visitor, is there a limit on the
22  number of people that can come and visit at the
23  same time?
24      A.  I think there is, but I'm not sure what

Page 66

1   that is.
2       Q.  How about for general population, is there
3   such a limit?
4       A.  I don't think so.  They all have to arrive
5   together.  It might be six, something like that.
6       Q.  When a general population inmate has a
7   visit, are they searched before they go into the
8   visit room?
9       A.  Yes.
10      Q.  And when they exit the visit room, are
11  they also searched?
12      A.  Yes.
13      Q.  What type of search is performed?
14      A.  Well, they take off their clothing and the
15  officer there checks them, makes them bend over and
16  things like that.  And they -- when they exit the,
17  they do -- go through the same process.
18          MR. HENZES:  Usually give them
19      different clothes.  They give different
20      clothes.
21          THE WITNESS:  Yes, you're right, in
22      the visiting area.
23          MR. HENZES:  They change their
24      clothes.

Page 67

1   BY MS. SIGYARTO:
2       Q.  For the general population, other than
3   going into the visiting area, are there other
4   activities where the general population inmate is
5   stripped searched before they participate and after
6   they participate?  Like, if they go into the
7   library, are they stripped searched?
8       A.  No.
9       Q.  When they go in and get their meals, are
10  they strip searched?
11      A.  No.
12      Q.  How about if they work in the laundry
13  room, are they strip searched?
14      A.  No, no.  We pat search the guys coming out
15  of the correctional industries.
16      Q.  Is that the food service?
17      A.  And we make them walk through metal
18  detectors when they get off -- before they get into
19  the housing units.
20      Q.  Is that when they leave the actual
21  facility?
22      A.  Whenever they are coming and going from
23  housing unit they have to go through a metal
24  detector, which we don't have in 1.5 units.  And

Page 68

1   also, pat search them when they are coming out of
2   the correctional industry shops.
3       Q.  Other than use of the phone and the visits
4   with people come in to the institution, are --
5   restricted housing unit inmates, are they allowed
6   any other access to the outside world?
7       A.  Other than visits and phones?
8       Q.  Maybe their classes, their educational
9   classes, if they choose to take them?
10      A.  Well, that would be in cell then.
11      Q.  How about the mail, can they use the mail?
12  Like for U.S. first class mail?
13      A.  Oh, sure.  Yeah, they get, I think it's
14  eight free postage paid envelopes a month.
15          MR. HENZES:  I don't know.  One of
16      the reasons why the post office was losing
17      money was because we cut back on that.
18          THE WITNESS:  I think it was ten,
19      but now it is eight.
20  BY MS. SIGYARTO:
21      Q.  And do they receive, like, stationary and
22  pens, too for free?
23      A.  If they don't have that, we will supply
24  that.  We give them special pens for the RHU, flex

17  (Pages 65 to 68)

Walker v. Farnen, et al.                                  FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 69

1    pens for their safety.
2        Q.  For those within the general population,
3    do they also have access to U.S. mail?
4        A.  Yes.
5        Q.  And are they given eight --
6        A.  Yes, ma'am.
7        Q.  -- free envelopes?
8        A.  Everybody gets them, right.
9        Q.  Do the restricted housing unit inmates
10   have any other access to the outside world?  We
11   have mail and, you know, people come in and visit
12   periodically and telephone calls.  Anything else?
13       A.  I can't think of anything other than
14   attorney visits.
15       Q.  For the general population, do they have
16   access to e-mail?
17       A.  No.
18       Q.  How about fax?
19           MR. HENZES:  What do you mean by
20       access to e-mail?
21           MS. SIGYARTO:  I mean, can they give
22       and receive e-mail messages.
23           MR. HENZES:  They can receive an
24       e-mail.  They got to pay for it in J?

Page 70

1           THE WITNESS:  Yeah, J, that's how
2       they get their money and they can get
3       messages, too.
4           MR. HENZES:  They can get e-mail.
5       But they can't send e-mail, but they
6       can -- mom and dad want to pay for it,
7       it's no different than sending a letter.
8    BY MS. SIGYARTO:
9        Q.  Do the inmates within the restricted
10   housing unit have the same privileges in connection
11   with receipt of e-mail messages?
12       A.  I think so.
13       Q.  How about fax, can you send a fax to
14   someone within a general pop?
15       A.  No, I don't think so.  I never heard of
16   that.
17           MR. HENZES:  No, unless the
18       superintendent's assistant is going to
19       walk it down.
20           THE WITNESS:  I mean, there might be
21       some circumstance where they got a call
22       from somebody's mother and so, you know,
23       the unit manager might get a call this
24       legal document needs to be faxed and

Page 71

1    signed.  I don't know.  But I don't run
2    into it.
3    BY MS. SIGYARTO:
4        Q.  But it's not standard as part of your --
5    things that are privileges that the inmates have
6    available?
7           MR. HENZES:  No.
8    BY MS. SIGYARTO:
9        Q.  Do those -- do inmates within the
10   restricted housing unit have access to medical
11   treatment?
12       A.  Yes.
13       Q.  And how -- on -- if an inmate desires to
14   have medical treatment, how would they go about
15   receiving it?
16       A.  Well, they would tell the officer if they
17   need to be on a sick call.  If they say they have
18   chest pains, we're bringing them up to the
19   infirmary.
20       Q.  For those --
21       A.  We have nurses coming by every Saturday
22   and Sunday to check on everybody.
23       Q.  And do they do rounds within general
24   population?

Page 72

1        A.  No, no.  General population is all sick
2    call.  But again, if an inmate has an issue or a
3    problem, they'd let staff know and deal with it.
4    If it's serious we will jump.
5        Q.  Is there a nursing station within the
6    general population area that they can go to in the
7    event that they are not feeling well?
8        A.  Well, they need a pass to get there.  But
9    we have a dispensary that they have access to for
10   sick call.  And there's another sick call for them,
11   too, but if it is something serious, they let us
12   know, we call them up.
13       Q.  Are you aware of bugs being a problem
14   within the restricted housing unit?
15       A.  No.
16       Q.  Are you aware of the department of
17   corrections doing anything to exterminate or
18   eradicate bugs?
19       A.  We have exterminators that come in all the
20   time.  I haven't seen the exterminators in a while,
21   so I'm not sure exactly.
22       Q.  How about vermin, like mice?
23       A.  We have vector control.  We also want to
24   make sure people aren't keeping them as pets.

18  (Pages 69 to 72)

Walker v. Farnen, et al.                    FRANCIS JOSEPH FEILD, JR., 3/6/12

**Page 73**

1    Q.  Is that a problem?
2    A.  Well, not to my knowledge. But I've heard
3  guys tell me things. They'll keep a duck in their
4  toilet.
5    Q.  Are —
6       MR. HENZES:  A duck?
7       THE WITNESS:  Baby duck.
8  BY MS. SIGYARTO:
9    Q.  Are inmates permitted to have, like, traps
10  or — if they requested a trap or some sort of
11  killer for bugs?
12    A.  We have those in — yes, people that do
13  vector control. I was walking down the block the
14  other day and there was one of those boxes that
15  have an entrance and no exit. It's sticking
16  outside of an inmate's cell. So, they can sign up
17  for bud — and, yeah, there are sign up sheets for
18  vector control and bugs.
19    Q.  Are there the sign up sheets for general
20  population?
21    A.  Yes.
22    Q.  Are the sign up sheets available for those
23  in the restricted housing unit?
24    A.  That I don't know. I would imagine it's

**Page 74**

1  up to the wing officer.
2    Q.  Which office?
3    A.  I don't know. The wing officer. The
4  section officer. Again, I have not seen that
5  firsthand, so I'm not sure exactly what they would
6  do.
7    Q.  Other than what we've already discussed,
8  can you think of any other activity that would
9  enable a death row inmate to exit their cell?
10    A.  No, I can't think of any.
11    Q.  For inmates on the death — housed in on
12  death row, would they be permitted to, say, go to
13  the library, have a visit from somebody from the
14  outside, and go into the yard all within the same
15  day?
16    A.  What was the first one?
17    Q.  The library.
18    A.  Well, I think the library hours are the
19  same as the shower and yard times, so that might be
20  a conflict. Otherwise, I don't see a problem with
21  it.
22    Q.  For transporting a death row inmate within
23  the institution from his cell to either the shower
24  or the yard, is there a procedure that the guards

**Page 75**

1  are expected to follow in connection with doing
2  that transport —
3    A.  Yes.
4    Q.  — i.e., cuffing him and shackling him?
5    A.  Yes. I'm sorry, I can't tell you exactly
6  what that is. But, yes, they do follow procedures
7  and there is a procedure for how many guards there
8  needs to be there for the escort and to hold an
9  inmate.
10       MS. SIGYARTO:  All right. I really
11       appreciate your time. Thank you very
12       much.
13       THE WITNESS:  Thank you.
14          - - -
15          EXAMINATION
16          - - -
17  BY MR. HENZES:
18    Q.  Just to get a couple of things cleared up
19  here. Capital case inmates are in a level five
20  housing unit, correct?
21    A.  Correct.
22    Q.  And that would be the most secure housing
23  unit within the department of corrections?
24    A.  Correct.

**Page 76**

1    Q.  And that say someone was in general
2  population and came to you and say, "I fear for my
3  safety, can you put me somewhere where I have no
4  contact with the inmates?" They would be put in
5  level five housing unit?
6    A.  Exactly.
7    Q.  And those individuals are also in status
8  called administrative custody?
9    A.  Correct.
10    Q.  And inmates in administrative custody,
11  whether they be capital case or someone who is a
12  regular, say, robbery conviction, would be living
13  under the same conditions in that level five
14  housing unit?
15    A.  Not necessarily. They don't have as many
16  privileges as capital case inmates have. So, for
17  instance, commissary and things like that, we don't
18  let them order food or anything like that.
19    Q.  Them, being the one who put themselves in
20  the level five housing unit?
21    A.  Right.
22    Q.  So, someone on a capital case unit could
23  be under better conditions than someone who decides
24  they want to live in a level five housing unit?

19  (Pages 73 to 76)

Walker v. Farnen, et al.                                    FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 77

1      A.  Yes.
2        Q.  And anybody that is housed in a level five
3    housing unit is basically living under the same
4    exercise, restrictions, telephone restrictions,
5    movement restrictions?
6      A.  Correct.
7           MR. HENZES:  All right.  Thank you.
8    That's all I have.
9           - - -
10         (At 12:21 p.m., the witness was
11    excused and the deposition was concluded.)
12         - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 78

1           CERTIFICATION PAGE
2           I, Laura Wilson, a Professional
3    Court Reporter and Notary Public, hereby certify
4    that the testimony and the proceedings in the
5    foregoing matter taken on the date hereinbefore
6    stated are contained fully and accurately in the
7    stenographic notes taken by me and constitutes a
8    true and correct transcript of the same.
9
10
11
12           Laura Wilson
             Professional Court Reporter
13           Notary Public
14
15      (The foregoing certification of this
16    transcript does not apply to any reproduction of
17    the same by any means unless under the direct
18    control and/or direction of the certifying
19    shorthand reporter.)
20
21
22
23
24

                                          20 (Pages 77 to 78)

Walker v. Farnen, et al.                     FRANCIS JOSEPH FEILD, JR., 3/6/12

Page 78

1                    CERTIFICATION PAGE

2           I, Laura Wilson, a Professional

3    Court Reporter and Notary Public, hereby certify

4    that the testimony and the proceedings in the

5    foregoing matter taken on the date hereinbefore

6    stated are contained fully and accurately in the

7    stenographic notes taken by me and constitutes a

8    true and correct transcript of the same.

9

10

11

12    Laura Wilson
       Professional Court Reporter
13     Notary Public

14

15          (The foregoing certification of this

16    transcript does not apply to any reproduction of

17    the same by any means unless under the direct

18    control and/or direction of the certifying

19    shorthand reporter.)

20

21

22

23

24

# EXHIBIT "3"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN WALKER,                            :        CIVIL ACTION
                                         :
                     Plaintiff           :
                                         :
              v.                         :
Jeffrey Beard, ET AL.,                   :
                                         :
                     Defendants  :        NO. 07-4977

## DECLARATION OF WNEDY SHAYLOR

I, Wendy Shaylor, declare under penalty of perjury that
that following is true and correct.

1.  I am employed by the Pennsylvania Department of
Corrections as the Facility Grievance Coordinator at the State
Correctional Institution at Graterford "Graterford".

2.  Attached hereto is Inmate Shawn Walker's grievance he
filed over his confinement on the capital case unit at
Graterford.

Date: 04/12/12                           Wendy Shaylor

Case 2:07-cv-04977-RBS   Document 27-3   Filed 04/16/12   Page 3 of 9

*due ~~process/2013~~ ~~In Rowlands~~ ( ) sentence*

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA 17001-0598

FOR OFFICIAL USE ONLY

196482

GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| Wendy Moyer | Graterford | Aug 6, 07 |
| FROM: (INMATE NAME & NUMBER) | SIGNATURE of INMATE: | |
| Shawn Walker BU-0744 | Shawn Walker | (RHU) |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |
| None | J-Block H-Wing cell-5 | |

INSTRUCTIONS:
1   Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2.   State your grievance in Block A in a brief and understandable manner.
3.   List in Block B any actions you may have taken to resolve this matter.  Be sure to include the identity of staff
     members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages.

My death sentence was vacated on
4-21-04 but I am still in the
Restricted Housing Unit (RHU) and
classified as a capital case, I am
not under a sentence of death, why
hasn't my classification and housing
assignment been change?

B. List actions taken and staff you have contacted, before submitting this grievance.

I sent a DC-135A to Tom Rowlands,
Records Supervisor (SCI6), I never got
a reply.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Wendy Moyer                                                                         08.08.07

Signature of Facility Grievance Coordinator                                         Date

WHITE – Facility Grievance Coordinator Copy   CANARY – File Copy   PINK – Action Return Copy   GOLDENROD – Inmate Copy
Revised
December 2000

JA-276

DC-804
PART 2

RECEIVED

07 AUG 22  AM 10: 09

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA 17001

Revised
December 2000

**DENIED**

GRIEVANCE NO.     | 196482

| TO: (Inmate Name & DC No.)<br>Shawn Walker, BU-0744 | FACILITY<br>SCI-Graterford | HOUSING LOCATION<br>J-H-005 | GRIEVANCE DATE<br>August 6, 2007 |
| --- | --- | --- | --- |

Mr. Walker states that his death sentence was vacated in 2004 and yet he is remains in the restrictive housing unit (RHU) and classified as a capital case.

This office has been advised by the office of chief counsel that multiple appeals have been filed concerning this case and this individual must remain listed as a capital case until such time as all appeals have been resolved.

This grievance is closed.

| Print Name & Title of Grievance Officer<br>Thomas Rowlands, CRSS | SIGNATURE OF GRIEVANCE OFFICER | DATE<br>08/22/2007 |
| --- | --- | --- |

JA-271

Case 2:07-cv-04977-RBS    Document 27-3    Filed 04/16/12    Page 5 of 9

| Form DC-135A | | Commonwealth of Pennsylvania Department of Corrections |
|---|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | 07 SEP -4  AM 9: 13  SUPERINTENDENT  SCI | **INSTRUCTIONS**  Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

| 1.  To: (Name and Title of Officer)  Mr. DiGuglielmo, Superintendent | 2.  Date:  August 28, 2007 |
|---|---|
| 3.  By: (Print Inmate Name and Number)  Shawn Walker BU0744  _Shawn Walker_  Inmate Signature | 4.  Counselor's Name  Mr. Stimmel |
| | 5.  Unit Manager's Name  William Banta |
| 6.  Work Assignment  Deathrow Inmate | 7.  Housing Assignment  J-Block H-Wing cell-5 |

8.  Subject: State your request completely but briefly. Give details.

Grievance Appeal # 196482   Due 09-25-07

My death sentence was vacated on 4-21-04 but I am still in the Restricted Housing Unit (RHU) and classified as a capital case. I am not under a sentence of death and the commonwealth is not appealing the Judge order vacating my death sentence.

9. Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _____ / _____ Date _____
                              Print                                    Sign

Revised July 2000

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|
| 1. To: (Name and Title of Officer)<br>*Mr. DiGuglielmo; Superintendent* | 2. Date:<br>*September 18, 2007* |
| 3. By: (Print Inmate Name and Number)<br>*Shawn Walker BU0744*<br><br>*Shawn Walker*<br><span style="font-size:smaller">Inmate Signature</span> | 4. Counselor's Name<br>*Mr. Stimmel* |
|  | 5. Unit Manager's Name<br>*William Banta* |
| 6. Work Assignment<br>*None* | 7. Housing Assignment<br>*J-Block H-Wing cell-5* |

8. Subject: State your request completely but briefly. Give details.

*Mr. DiGuglielmo, did you get my grievance appeal (#196482) that I sent you 3 weeks ago?*

9. Response: (This Section for Staff Response Only)

*Mr. Walker - the appeal was received on 09-04-07 and the response is due 09-25-07.*

*CC: #196482*

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _____ / *Wendy Noyce* Date *09-19-07*
<span style="font-size:smaller">Print</span>     <span style="font-size:smaller">Sign</span>

Revised July 2000

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI Graterford**
**Superintendent's Office**

September 19, 2007

SUBJECT:    GRIEVANCE APPEAL # 196482

TO:          Shawn Walker
             BU-0744
             J-H-1005

FROM:        David DiGuglielmo
             Superintendent

Based upon my review of your appeal, I am going to uphold the initial response for the following reason(s):

We are guided by Chief Counsel on Capital Case criteria.

If your sentence is vacated and is still under appeal, you remain in Capital Case status.

DD:tjf

cc:    Grievance File

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."

**FILE WITHOUT ACTION**
Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
P.O. Box 598, 2520 Lisburn Road
Camp Hill, PA 17001-0598

RECEIVED

07 OCT -5  AM 10: 00

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.  However, this information is being filed without action since you have either failed to comply with the provisions outlined in DC-ADM 804, "Inmate Grievance System" or have already sought and/or received appropriate action in response to your matter.

| Inmate Name: | Shawn Walker | Inmate Number: | BU-0744 |
|---|---|---|---|
| SCI Filed at: | Graterford | Current SCI: | Graterford |
| Grievance # (if available): | 196482 | | |

| Action: | | File Without Action |
|---|---|---|
| | | a) You have already received final disposition/review on this issue through this Office. |
| | | b) This Office has no prior record of receipt of an appeal from you regarding this issue. |
| | | c) You have already filed a grievance to seek review and resolution of this matter. |
| | X | d) This serves to confirm receipt of the above-mentioned appeal by this Office. |
| | | e) You are encouraged to work through institutional channels to resolve your complaint initially.  If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns. |
| | | f) You failed to provide the official grievance number for identification purposes. |
| | | g) You failed to identify the specific publication(s) you are appealing. |
| | | h) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review.  Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal. |
| | | i) Staff and administrative responses to "Inmate Request to Staff" forms (DC-135A) are not permitted to be appealed to this Office. |
| | | j) You have not yet appealed this issue to the Facility Manager.  Final review will not be granted until you do so.  Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review.  This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent. |
| | | k) Your grievance and/or correspondence is being filed without action for the reason(s) specified below. |

| Comments: | |
|---|---|

You write in regards to the above stated grievance.  Review of the record reveals that this grievance was accepted into final review on September 28, 2007.  Please be patient.

| Signature: | Cindy L. Watson |
|---|---|
| Title: | Chief Grievance Officer |
| Date: | 10-01-07 |

CGW/KLM

cc:    Superintendent DiGuglielmo
       Weaver #2007-C59-0332
       DC-15
       Grievance Office
       Central File

# FINAL APPEAL DECISION
## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
P.O. Box 598, 2520 Lisburn Road
Camp Hill, PA 17001-0598

This serves to acknowledge receipt of your appeal to final review for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the grievance officer's response, your appeal to the facility manager, the facility manager's response, the issues you raised to final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this Office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Professional Responsibility, etc.) may have been solicited in making a determination in response to your issue as well.

| Inmate Name: | Shawn Walker | | Inmate Number: | BU0744 |
|---|---|---|---|---|
| SCI Filed at: | Graterford | | Current SCI: | Graterford |
| Grievance #: | 196482 | | | |
| Publication (if applicable): | | | | |

| Decision: | Uphold Response (UR) |
|---|---|

*The original or revised responses provided at the institutional level are reasonable and appropriate in accordance with Department of Corrections' policy and procedure. Accordingly, your final appeal is denied.*

| Response: | Frivolous |
|---|---|

You have failed to provide any evidence that your classification as a capital case inmate should be changed and that you should be removed from the Restricted Housing Unit since your death sentence was vacated on April 21, 2004. A review of the record reveals that appeals were filed concerning your vacated sentence. Contrary to your claims, one of those appeals is currently pending. Therefore, per DOC policy, until all appeals have been resolved, you will remain housed as a capital case inmate.

| Signature: | Cindy G. Watson |
|---|---|
| Title: | Chief Grievance Officer |
| Date: | 10/30/07 |

CGW/LLS

cc:   Superintendent DiGuglielmo
      DC-15
      Grievance Office
      Central File

**DRAFT**

R/W Curtis Environmental Consulting, LLC
Attorney Work Product CONFIDENTIAL

| Item | Date | Notable Activity | Reasonable/Prudent Industry Response | Halliburton's Action |
|---|---|---|---|---|
| 1 | 1962 | Medical researchers published findings that perchlorate blocks the uptake of essential iodine into the thyroid gland, thus inhibiting thyroid hormone production. ("Effect of perchlorate on the human thyroid gland" JB Wyngaarden & JB Stanbury, Metabolism Clinical and Exp 1:533-539, 1962) | It would be reasonable and appropriate for a responsible company to research information regarding the products and chemicals it handled within their operations. Particularly, how these chemicals would impact employees, environment and community exposure. | It is unknown if Halliburton research the impacts of handling Ammonium Perchlorate. Certainly, with a research center only 5 miles away, one would believe they had the expertise to evaluate chemicals the company was handling. |
| 2 | 1957 | A national task group on underground waste reported perchlorate contamination had spread over "several square miles east of Sacramento. (Journal of the American Water Works Association "Underground Waste Disposal and Control") 49(10):1331-1342; 1957) | It is reasonable to expect that prior to entering into a new type of business a prudent company would research other companies (Aerojet) performing the same type of business, investigating how those businesses performed the cleaning operation and what happened to their waste products. | It is not known if Halliburton became aware of the groundwater contamination with perchlorate east of Sacramento, CA. |
| 3 | Feb 1963 | Perchlorate found in drinking water supply wells in Rancho Cordova, CA at levels of 1000 to 2000 ppb. (http://www.sccrrowatch.org/index.php?alid=Perchlorate_Study_(Group)) | Aerojet, being in a similar operation, should have been reviewed to determine how waste products were handled. Halliburton could have learned from as Aerojet is understand how perchlorates could enter into groundwater. | At the Aerojet site east of Sacramento, CA rocket motor manufacturing and testing operations occurred. Waste from these operations were dumped and disposed of in the ocean. However, ground water contamination occurred. |
| 4 | Jul-1963 | Rocket Motor Cleaning operations began. From an undated picture it did not appear to have any containment under the missile casing clean out skid. (Woods 000006) | Prior to Halliburton entering into the missile motor case cleaning business it would have been reasonable to construct a permanent containment system to prevent wastewaters and other chemicals from soaking into the ground or running off site. | Based on two memos dated 11/1/63 & 12/9/63 (items 5 & 6) it suspected that Halliburton operated a "missile cleaning machine" placed on unprotected ground at the Osage Road facility. |
| 5 | Nov-1963 | In a memo to R. E. Moeller regarding the cleaning of a "Redhead" Roadrunner Missile, it was stated "The Redhead" Roadrunner Missile is no doubt the most difficult we have ever cleaned." (Woods 000048) | It is apparent that Halliburton started cleaning missile motor casing prior to November of 1963. Also, because the necessary equipment had to be set up on the North 40 it is suspected that no permanent foundation existed to collect waste waters as well as trichloroethylene. | The Mechanical Research & Development Department was charged with developing methods to efficiently clean missile motor casing from new customers. Had to set up the necessary equipment in the North 40 and used trichloroethylene for drying the cleaned casing. |
| 6 | Dec-1963 | A 2nd memo to R.E. Moeller documented the cleaning of another "Redhead" Roadrunner Missile motor casing. It was stated that trichloroethylene was used to wash out the casing and "The nature of this operation dictates that extreme safety precautions should be taken for an area of approximately 200-yard radius." "For this reason it is highly recommended that a method of spraying the working area down with clean water before any work is started each day." "The key to safe rocket cleaning work is to keep everything around the missile cleaning skid wet." (Woods 000013) | It is evident that Halliburton had no concern with wastewaters and trichloroethylene running off the site or percolating into the soils. | Halliburton had to move the clean-out equipment from the MRD area to the test area. Again this implies that no permanent containment pad was employed. |
| 7 | Feb-1965 | (Dwg. No. x-87-01-212 through 218) Dwgs. Of missile cleaning area (4 sheets) indicates the possible design of a concrete pad design. (Woods 000010) | No records have been found, but it is suspected that based on a 1965 drawing list that no concrete containment was used upon start up of the missile motor cleaning operations. | It may have taken Halliburton around three years to construct a concrete containment system to prevent wash waters from soaking into the ground and provide for recycling of the rinse waters back to the high pressure jet system. |
| 8 | May-1976 | Publication "Nonhazardous Industrial Solid Waste Source Control" describes the various factors to determine, consider, and evaluate in constructing a surface impoundment. Issued by the Texas Commission on Environmental Quality Industrial Solid Waste Management. | Understanding the geology and hydrology of the area where the evaporation pond was located should have raised concerns regarding the percolation of the pond contents into the aquifers below. It would at a minimum been prudent to utilize a clay liner to minimize leaching. | No evidence could be found regarding Halliburton's engineering evaluation of constructing an unlined evaporation pond containing high levels of perchlorate. |
| 9 | Sep-1976 | OK Water Resources Board issues Halliburton a waste disposal permit for its Missile Cleaning Site. Expiring 9/13/81. No discharge point. Discharge of waste to waters of the state is specifically prohibited. (ODEQ-03630) | Because OK's definition of "waters of the State" include "...all other bodies or accumulations of water, surface and underground..." no waste waters should be allowed to migrate to below ground water sources. A prudent approach to the design of the evaporation pit would have been to utilize a barrier in the bottom of the pond. | Halliburton scraped/dug an evaporation pit (30 ft. x 50 ft) in nearby soils with sloped drainage leading to the pit. Water could leach into the permeable soils and thus to ground water from the bottom of the evaporation pit. (ODEQ 03834) |

**DRAFT**

RW Curtis Environmental Consulting, LLC
Attorney Work Product CONFIDENTIAL

| Item | Date | Notable Activity | Reasonable/Prudent Industry Response | Halliburton's Action |
|---|---|---|---|---|
| 16 | Jun-1985 | CAMEO Chemicals database published a concern of water pollution stemming from Ammonium Perchlorate. It suggested that it is dangerous if it enters water intakes and to notify water intake operators. (HALDEQ 000529) | A reasonable company would pursue information and knowledge regarding the chemicals it handled. Halliburton had knowledge of the Ammonium Perchlorate concern via the CAMEO document. | Halliburton's Mechanical Research & Development Department had access to publications discussing the concerns with Ammonium Perchlorate and its products from dissolution. |
| 17 | Jan-1986 | The Agency for Toxic Substances and Disease Registry stated "the effects of combined low level perchlorate ingestion, need to be described as soon as possible." | | |
| 18 | Dec-1986 | Anonymous phone call received by OSDH regarding Halliburton burning explosive/explosives leaving stain on ground/also stating to operate the ditching. (ODEQ-00040) | A reasonable company would have provided training and oversight to insure that a radioactive materials (including protective clothing) would have been handled according to proper and regulatory requirements. | No record could be found that indicated Halliburton did anything to investigate the complaint or to put a stop to the practice. |
| 19 | Dec-1986 | Halliburton requests the maintenance of protector filer status and encloses an updated EPA Notification of HW Activity. It was stated that the facility meets all applicable distance requirements for the burning of the propellant. Halliburton states, "to my knowledge no RCRA defined HW other than the rocket propellant has ever been generated, stored or treated at the Osage Road Facility"-Steve Buford. Also stated on the General Information Form 1 Halliburton's V876022 permit "Total retention." (ODEQ-12599) | §265.382 specifies the minimum distance from detonation to the property of others. The required distance is base on the pounds of waste propellant detonated. It is questionable if Halliburton met this requirement at the various burn pits. It would have been a prudent move to seek help on identifying what is or is not a HW. It is obvious that Mr. Burford did not fully understand the RCRA rules for classifying HW. (See Item 12). Aerial photos indicate uncontrolled overflow from the evaporation pond. | First acknowledgement that the removal of propellant constitutes generation of HW. In 1982 it was stated that Halliburton has not generated any HW. The pressure cleaning of the missile motors generates D003 (Ammonium Perchlorate) HW. |
| 20 | Dec-1986 | Letter to Air Quality Service, OSDH for approval to openly burn solid rocket propellant and motor case liners. Included was the following statement, "No hazardous component mentioned in Section 112 of the Federal Clean Air Act 42 U.S.C. Section 7412 which would be subject to the National Emission Standards for Hazardous Air Pollutants (NESHAPs) are handled or burned at the Osage Road facility. (ODEQ-00277) | The request was misleading from the standpoint that Halliburton indicated that no hazardous components under section 112 of the Clean Air Act were burned. Were in fact HW was burned. A reasonable approach in submitting an application to openly burn HW would have included information on the products of combustion, the effects and concentration impacting the off-site areas, wind rose data, operational procedures for mitigating any impact as well as emergency procedures. | No mention or intention to report on the emissions that are generated during the burning. Atlantic Research Corporation's MSDS sheet states "Combustion Products - toxic, avoid inhalation and ingestion." It goes on to state "combustion byproducts contains hydrochloric acid and carbon monoxide." Morton Thiokol MSDS states "Decomposition products could cause a breathing difficulty and respiratory damage." |
| 21 | Jan-1987 | Request to openly burn materials at Osage Road site was approved by Air Quality Service.- Grant Marburger (ODEQ-00277) | OK Air Quality Service was not aware that Halliburton was intending on burning HW and no mention to the fact was ever provided. | |
| 22 | Jan-1987 | Anonymous complaint regarding the evaporation pond (a disposal pit which is believed to be taking radioactive material and rocket missile fuel. There are several water wells in the immediate area.) (ODEQ-00041) | A reasonable company would have undertaken additional actions to investigate the accusations. Drinking water wells should have been sampled to determine if any radioactive or propellant constituents were present. (See Item 28) | Halliburton took no action regarding this complaint. |
| 23 | Dec-1987 | Motor case cleaning procedures and safety standards issued. (Woods 000896) | Since the burning of other materials, i.e. wood paper, along with the propellant was not part of the request for approval to burn it would be reasonable to obtain approval from OSDH before doing so. Also the burning or 400 to 500 lbs of propellant impacts the distance requirements found in §265.382 (see item 19). | 15.When accumulated 400-500 lbs of propellant remove to burning area. 20. Any wood, paper, etc., that becomes saturated with the propellant-contaminated water is to be burned at the same time propellant is burned. Did not request approval to do so. |
| 24 | Feb-1988 | OSDH internal file reported an estimated burning of 40 tons of propellant per year, no waste analysis plan, facility inspection schedule, inspection log, contingency plan or closure plan. (ODEQ-12677) | Halliburton's Part A RCRA stated that they treated 30 Tons per year which became the limit of permitted treatment. A reasonable approach would have been to put in place procedures so as to not to exceed permitted limits. | Halliburton allowed the local site management to determine the quantities to be burned without guidelines on how much can legally be treated. |
| 25 | Feb-1988 | Halliburton Services file RCRA Inspection Schedule, Inspection Log Sheets, Contingency Plan and Closure Plan (ODEQ-12648) | Such plans were required as part of the RCRA Part A permit. Demonstrates Halliburton's lack of concern or knowledge for environmental regulations. | Halliburton states in its contingency plan they are not aware of any long-term biological or environmental effects of the combustion products. (ODEQ-12656) |

**DRAFT**

RW Curtis Environmental Consulting, LLC
Attorney Work Product CONFIDENTIAL

| Item | Date | Notable Activity | Reasonable/Prudent Industry Response | Halliburton's Action |
|---|---|---|---|---|
| 31 | Aug-1989 | Halliburton installs a lined evaporation pond. (ODEQ-18140) (Aerial photos taken around this time indicate that a new pond was dug in which the liner was installed.) | Prior to digging a new pond Halliburton should have discussed the need for permitting a new unit to place a synthetic liner. Most likely additional permitting would have been required. Future agency oversight would not have any record of location of past evaporation ponds. Certainly the existing no discharge water permit does not cover the new installation. | Without ODEQ's knowledge, Halliburton constructed a new evaporation pond with liner beside the old pond. |
| 32 | Jan-1990 | Since 1990, over 30 sites have been identified in Southern CA, were groundwater has been contaminated with perchlorate, including the Colorado River. (Perchlorate in the Pacific Southwest, http://www.epa.gov/region9/toxic/perchlorate/perfs_ca.htm) | By this time the impact of missile propellant fuels on groundwater was widely recognized. It is irresponsible for Halliburton not to have taken actions to investigate its own operations. They took the position if its not a problem for us then we do not have to look for a problem then I do not have to address anything. | Halliburton continues to keep its corporate head in the ground. It's likely that company representative leaders of Southern CA groundwater problems but did nothing to evaluate its own facility. |
| 33 | Feb-1990 | Halliburton filed 1989 HW report, (ODEQ-12583) | No other record for burning propellant in 1988 has been found. | On form GM it was reported that in 1988, 192,600 lbs of D003 was generated. |
| 34 | Mar-1990 | RCRA Facility Assessment conducted a Visual Site Inspection (VSI) by ICF and the report was issued June 20, 1990. Report stated that the Release Potential from the evaporation pond was high since the pond was unlined for approx. 27 years. Also the Release Potential from the burn pits was high because the unit has no liner. In addition, the release potential for release of haz. wastes or haz. constituents is high due to the nature of the burning practices. RCRA Facility Investigations (RFIs) were recommended for the evaporation pond, burn pits, past burn pits, and old well bore area. (ODEQ-18129) | The recommendations presented in the VSI report were appropriately presented. The SWMUs and areas of concern most probably have impacted the area groundwater. Halliburton continues to withhold information regarding their operations (evaporation ponds) that would possible draw attention to a potential need to remediate a significant area around their facility. Also the tone of Halliburton's letter to EPA has a legal flare not previously observed. | Halliburton provided no mention of various evaporation ponds closed over the 27 years of operation. They also objected to the "shaker table" being characterized as a SWMU and objected to including SWMUs at their Manufacturing and Plant II locations being included in the VSI. (ODEQ-18135) |
| 35 | Apr-1990 | EPA Region is requested that the risk evaluation of perchlorate toxicity due to detection of perchlorate in a drinking water supply aquifer resulting from the AeroJet General Corp's rocket and Mfg site north of Sacramento, CA (http://www.epa.gov/swrcb/perchlorate/AIswDsepolicies/xegsupload/NWMPVWS-dPerch-SRG9.pdf) | Halliburton chose to keep its head in the sand as to not alert the Duncan community and State agencies that a potential problem exist with contaminated drinking water around the Osage Road site. | Two years prior, Halliburton discovered 2,600 ppb/ou Drake fresh water well and reported that perchlorate has little effect to humans in such low levels. |
| 36 | Aug-1990 | PRC submits their draft technical review of Halliburton's RCRA Part B, Subpart X Permit Application noting several deficiencies to EPA. Review based on application submitted 10/25/87 and a 8/8/1990 site visit. (HAL-OR0012916) | | |
| 37 | Feb-1991 | NOV issued due to 1/24/91 OSDH site inspection. No disposal plan or quarterly reports. (ODEQ-00692) | | |
| 38 | Aug-1991 | Halliburton reported that handling of propellant ended in the summer at the Osage Road facility. (ODEQ-13458 & Woods 000816) | According to monthly Controlled Industrial Waste reports Halliburton's Part A permit was violated 3 times, Halliburton failed to implement control procedures to limit the amount of propellant burned to permitted amounts. | Based on the process information submitted for a Part B permit in 1988 it was stated that "Each motor contains approximately 200 pounds of propellant." (Myers 000178) Thus between 1963 and 1991 over 1,932,878 lbs were burned at the Osage Road facility. |
| 39 | Oct-1991 | Halliburton sampling of Lined Evaporation Pond water for perchlorate 19,100 mpl and pH of 5.4 (ODEQ-00806) | It is evident that Halliburton has not been following its own procedures when discharging perchlorate contaminated waters to the evaporation pond. Also note that after 2 years of the lined evaporation pond being in operation the concentration of perchlorate is 19,100,000 ppb. | Halliburton has failed to maintain the proper pH level in the evaporation pond. The pH is supposed to be treated at the sump prior to pumping to the evaporation pond to maintain the pH around 7.0. |

**DRAFT**

RW Curtis Environmental Consulting, LLC
Attorney Work Product CONFIDENTIAL

| Item | Date | Notable Activity | Reasonable/Prudent Industry Response | Halliburton's Action |
|---|---|---|---|---|
| 49 | Aug-1992 | Halliburton submits a revised closure plan in response to OSDH's letter of 7/10/92. (ODEQ-00778) | At this point in the revisions of Halliburton's closure plan there appears to be a shift in preparing closure plan documents. A higher quality of work product was submitted and with it a change in following a strict compliance with the regulatory requirements and avoiding the discovery of perchlorate. | Halliburton dropped sampling for Perchlorate. (Mike Comforth Halliburton's engineer.) |
| 50 | Sep-1992 | OSDH tentatively approves Halliburton's Closure Plan (ODEQ-00749) | | |
| 51 | Dec-1992 | Halliburton sampled the cleaning pit, burning pit, evaporation pond lower sample and upper sample. The results for perchlorate were 0.0, 0.0, 21,792, 16,083 mpl respectively. | | |
| 52 | Jul-1993 | Halliburton applies for Wastewater Discharge Permit to treat and dispose of 200,000 gals of waste water from the evaporation pond. Pretreatment used was reverse osmosis. Waste water sent to | | |
| 53 | Aug-1993 | Laboratory results of Soil Samples at various locations which are not readily identifiable. It is assumed that the samples were taken at the Osage Road facility. | | |
| 54 | Mar-1994 | ODEQ approves Halliburton's Closure Plan. | | |
| 55 | Aug-1994 | ODEQ conducted a Compliance Evaluation Inspection and reported not areas of non-compliance. Contained in the inspection narrative were following information: Tested water following reverse osmosis determined water from the pond could be disposed of through the City of Duncan sewer system. Also because the water going into the pond was determined to no longer be characteristically reactive (D003), the evaporation pond was determined not to be receiving hazardous waste and, therefore, no groundwater monitoring is required of this unit. (HAL-OR0011578) | | |
| 56 | Feb-1995 | HESI requests ODEQ to grant "Clean Closure" for the Osage Road facility.(HAL-OR0011622) | | |
| 57 | Feb-1995 | Delta Environmental Consultants provide Halliburton Supplemental Data for Interim Closure Report (ODEQ-13498) | | |
| 58 | Mar-1995 | ODEQ advises HESI for the need within 60 days upon completion of closure a certification that the HW management facility has been closed in accordance with the approve closure plan. (HAL-OR0012331) | | |
| 59 | May-1995 | Delta Environmental Consultants submits a closure plan certification. (HAL-OR0012328) | | |
| 60 | May-1995 | ODEQ determines that HESI is in compliance with the closure completion requirements of 40 CFR §265.115. (HAL-OR0011577) | | |
| 61 | Aug-1995 | Delta Environmental Consultants submit quarterly MW sampling results and request to drop certain parameters. | | |
| 62 | Aug-1995 | ODEQ concurs with Delta's request to drop certain MW parameters. | | |
| 63 | Apr-1996 | Delta Environmental Consultants submits a clarification for ODEQ on how evaluating monitoring results compared to the 1st four sampling events will be handled. (HAL-OR 000810) | | |

**DRAFT**

RW Curtis Environmental Consulting, LLC
Attorney Work Product CONFIDENTIAL

| Item | Date | Notable Activity | Reasonable/Prudent Industry Response | Halliburton's Action |
|------|------|------------------|--------------------------------------|----------------------|
| 73 | Jun-1997 | ODEQ accepts Delta's 1996 statistical analysis indicating the radiation is apparently the result of NORM. ODEQ will accept NORM if Halliburton can assure that no petroleum exploration contributed to the occurrence. (ODEQ-01044) | | |
| 74 | Nov-1997 | Delta recommends continued semi-annual groundwater sampling for the remainder of the monitoring period. (HAL-OR 0011583) | | |
| 75 | Dec-1997 | ODEQ concurs with continued groundwater sampling. (HAL_OR0011589) | | |
| 76 | 1998 | Perchlorate plumes popped up at defense sites all across the country - Texas and Utah in 1998, then Kansas, Missouri, Nebraska, Iowa, West Virginia and Maryland the next years... (http://www.dyncorp.com/docs/23471413/Staff Reporter-of-THE-WALL-STREET-JOURNAL) | | |
| 77 | Oct-1998 | Delta continues to recommend continued sampling of monitoring wells based on the June, 1998 sampling. (HAL_OR0012145) | | |
| 78 | Jul-2001 | ODEQ agrees to cease monitor of gross alpha, gross beta, radium, and fluoride but wants monitoring to continue for N-nitrate because the result in MW 1,2,4,5,6 and 7 remain higher than MCL of 10mg/L. (ODEQ-14906) | | |
| 79 | May-2002 | ODEQ denies request to close facility and requires semi-annual groundwater sampling to continue due to the N-nitrate levels. (ODEQ-14914) | | |
| 80 | Oct-2002 | In a report produced by Chase Environmental Group performing a Phase I Historical Site Assessment for decommissioning the Property reported "evidence existed that adjacent areas of the property, referred to as 'burn pits' were used for thermal volume reduction of radiologically contaminated personal protective equipment." (WOODS 000601) | A responsible company would never allow radioactive materials to become air born via burning personal protective use to address radio active products. Such clothing would have been place in a container for proper disposal off site. | Apparently Halliburton used the Missle Cleaning "burn pits" to dispose of contaminated personal protective suits utilized in the cleaning and handling of the radioactive rod racks. Personnel did not properly dispose of protective clothing. See compliant dated 1/28/87 (ODEQ-00041) |
| 81 | Nov-2002 | DOD ISSUES PERCHLORATE POLICY Statement w/ John Paul Woodley Jr., assistant deputy under secretary of defense for environment. DOD components may ascertain and assess for perchlorate if there is a reasonable basis to suspect both a potential presence of perchlorate and a pathway on the installations where it could threaten public health or safety... (http://eec.army.mil/pub/doc/news/comupdates/win03/win0307.html) | Another source of information to acknowledge the potential for perchlorate to contaminate groundwater. Halliburton should have recognized the potential of perchlorate contamination at the Osage Road facility. Certainly a DOD (source of missile motor casing) announcement such as this would have made it to Halliburton's management. | No indication that Halliburton responded to any such announcement. |
| 82 | Jul-2003 | Internal email from ODEQ Bob Welch acknowledges discovery that Halliburton had not been submitting quarterly monitoring result for N-nitrates WOODS 000664) | | |
| 83 | Oct-2004 | Halliburton submits additional groundwater monitoring results, noting that there was gaps in the sampling in 2000 and 2002. Results indicate that N-nitrates are persistent but only one MW-6 has results above MCL. Requested closure be granted.(ODEQ-02154) | | |
| 84 | Nov-2004 | ODEQ requests Halliburton to continue sampling for two more semi-annual sampling results before determining whether to close the site is made. (ODEQ-02148) | | |
| 85 | Aug-2005 | Benham requests that the ODEQ to grant closure of the site since N-nitrates are below MCL. (ODEQ-02010) | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN T. WALKER,<br>*Plaintiff,*<br>vs.<br>MICHAEL FARNAN ET AL,<br>*Defendants,* | CIVIL ACTION NO.:  07-4977  (RBS)<br>Non-Jury |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
STATEMENT OF UNDISPUTED OR INDISPUTABLE FACTS**

Plaintiff Shawn T. Walker ("Walker" or "Plaintiff"), by and through his undersigned

attorneys, Obermayer Rebmann Maxwell & Hippel LLP, hereby responds in opposition to the

Statement of Undisputed or Indisputable Facts of Defendants Jeffrey A. Beard, Michael A.

Farnan, David DiGuglielmo and Cindy G. Watson (collectively "Defendants"), as follows:

1.      Admitted in part; denied in part.  Admitted to the extent that following a jury trial,

Walker was convicted of murder in the first degree and aggravated assault.  The conviction was

entered on March 3, 1992.

2.      Denied as stated.  Admitted to the extent that on March 3, 1992, Walker was

convicted of first degree murder and aggravated assault.  A jury returned a verdict of death.

3.      Denied as stated.  When Walker arrived at Graterford, he was confined in the

Restricted Housing Unit in J-Unit also known as Death Row.

4.      Denied as stated.  From 1992 until he was transferred to General Population on

May 4, 2012—two months shy of 20 years—Walker was held in solitary confinement on Death

Row.

5.      Admitted to the extent that Walker was permitted to shower three times weekly,

and Walker used his opportunities to shower.

4644761.5

6.    Denied as stated. Admitted to the extent that if Walker submitted to a strip search, he was permitted to use an outdoor exercise "yard", which consisted of an enclosed cage. Due to the invasive strip searches, Walker stopped using the yard about 7 years ago. It is further stated that Walker was not prohibited from moving and exercising within the confines of his cell, and to the extent possible in his confined quarters, Walker did move and exercise in his cell.

7.    Denied as stated. It is admitted only that while on Death Row, food was transported to Walkers' cell, three times daily. Walker was confined to his cell for all meals.

8.    Admitted that because Walker demonstrated positive behavior and was free of misconducts during the period leading to consideration, he was able to have a radio and television in his cell.

9.    Denied as stated. Admitted to the extent that Walker was limited to non-contact visits while housed on Death Row. By way of further response, although the visits were non-contact, Walker was strip searched each time he left his cell, and again upon his return. Walker was transported from his cell to the visiting area in handcuffs and shackles. During the visit, Walker remained restrained, and locked in a closet-like room, with a phone receiver. Walker was permitted to communicate with his visitors via a telephone receiver from behind reinforced glass.

10.    Admitted to the extent that Walker was permitted to sign up for sick call. It is further admitted that prison personnel determined whether Walker was in need of medical treatment. The medical assessment was made while Walker remained in the confines of his cell.

11.    Admitted to the extent that Walker was permitted to send mail via the U.S. post office.

12.    Admitted.

13.    Denied as stated. Admitted to the extent that Walker could sign up to use the Capital Case Mini Law Library. It is expressly denied that Walker's access to the library was unfettered and limitless, or the same as or equal to the facility's Main Law Library, available for use by general population inmates. Further, Walker's ability to utilize the resources in the Capital Case Mini Law Library was limited by his inability to use a computer. Research periods for the Capital Case Mini Library were scheduled and assigned in time blocks of two hours each, for a maximum of six hours per week. At the discretion of the facility staff, up to two inmates could use the library during the hours of operation. Walker's ability to use his library privileges hinged upon whether other inmates in the Restricted Housing Unit wished to use the Library.

14.    Denied as stated. Admitted to the extent that Walker had limited privileges to use the commissary. It is expressly denied that Walker's commissary privileges were the same as or equal to the privileges afforded to general population inmates.

15.    Admitted.

16.    Denied as stated. Admitted to the extent that Walker had access to counseling services.

17.    Denied as stated. Admitted to the extent that the general practice on Death Row was for inmates to be rotated every 90 days. During the duration of his confinement on death row, Walker's cell was changed at the approximate frequency of every ninety days. The cells into which Walker was moved often were not cleaned prior to his arrival.

18.    Denied as stated. Admitted to the extent that Walker was interviewed by the Program Review Committee while on Death Row approximately every 90 days. By way of further response, the Program Review Committee repeatedly denied his requests to be transferred out of the RHU without considering Walker's statements to the Committee.

19.   Denied. The allegations set forth in this paragraph are conclusions of law which are denied pursuant to the Federal Rules of Civil Procedure. By way of further response, Section 4303 of 61 Pa. C.S.A. expressly provides, in pertinent part, as follows: "Upon receipt of the warrant, the secretary shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement." It is expressly denied that Section 4303 authorizes defendants to continue to confine Walker on death row after his death sentence was vacated.

20.   Admitted to the extent that the Pennsylvania Department of Corrections public website provides that Walker's death warrant was signed by the governor on two dates: July 15, 1995 and October 30, 1995.

21.   Admitted to the extent that all inmates sentenced to death incarcerated at Graterford, are housed in the J-Unit, Graterford's Death Row.

22.   Denied as stated. Admitted to the extent that there are three restricted housing units at Graterford: J Block a/k/a Death Row; L Block for those held in administrative or disciplinary custody, and SSNU a/k/a the Secure Special Needs Unit. It is expressly denied that these three restricted housing units are identical.

23.   Denied as stated. It is admitted only that death row inmates as well as inmates under disciplinary or administrative custody are housed on J Block, while capital case inmates are separated from other inmates.

24.   Denied as stated. It is admitted only that inmates housed under disciplinary or administrative status have lost certain of the privileges which generally are available to death row inmates, who are not subject to disciplinary or administrative action, such as no access to normal telephone calls, no authorization to have a radio or television, and restricted privileges to

the commissary. It is expressly denied that Walker, at any point relevant hereto, was subject to administrative and/or disciplinary custody. Unlike Walker who was to be held on Death Row indefinitely, an inmate subject to disciplinary or administrative action serves a specific and finite time. An inmate on disciplinary or administrative status can be sanctioned up to 90 days disciplinary time for each infraction.

25.    Denied as stated. Admitted to the extent that Walker challenged his conviction for first degree murder and the death sentence via a Post-Conviction Relief Act petition. By way of further response, on April 21, 2004, the Philadelphia County Court of Common Pleas upheld the conviction and denied Walker's request for a new trial, but vacated Walker's death sentence and awarded Walker a new penalty hearing to determine whether Walker's defense counsel was ineffective for failing to adequately investigate and present specific mitigation evidence.

26.    Admitted that Walker appealed the denial of his guilt phase claims, and the Commonwealth cross-appealed the grant of penalty phase relief.

27.    Admitted to the extent that on May 11, 2007, the Commonwealth filed a Praecipe to Discontinue its Appeal of the grant of penalty phase relief, which was granted on May 15, 2007. A true and correct copy of the Praecipe to Discontinue is attached hereto as Exhibit "A."

28.    Denied as stated. Walker's August 6, 2007 grievance is a document that speaks for itself. A true and correct copy of Walker's August 6, 2007 grievance is attached here to as Exhibit "B."

29.    Denied as stated. Thomas Rowlands Initial Review Response to Walker's grievance is a document that speaks for itself. A true and correct copy of Thomas Rowlands' Initial Review Response is attached hereto as Exhibit "C."

4644761.5

7

30.    Denied as stated. Walker's August 28, 2007 grievance appeal is a document that speaks for itself. A copy of Walker's August 28, 2007-dated grievance appeal is attached hereto as Exhibit "D."

31.    Denied as stated. Superintendent DiGuglielmo's September 19, 2007 letter is a document that speaks for itself. A copy of Superintendent DiGuglielmo's September 19, 2007-dated letter response is attached hereto as Exhibit "E."

32.    Denied as stated. Walker's September 25, 2007 Grievance Appeal is a document that speaks for itself. A copy of Walker's September 25, 2007-dated Grievance Appeal is attached hereto as Exhibit "F."

33.    Denied as stated. Cindy Watson's Final Appeal Decision is a document that speaks for itself. A copy of Watson's Final Appeal Decision is attached hereto as Exhibit "G."

34.    Denied as stated. The Pennsylvania Supreme Court's November 30, 2011 Opinion is a document that speaks for itself. A copy of the Pennsylvania Supreme Court's November 30, 2011 Opinion, 36 A.2d 1 (Pa. 2011), is attached hereto as Exhibit "H."

29. (sic) Denied as stated. Admitted to the extent that on April 12, 2012, the Philadelphia Court of Common Pleas sentenced Walker to life in prison, without parole. By way of further response, on May 4, 2012, three weeks following the resentencing on April 12, 2012, Walker was transferred from death row to General Population, where Walker remains to this day. A copy of the April 12, 2012 Order is attached hereto as Exhibit "I."

WHEREFORE, Plaintiff Shawn T. Walker respectfully requests that this Court deny the

Motion for Summary Judgment of Defendants Jeffrey A. Beard, Michael A. Farnan, David

DiGuglielmo and Cindy G. Watson.

Respectfully submitted,

/s/ Matthew A. Green
Mathieu J. Shapiro (Id. No. 76266)
Dawn M. Sigyarto (Id. No. 91580)
Matthew A. Green (Id. No. 91592)
Obermayer Rebmann Maxwell & Hippel, LLP
1617 JFK Boulevard, Suite 1900
Philadelphia, PA 19103
Tel. (215) 665-3000
Fax (215) 665-3165
Attorneys for Plaintiff,
Shawn T. Walker

Dated: October 31, 2012

4644761.5