IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 14-1469 and 15-1390 (Consolidated)

———————

**CRAIG WILLIAMS,**

**Appellant**

v.

**SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS; DORINA VARNER, Chief Grievance Coordinator; TINA FRIDAY, Records Officer, in her Individual and Official Capacity; JEFFREY R. ROGERS, Manager, in his individual and Official Capacity; TRACY SHAWLEY, Grievance Coordinator, in her individual and Official Capacity; LOUIS FOLINO, in his Individual and Official Capacity**

------------------------------------------------------------------------------------------------------------------

**SHAWN T. WALKER,**

**Appellant**

v.

**MICHAEL A. FARNAN; SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS; SUPERINTENDENT GRATERFORD SCI; CINDY G. WATSON, and others to be named later**

———————

# BRIEF FOR APPELLEES

———————

APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA, ENTERED JANUARY 22, 2014, AND FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA, ENTERED JANUARY 29, 2015

BRUCE R. BEEMER
*First Deputy Attorney General*

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 565-5438
FAX:   (412) 565-3028

BY:    KEMAL A. MERICLI
CLAUDIA M. TESORO
*Senior Deputy Attorneys General*

JOHN G. KNORR, III
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

DATE:  March 14, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES ...................................................................2

STATEMENT OF THE CASE................................................................3

    Procedural background. ...................................................................3

    Statement of Facts...........................................................................6

STATEMENT OF RELATED CASES ..................................................10

SUMMARY OF ARGUMENT .............................................................11

ARGUMENT .....................................................................................13

I.    Williams and Walker Possessed No State-Created Liberty Interest In Being Housed In The General Prison Population. .......................................15

    A.    Pennsylvania law does not create, but expressly forecloses, any such liberty interest for death-sentenced and death-eligible prisoners. ..........................................................................17

    B.    Williams and Walker were not subjected to "atypical and significant hardship.".............................................................24

        1.    For prisoners like Williams and Walker, confinement on death row is not an "atypical and significant hardship" but rather falls within the "normal range" of conditions which their convictions authorize the Commonwealth to impose. ...................................................................24

        2.    Conditions in the CCUs are not comparable to those described in *Wilkinson* and are no harsher than those in ordinary administrative confinement. .......................................26

II.    To The Extent That They Had Any Liberty Interest At All, Williams And Walker Received The Process They Were Due. ...................................31

III.    In The Alternative, The Prison Officials Are Entitled To Qualified Immunity ................................................................................................... 32

    A.    Walker has waived the qualified immunity issue by failing to address it. ............................................................................................ 32

    B.    The prison officials did not violate "clearly established rights." ........ 33

CONCLUSION ........................................................................................ 36

CERTIFICATE OF COUNSEL ............................................................. 37

CERTIFICATE OF SERVICE ............................................................... 38

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)..................................................................33, 34

*Austin v. Wilkinson*,
189 F.3d 719 (N.D. Ohio 2002).......................................................28

*Beard v. Banks*,
548 U.S. 521 (2006)..........................................................................6

*Brousseau v. Haugen*,
543 U.S. 194 (2004)........................................................................34

*Carroll v. Carman*,
135 S.Ct. 348 (2014).......................................................................34

*Clark v. Beard*,
918 A.2d 155 (Pa. Cmwlth. 2007) ......................................18, 28, 35

*Commonwealth v. Walker*,
36 A.3d 1 (Pa. 2011) .........................................................................9

*Commonwealth v. Walker*,
656 A.2d 90 (Pa. 1995) .....................................................................9

*Commonwealth v. Williams*,
980 A.2d 510 (Pa. 2009), *cert. denied*,
560 U.S. 940 (2010)..........................................................................8

*Cook v. Corbett*,
No. 14-5895, 2015 WL 4111692 (E.D. Pa. July 8, 2015) .................10

*Davis v. Ayala*,
135 S.Ct. 2187 (2015)......................................................................14

*Fantone v. Latini*,
780 F.3d 184 (3d Cir. 2015).......................................................23, 29

*Griffin v. Vaughn*,
 112 F.3d 703 (3d Cir. 1997)............................................................ 16, 23, 25, 26

*Hatch v. District of Columbia*,
 184 F.3d 846 (D.C. Cir.1999) ..................................................................25

*Jones v. Sec'y, Pa. Dep't of Corrections*,
 549 Fed. Appx. 108 (3d Cir. 2013) .........................................................30

*Kabakjian v. United States*,
 267 F.3d 208 (3d Cir. 2001)....................................................................32

*Lopez v. Pa. Dep't of Corrections*,
 119 A.3d 1081 (Pa. Cmwlth. 2015) .........................................................35

*Malley v. Briggs*,
 475 U.S. 335 (1986)................................................................................33

*Mammaro v. New Jersey Div. of Child Protection*,
 --- F.3d---, 2016 WL 683637 (3d Cir. 2016) .........................................34

*Meachum v. Fano*,
 427 U.S. 215 (1976)................................................................... 22, 24, 26

*Montanez v. Secretary, Pa. Dept. of Corrections*,
 773 F.3d 472 (3d Cir. 2014).....................................................................31

*Mullenix v. Luna*,
 136 S.Ct. 305 (2015) ................................................................... 33, 34

*Parker v. Cook*,
 642 F.2d 865 (5th Cir. 1981).......................................................... 19-20, 35

*Prieto v. Clarke*,
 780 F.3d 245 (4th Cir. 2015)........................................................... passim

*Reichele v. Howards*,
 132 S.Ct. 2088 (2012) ...........................................................................33

*Rezaq v. Nalley*,
 677 F.3d 1001 (10th Cir. 2012) .................................................... 25, 26

*Sandin v. Conner*,
515 U.S. 472 (1995) ................................................................... passim

*Saucier v. Katz*,
533 U.S. 194 (2001) ........................................................................33

*Shoats v. Horn*,
213 F.3d 140 (3d Cir. 2000)............................................................23

*Smith v. Coughlin*,
748 F.2d 783 (2d Cir. 1984)...................................................... 19, 35

*Spady v. Bethlehem Area Sch. Dist.*,
800 F.3d 633 (3d Cir. 2015)............................................................34

*Sutton v. Rasheed*,
323 F.3d 236 (3d Cir. 2002)............................................................13

*Taylor v. Barkes*,
135 S.Ct. 2042 (2015) ....................................................................33

*Tillman v. Lebanon Co. Correctional Facility*,
221 F.3d 410 (3d Cir. 2000).................................................. 14, 31-32

*United States v. Pelullo*,
399 F.3d 197 (3d Cir. 2005)............................................................33

*Werkheiser v. Pocono Twp.*,
780 F.3d 172 (3d Cir. 2015)............................................................33

*Wilkinson v. Austin*,
545 U.S. 209 (2005)................................................................ passim

*Williams v. Sec'y Pa. Dep't of Corrections*,
459 Fed. Appx. 87 (3d Cir.), *cert. denied*,
132 S.Ct. 2745 (2012) .............................................................. 10, 30

**Pennsylvania statutes**

Act of June 18, 1998, P.L. 622, § 3,
*formerly codified at* Pa. Stat. Ann., tit. 61, § 4003 .............................18

Pa. Cons. Stat., tit. 61, § 4303 ..................................................... 6, 13, 18

Pa. Cons. Stat., tit. 61, § 6137 ..................................................... 28

## Federal statutes

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

28 U.S.C. § 1343 ..................................................................... 1

42 U.S.C. § 1983 ..................................................................... 1

## Constitutional Provisions

U.S. CONST., Amend. XIV, § 1 (Due Process Clause) ........................................... 15

## Rules

L.R. 56.1 (W.D. Pa.) ..................................................................... 6

## Other Authorities

Pa. Dept. of Corrections, DC-ADM 802: Administrative Custody Procedures ........ 7

## STATEMENT OF JURISDICTION

Before this Court are two prisoner civil rights actions, brought under 42 U.S.C. § 1983. *Williams*, Appeal No. 14-1469, was litigated in the Western District of Pennsylvania, while *Walker*, Appeal No. 15-1390, was litigated in the Eastern District of Pennsylvania. In each, the district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

In *Williams*, the district court granted summary judgment on January 22, 2014 (JA11-12) and the Notice Appeal was filed on February 21, 2014 (JA10). In *Walker*, the district court granted summary judgment on January 29, 2015 (JA 40) and the Notice of Appeal was filed on February 4, 2015 (JA 37). This Court has appellate jurisdiction over both appeals by virtue of 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

This case concerns state prisoners convicted of capital crimes, whose sentence of death has been vacated but who remain "death-eligible"; that is, prisoners who have not yet been re-sentenced and who remain exposed to a possible death penalty. The issues presented are:

1.      While a prisoner remains either sentenced to death or death-eligible, does Pennsylvania law create a protected liberty interest in being housed in the general prison population?

2.      To the extent that such prisoners have any liberty interest at all, are they afforded adequate procedural due process to protect that interest?

3.      Are the prison officials entitled to qualified immunity from the appellants' damages claims?

2

## STATEMENT OF THE CASE

These consolidated appeals arise in prisoner civil rights cases. Plaintiffs (now appellants) Craig Williams and Shawn Walker are prisoners in the custody of the Pennsylvania Department of Corrections (DOC), formerly sentenced to death but since re-sentenced to life imprisonment. They contend that Pennsylvania prison officials violated their right to procedural due process by holding them in solitary confinement in Capital Case Units (CCUs),[1] without taking into account their "individual circumstances and characteristics," Br. for Appellants at 29, especially during the period after their death sentences had been vacated but before their new sentences were imposed.

**Procedural background.**

*1. Williams.* Williams filed his *pro se* complaint in July of 2012 against the Secretary of the Department of Corrections and five other DOC officials.[2] He claimed that his confinement on death row, pending his re-sentencing, had violated his rights to both procedural and substantive due process, as well as the DOC's own policy (*See* JA 16-22) (Williams report & recommendation). He sought an

---

[1] Capital Case Units are colloquially called "death row," and the two terms will be used interchangeably.

[2] Chief Grievance Coordinator Dorina Varner; Records Officer Tina Friday; Program Manager Jeffrey R. Rogers; Grievance Coordinator Tracy Shawley; and Superintendent Louis S. Folino (JA 50-59) (Williams complaint).

award of damages. Following, discovery, the defendants moved for summary judgment, on the merits or alternatively on the ground of qualified immunity (*See* JA 67-185) (summary judgment papers).

The motion was referred to a magistrate judge, who recommended that it be granted (JA 13-29) (report & recommendation). With respect to procedural due process, she found that Williams did not have a state-created liberty interest in being housed in the general population; and that even if he did, he received sufficient due process (*See* JA 19-23). The magistrate judge did not reach the issue of qualified immunity. After *de novo* review, the district court adopted the report and recommendation in full and granted the defendants' motion on January 22, 2014 (JA 11-12). Williams appealed (JA 10).

*2. Walker.* Walker too started out representing himself but he later obtained counsel. They filed an amended complaint (JA 189-201), which became the operative pleading, against the Secretary and three other DOC officials.[3] Walker claimed that his confinement on death row violated his rights under the Eighth Amendment, and both substantive and procedural due process (*See* JA 44) (Walker

---

[3]   Chief Counsel Michael Farnan; SCI Graterford Superintendent David DiGuglielmo; and Grievance Officer Cindy G. Watson.

4

opinion).[4] He sought declaratory and injunctive relief, plus damages (JA 189-201) (amended complaint). Following discovery, the defendants moved for summary judgment (JA 212-281) (summary judgment papers).

The district court granted the motion on January 29, 2015 (JA 40-48) (opinion). Because Walker had recently been transferred to the general population, the district court denied his request for declaratory and injunctive relief as moot (JA 44). On his damages claims, the court concluded that the defendants were entitled to qualified immunity (JA 45-48). The district court found it unnecessary to reach the merits of those claims because, as the court explained, Walker "did not have a clearly established right to be transferred to the general population after his death sentence was vacated, but before he was resentenced" (JA 48). The court entered judgment accordingly and Walker appealed (JA 37).

---

[4] The district court's opinion did not specify whether Walker's due process claim sounded in procedural or substantive due process, but the complaint makes it clear that it included both (*See* JA 198) (amended complaint) (alleging that the DOC has no "process" through which Walker could have sought transfer off of death row; and that his confinement there was "arbitrary" and "conscience shocking").

**Statement of Facts.**[5]

The confinement of death-sentenced prisoners is governed by a

Pennsylvania statute, which provides in relevant part that the DOC "shall … keep

the inmate in solitary confinement" and subject to other restrictions, "until

infliction of the death penalty or until lawful discharge from custody." Pa. Cons.

Stat., tit. 61, § 4303. Pursuant to this provision, death-sentenced prisoners are thus

confined in the Capital Case Units (CCUs), or "death rows," located in various

state prisons.

In the judgment of prison officials, prisoners whose death sentences have

been vacated, but who are still liable to have the death penalty re-imposed, present

the same security and safety issues as those who are actually under a death

sentence (JA 175-177) (Smeal decl.). Thus, when a sentence of death is vacated on

appeal or otherwise, the prisoner remains in a CCU until he or she is no longer

exposed to the death penalty; that is, until the prisoner is re-sentenced to something

---

[5] This discussion is based primarily on the material submitted by the appellees in support of their respective motions for summary judgment. In *Williams*, they supported their motion with a statement of undisputed facts, JA 67-70, which Williams did not controvert and is therefore deemed to have admitted. *See* L.R. 56.1 (W.D. Pa.); *Beard v. Banks*, 548 U.S. 521, 527 (2006). Walker, for his part, generally accepted the appellees' statement of facts, *see* JA 214-218, 282-287 (statement of facts & response); where he qualified his agreement, we have accepted his version.

other than death and no appeals from that decision are pending (JA 91) (DOC

Capital Case Procedures Manual).

Prisoners confined in a CCU experience similar conditions as those who are

housed in Administrative Custody, although in some respects the conditions in the

Capital Case Units are more lenient. Thus, all CCU prisoners are single-celled.

They spend most of their time in their cells, but are allowed one hour of outdoor

exercise a day, five days a week, plus three opportunities a week to shower and

shave. They are allowed non-contact visits, for which they are allowed to leave

their cells; and may sign up to use a mini-law library for up to six hours each week,

depending on demand. They are permitted to have newspapers and magazines in

their cells. A limited number of prison jobs are available.

Unlike prisoners in Administrative Custody, prisoners in a CCU may have a

radio and television in their cells; may have three 15-minute phone calls each

week; and have greater (but still limited) commissary privileges (JA 22) (Williams

report & recommendation); (JA 68-69) (Williams statement of material facts); (JA

216, 285-286) (Walker statement of facts & response). *See also* JA 101-103, 120-

123 (administrative custody conditions).[6] Every 90 days, prisoners are entitled to

---

[6] The last-cited materials are from successive versions of the DOC policy
known as "DC-ADM 802: Administrative Custody Procedures." The current
version is available at http://www.cor.pa.gov; select "Administration"; select
"DOC Policies"; select "802 Administrative Custody" (last visited March 8, 2016).

review their status with a Program Review Committee (JA 155-172) (Program

Review Committee reports for Williams); (JA 215, 284) (Walker statement of facts

& response).

Against this background are the cases of the two appellants, Williams and

Walker:

*Williams.* Williams was convicted of first degree murder in 1988 and

sentenced to death in 1990, and his conviction and sentence were upheld on direct

appeal (JA 67) (statement of facts). In 2006, in post-conviction proceedings, he

obtained partial relief: the Court of Common Pleas vacated the death penalty and

granted Williams a new sentencing hearing, but refused to overturn his conviction.

(JA 67-68). Williams appealed this aspect of the ruling but was unsuccessful. *See*

*Commonwealth v. Williams*, 980 A.2d 510 (Pa. 2009), *cert. denied*, 560 U.S. 940

(2010). In the meantime, he remained in the Capital Case Unit.

The case then returned to the Court of Common Pleas for the new penalty-

phase hearing Williams had been granted. On May 1, 2012, the District Attorney's

office declared that it would not seek re-imposition of the death penalty; and that

same day the trial judge re-sentenced Williams to life imprisonment without parole

(JA 70, 88).[7] Williams was then transferred out of the CCU into the general

---

[7] By order dated February 4, 2015, this Court directed the parties to provide,
in their forthcoming briefs, certain details about the vacation of Williams' death

[continued….]

population. He was later transferred from SCI Greene and has, since September 12, 2012, been imprisoned at SCI Albion, where there is no death row (JA 70).

*Walker.* Walker's case followed a similar course. Like Williams, Walker was convicted of first degree murder in the Philadelphia Court of Common Pleas. He was sentenced to death in 1993; and the conviction and sentence were affirmed on direct appeal. *See Commonwealth v. Walker*, 656 A.2d 90 (Pa. 1995). In 2004, in post-conviction proceedings, the Court of Common Pleas vacated his sentence but affirmed his conviction. Walker appealed but was unsuccessful. *See Commonwealth v. Walker*, 36 A.3d 1 (Pa. 2011). He too remained in the Capital Case Unit in the meantime. His case then returned to the Court of Common Pleas, which re-sentenced him to life imprisonment on April 12, 2012. On May 4, 2012, Walker was transferred from the CCU into general population (JA 216-218, 286-287) (statement of facts & response).

---

sentence and whether its re-imposition was a "realistic possibility" between July 11, 2006, and May 1, 2012. Williams and Walker have chosen not to address these points; we therefore note only that prison officials have no way to assess the likelihood that a death sentence will be re-imposed on any given prisoner – not even in hindsight, and still less contemporaneously.

## STATEMENT OF RELATED CASES

These two cases have not previously been before this Court. There are no pending or completed federal cases to which they are directly related, although Williams earlier, and unsuccessfully, pursued a similar challenge via habeas. *See Williams v. Sec'y Pa. Dep't of Corrections,* 459 Fed. Appx. 87 (3d Cir.), *cert. denied*, 132 S.Ct. 2745 (2012). Also, the Eastern District of Pennsylvania recently dismissed an inmate's due process claim much like the one Williams and Walker are pressing. *See Cook v. Corbett*, No. 14-5895, 2015 WL 4111692, at *9-11 (E.D. Pa. July 8, 2015).[8]

---

[8] As of this writing, other aspects of the *Cook* case remain pending before the district court.

## SUMMARY OF ARGUMENT

1. Williams and Walker were not deprived of a state-created liberty interest by being housed in the CCU. First, no state statute, regulation or policy conferred any interest in avoiding such confinement. To the contrary, Pennsylvania by statute and policy requires that death-sentenced prisoners be kept in "solitary confinement" and under other restrictions – even if the death penalty has been vacated – until the possibility that a death sentence will be re-imposed has been definitively removed. Pennsylvania law thus does not "create" an interest in avoiding such confinement; it forecloses it.

Second, Williams and Walker were not subjected to "atypical and significant hardship" beyond what they could "reasonably expect to encounter" as the result of their convictions for first-degree murder. Since state law expressly mandated their confinement on death row, they could not have "reasonably expected" anything else.

In addition, the conditions of confinement in the CCUs are considerably more lenient than those described in *Wilkinson v. Austin*, and more lenient than those experienced by Pennsylvania prisoners who are in administrative custody.

2. The only state-created liberty interest that Williams and Walker possessed was that the state rule governing their confinement be correctly applied, that is, that they not be confined in a CCU unless they were in fact either death-sentenced or

11

death-eligible. Williams and Walker do not suggest that the procedures in use by the DOC – which included reviews of their status every 90 days – were inadequate to safeguard that limited interest.

3. Finally, no "clearly established law" supports the right that Williams and Walker assert. To the contrary, the existing case law points in the other direction. The Pennsylvania courts have repeatedly held that no such state-created liberty interest exists; and in analogous cases from other States, the federal courts have agreed. At the very least, then, the prison officials are entitled to qualified immunity.

# ARGUMENT

*Standard of review*. Appellate review of the grant of summary judgment is plenary. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2002).

*        *        *        *        *

Pennsylvania statutory law, and the DOC policy that implements that statute, provide that, once sentenced to death, a prisoner is housed in a Capital Case Unit (CCU) – "death row" – until the sentence is carried out or the prisoner is re-sentenced to a lesser penalty. *See* Pa. Cons. Stat., tit. 61, § 4303 (death-sentenced inmate to be kept "in solitary confinement," and access limited to DOC staff and the inmate's counsel, spiritual advisor and immediate family); JA 91 (Capital Case Procedures Manual: Modification of Sentences). Thus, Pennsylvania's rule is that prisoners like Williams and Walker, whose death sentences have been vacated but who are still exposed to the death penalty, remain in a CCU until re-sentenced to something other than death.

It is important at the outset to clarify the limited nature of the issue presented in this appeal. First, Williams and Walker do not claim that Pennsylvania's rule violates any *substantive* provision of the Constitution: while such claims were

13

raised below, they have been abandoned on appeal.[9] Second, they do not claim,

and have never claimed, that the DOC's policy is inconsistent with the statute or is

otherwise unauthorized by Pennsylvania law. Finally, they do not claim that the

rule was misapplied as to them: Williams raised such a claim below but again has

abandoned it on appeal.[10]

We emphasize this point because some of the language in the appellants'

brief – for example, its repeated invocation of Justice Kennedy's concurrence in

*Davis v. Ayala*, 135 S.Ct. 2187, 2208-2210 (2015) (Kennedy, J., concurring)

(suggesting that long-term solitary confinement may raise Eighth Amendment

concerns) – would more properly appear in a brief challenging the *substantive*

validity of Pennsylvania's rule. *See* Br. for Appellants at 3-4. But no such issue is

in this case.

Rather, Williams' and Walker's only claim is that prison officials deprived

them of *procedural* due process. *See generally Tillman v. Lebanon Co.*

*Correctional Facility*, 221 F.3d 410, 417-422 (3d Cir. 2000) (distinguishing

between substantive and procedural challenges). As we just discussed,

---

[9] Williams and Walker both raised substantive due process claims, while Walker in addition raised an Eighth Amendment claim. *See supra* at 3, 4; Br. for Appellants at 15 (explicitly abandoning substantive due process claim).

[10] *See supra* at 3; Br. for Appellants at 13 (explicitly abandoning this claim).

14

Pennsylvania has adopted a rule that classifies prisoners into two groups – those who have been sentenced to death (or remain death-eligible) and those who have not – and provides that the first group is to be confined in the CCU. Despite this, Williams and Walker claim that they have an interest, "created by the state," in *avoiding* precisely the confinement that state law prescribes.[11] Br. for Appellant at 20, 23.

We submit that this claim, almost by definition, is doomed to failure. We discuss first the merits of that claim and then the prison officials' alternative defense of qualified immunity.

## I.     Williams and Walker Possessed No State-Created Liberty Interest In Being Housed In The General Prison Population.

The Fourteenth Amendment provides in relevant part that no State "shall … deprive any person of … liberty … without due process of law." U.S. CONST., Amend. XIV, § 1. The threshold legal issue here is whether Williams and Walker possessed a liberty interest entitling them to be housed in the general prison population unless consideration of their "individual circumstances and

---

[11] Williams' and Walker's claim is not limited to "the time [they were] awaiting resentencing." Br. for Appellant at 23. Rather, they contend that they possessed this interest even when they were actually under sentence of death, although it became "qualitatively more acute" once their death sentences had been vacated. *Ibid.*

characteristics" counseled otherwise. Br. for Appellants at 29. (Only if they did must this Court consider whether they received the process they were "due.")

A liberty interest may arise from the Constitution itself or "from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). Here, Williams and Walker have abandoned any argument based on the substantive provisions of the Constitution itself;[12] they now contend only that "they had a protected liberty interest that was created by the state." Br. for Appellants at 20.

In the prison context, establishing a state-created liberty interest requires showing two things: 1) that the interest was actually "created" by the State, that is, the existence of some state statute, rule or policy "conferring a right"; and 2) that the right conferred is a substantial one: it must "confer 'freedom from restraint which … imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997), *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995) (ellipsis by this Court).

We submit that Williams and Walker have made neither of these showings and we discuss them in turn.

---

[12] *See supra* at 13-14.

**A.    Pennsylvania law does not create, but expressly forecloses, any such liberty interest for death-sentenced and death-eligible prisoners.**

Williams and Walker claim that they had a state-created interest "in avoiding the … conditions of Pennsylvania's death row" and being housed within the general prison population. Br. for Appellants at 23. They possessed this interest, they say, at all times, even when actually under a sentence of death, but especially once their death sentences had been vacated: "even if their initial confinement did not give rise to such an interest, [they] had such an interest at the moment their death sentences were vacated …." *Id.* at 18.

But while Williams and Walker insist that this interest was "created by the state," Br. for Appellants at 20, they make no attempt to identify any Pennsylvania statute, regulation or policy that created it. Their reticence is understandable, for no such state rule exists. To the contrary, it is self-evident that the governing statute and policy, far from creating such an interest, explicitly foreclose it.

Pennsylvania law expressly provides that, once a prisoner is sentenced to death, the DOC "shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement"; and that access to the prisoner is limited to prison staff and the prisoner's counsel, spiritual advisor and

immediate family. Pa. Cons. Stat., tit. 61, § 4303.[13] Pursuant to this directive, the

DOC has established its CCUs. The DOC has also adopted its Capital Case

Procedures Manual, which provides that when a death sentence is vacated, the

prisoner is to remain in a CCU unless and until the prisoner is no longer exposed to

the death penalty (*See* JA 91) (Capital Case Procedures Manual).

Pennsylvania's Commonwealth Court has upheld this policy as a legitimate

exercise of the discretion entrusted to the DOC by Section 4303, *see Clark v.

Beard*, 918 A.2d 155, 160-161 (Pa. Cmwlth. 2007); and Williams and Walker do

not suggest otherwise. To the contrary, they concede that they "were *statutorily

required* to live in solitary confinement. Even vacatur of their sentences of death

… *could not alter* their conditions of confinement." Br. for Appellants at 23

(emphases added).

In the face of these provisions of state law – which required that Williams

and Walker be housed in a CCU – it is simply untenable to suggest that state law

simultaneously gave them a protected interest in being housed somewhere else.

Thus, in *Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015), the court rejected a similar

---

[13] Section 4303 was enacted in 2009. Its predecessor, which was enacted in 1998, also required solitary confinement for death-sentenced inmates "until infliction of the death penalty or until lawful discharge from custody." Act of June 18, 1998, P.L. 622, § 3, *formerly codified at* Pa. Stat. Ann., tit. 61, § 4003. Although both Williams and Walker were originally sentenced to death before 1998, they do not suggest that Pennsylvania law was any different back then.

claim that Virginia inmates sentenced to death enjoyed a state-created liberty interest in avoiding confinement on death row. There as here, "[a] written state policy mandate[d] that all persons sentenced to death in Virginia be confined to death row while awaiting execution." *Id.*, at 247. This policy, the court held, made it clear that "under Virginia law, a capital offender has no expectation or interest in avoiding confinement on death row." *Id.*, at 252. To the contrary, the state policy "forecloses any Due Process expectation or right … to any other housing assignment." *Ibid.*

The court concluded: "[W]hen a state policy expressly and unambiguously disclaims a particular expectation, an inmate cannot allege a liberty interest in that expectation. … [A] court cannot conclude that death row inmates have a state-created interest in consideration for non-solitary confinement when the State's established written policy expressly excludes such consideration." *Ibid.*

The Second Circuit reached the same conclusion in *Smith v. Coughlin*, 748 F.2d 783 (2d Cir. 1984). New York had a statute, quite similar to Pennsylvania's, that required death-sentenced prisoners to be housed in solitary confinement in a segregated unit. *Id.*, at 785 (quoting statute). In light of this provision, which "expressly mandated" the plaintiff's placement in this unit, he "had no basis to claim to be the beneficiary of any state-created liberty interest" in being placed elsewhere. *Id.*, at 787. *See also Parker v. Cook*, 642 F.2d 865, 874 n.7 (5th Cir.

19

1981) ("Because death row inmates are never placed in the general population or given an expectation of being placed in the general population, it appears that no liberty interest is affected when they are placed in administrative segregation").

Williams and Walker have thus failed to establish the first element of a state-created liberty interest: that the state has "created" anything at all; and this failure alone requires the rejection of their claim.

*          *          *          *          *

Williams and Walker, however, ignore this element entirely. According to them, *Sandin v. Conner* and *Wilkinson v. Austin* held that "inmates possess a state-created liberty interest" in avoiding *any* conditions of confinement that represent an "'atypical and significant hardship … in relation to the ordinary incidents of prison life.'" Br. for Appellants at 18, *quoting Sandin*, 515 U.S. at 484. Accordingly, they devote their entire discussion of this issue to establishing that their conditions of confinement constituted an "atypical and significant hardship." *See* Br. for Appellants at 19-28. They are quite wrong about this, as we discuss below, but they are also wrong to assume that they need not address whether Pennsylvania has "created" a liberty interest.

Like the plaintiff in *Prieto v. Carter*, Williams and Walker treat *Sandin* and *Wilkinson* as "establishing a … regime in which atypical and harsh confinement conditions, *in and of themselves*, give rise to a protected liberty interest, regardless

20

of whether any state law or policy creates the possibility of avoiding such conditions." *Prieto*, 780 F.3d at 250 (emphasis in original). As *Prieto* points out, this reading of the cases is profoundly mistaken. *Id.*, at 250-252.

*Sandin* did not abandon the common-sense idea that a "state-created" liberty interest must, in some sense, actually be "created" by state law. *Sandin* held that "state-created" interests are "limited" to those that impose "atypical and significant hardships on the inmate," *id.*, at 483-484; but nowhere does *Sandin* say that these liberty interests need not be grounded in state law at all. To the contrary, in *Wilkinson*, the Supreme Court described its holding in *Sandin* as follows: "a liberty interest in avoiding particular conditions of confinement may arise *from state policies or regulations*, subject to the important limitations set forth in *Sandin*." *Wilkinson*, 545 U.S. at 221 (emphasis added).[14] Or as the Fourth Circuit put it, "*Sandin* added an additional showing necessary to establish a protected liberty interest. … *After* finding a basis for an interest or expectation in state regulation, an inmate must *then* demonstrate that denial of this state-created interest resulted in an 'atypical and significant hardship' to him." *Prieto*, 780 F.3d at 250 (emphases added).

---

[14] In *Wilkinson* itself, the Court devoted extensive attention to the Ohio policies that were said to give rise to the asserted liberty interest, *id.*, at 215-218, an exercise that would have been entirely unnecessary under Williams' and Walker's reading of *Sandin*.

Williams' and Walker's approach is inconsistent with *Sandin* in another respect as well, for it would collapse the procedural due process analysis into substantive due process. To say that *any* "atypical and significant hardship," standing alone, creates a protected liberty interest is no different in practice from saying that such an interest arises directly under the Due Process Clause. But *Sandin* clearly did not contemplate such a result: *Sandin* sought to "return to the due process principles … correctly established in *Meachum [v. Fano*, 427 U.S. 215 (1976)]; and *Meachum* is clear on this point:

> We reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. … Similarly, we cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause.

*Id.*, at 224 (emphases in original). *See also Prieto*, 780 F.3d at 251 (Prieto's approach would collapse due process into Eighth Amendment claim).

Finally, as this case and *Prieto* illustrate, Williams' and Walker's approach leads to an absurd and nonsensical result: that some undefined and abstract notion of "state law" is said to "create" a liberty interest that *actual* provisions of state law expressly foreclose.

This Court has, by and large, followed the two-step approach to state-created liberty interests just outlined. Shortly after *Sandin*, the court confirmed that state-created liberty interests must be grounded in provisions of state law *and* must

22

satisfy *Sandin*'s "atypical and significant hardship" test. "The central teaching of *Sandin* is that a state statute or regulation conferring a right is not alone enough to trigger due process. The state law must [also] confer 'freedom from restraint which … imposes atypical and significant hardship on the inmate [.]'" *Griffin*, 112 F.3d at 708 (quoting *Sandin*; ellipsis by this Court). Just last year, this Court held that a prisoner possessed no state-created liberty interest in the rescission of his parole. *Fantone v. Latini*, 780 F.3d 184, 186 (3d Cir. 2015). The Court discussed at some length the existence *vel non* of "atypical and significant hardships," *id.*, at 189-190; but began its analysis by saying that "[p]erhaps the most significant legal principle leading to our result on this appeal" was the absence of any support for the asserted liberty interest in state law. *Id.*, at 186.

While this Court's application of *Sandin* has not always been as meticulous as one might hope, *see, e.g., Shoats v. Horn*, 213 F.3d 140, 143-145 (3d Cir. 2000) (acknowledging the need for a state-created interest to be grounded in a "statutory entitlement," but not addressing whether such an entitlement existed), the Court has certainly never recognized a "state-created" liberty interest in *opposition* to the provisions of the governing state law. Nor, to our knowledge, has any other court.

The absence of any basis in Pennsylvania law for the liberty interest that Williams and Walker assert is alone fatal to their claim and alone requires that the district court be affirmed. Nevertheless, we now turn to the second element of a

state-created liberty interest: whether it involves the imposition of "atypical and

significant hardship."

### B. Williams and Walker were not subjected to "atypical and significant hardship."

#### 1. For prisoners like Williams and Walker, confinement on death row is not an "atypical and significant hardship" but rather falls within the "normal range" of conditions which their convictions authorize the Commonwealth to impose.

The Supreme Court held in *Sandin* that a State creates a protected liberty

interest only when the denial of that interest "imposes atypical and significant

hardship on the inmate outside of the ordinary incidents of prison life." *Id.*, at 484.

In a series of cases, the Supreme Court has made it clear that this baseline – "the

ordinary incidents of prison life" – has its source in the terms of a prisoner's

conviction and sentence.

Thus, in *Meachum*, the Court rejected a due process challenge premised on a

prisoner's transfer to a maximum security prison because the conditions in such a

facility fell "within the normal limits or range of custody *which the conviction has*

*authorized the State to impose*." *Id.*, 427 U.S. at 225 (emphasis added). In *Sandin*

itself, the Court rejected a similar claim for freedom from restricted confinement

for disciplinary reasons because such confinement was "*within the expected*

*perimeters of the sentence* imposed." *Id.*, at 485 (emphasis added). And in

*Wilkinson*, the Court repeated that no due process claim arises if the conditions of

24

confinement are not a "dramatic departure from the *basic conditions of [a prisoner's] sentence*." *Id.*, 223 (emphasis added).

This Court and others have followed the Supreme Court's guidance. "[T]he baseline for determining what is 'atypical and significant'—the 'ordinary incidents of prison life'—is ascertained by what a sentenced inmate may reasonably expect to encounter *as a result of his or her conviction*…." *Griffin*, 112 F.3d at 706 (emphasis added). *Accord Rezaq v. Nalley*, 677 F.3d 1001, 1012 (10th Cir. 2012) ("The 'ordinary incidents of prison life' will differ depending on a particular inmate's conviction and the nature of … confinement routinely imposed on inmates *serving comparable sentences*") (emphasis added); *Hatch v. District of Columbia*, 184 F.3d 846, 847 (D.C. Cir.1999) ("ordinary incidents of prison life" are "the most restrictive conditions that prison officials … routinely impose on inmates *serving similar sentences*") (emphasis added).

The Fourth Circuit, applying these concepts in *Prieto*, rejected the idea that confinement on death row – mandated by Virginia law for death-sentenced prisoners – could constitute a departure from the "ordinary incidents of prison life" for such a prisoner.

> Conditions dictated by a prisoner's conviction and sentence *are* the conditions constituting the "ordinary incidents of prison life" for that prisoner. … [Where] state law mandates the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence, those confinement conditions are, by definition, the "ordinary incidents of prison life" for such offenders.

*Id.*, 780 F.3d at 253-254 (emphasis added).

The same result should obtain here. We have already discussed at length the state-law provisions that govern the placement of death-sentenced and death-eligible prisoners in Pennsylvania, and will not repeat those points again. It is enough to say that, for these prisoners, confinement on death row is not a "departure" from the baseline, it *is* the baseline. It is precisely what their convictions have "authorized the State to impose." *Meachum*, 437 U.S. at 225. It is precisely what is imposed on "inmates serving similar sentences." *Rezaq*, 677 F.3d at 1012. And it is precisely what they can "reasonably expect to encounter as the result of [their] conviction[s]," *Griffin*, 112 F.3d at 706; indeed, they could not "reasonably expect to encounter" anything else.

> **2.    Conditions in the CCUs are not comparable to those described in *Wilkinson* and are no harsher than those in ordinary administrative confinement.**

Williams and Walker, however, rely primarily on a comparison of the conditions they encountered in the CCU to those presented in *Wilkinson* and to those that are imposed on Pennsylvania prisoners in administrative custody. *See* Br. for Appellants at 20-28. For the reasons just discussed, their argument is fundamentally misguided: conditions of confinement mandated by state law *cannot* be beyond "the expected perimeters of the sentence imposed." *Sandin*, 515 U.S. at

485. In any case, as we now discuss, their hyperbolic contention goes well beyond what the record supports.

*Wilkinson* concerned the conditions of confinement in Ohio's "Supermax" facility, the Ohio State Penitentiary (OSP), *id.*, 545 U.S. at 213; and the Supreme Court was "satisfied that assignment to OSP imposes an atypical and significant hardship under any plausible baseline." *Id.* at 223. Williams and Walker now argue that the conditions under which they were confined "were at least as severe, if not more so, than those determined to implicate a liberty interest in *Wilkinson*" Brief for Appellants at 22; and therefore "were also an atypical and significant hardship under any plausible baseline." *Id.* at 25. That is simply not true.

Williams' and Walker's grandiose assertions about the severity of what they experienced cannot be squared with the record or with *Wilkinson*. As explained in *Wilkinson*, "[c]onditions at OSP are more restrictive than any other form of incarceration in Ohio, including *conditions on its death row* or in its administrative control units." *Id.*, 545 U.S. at 214 (emphasis added). The Supreme Court found three aspects of these conditions especially telling.

First, "[i]n contrast to any other Ohio prison, including any segregation unit," OSP is designed to foster "extreme isolation," where inmates "are deprived of almost any environmental or sensory stimuli and of almost all human contact." *Ibid.* Thus, inmates at OSP were virtually sealed into their cells in a way that made

27

conversation with other inmates impossible. They were afforded no outside recreation and no prison jobs. Some were allowed no phone calls at all except with attorneys and for family emergencies; others were allowed two ten-minute calls per month. Some were allowed no visitors except attorneys. *See id.*, at 214-215, 223-224; *Austin v. Wilkinson*, 189 F.3d 719, 724-726 (N.D. Ohio 2002). None of this is true of conditions in Pennsylvania's CCUs. *See supra* at 7 (prisoners in CCU are afforded outside recreation, non-contact visits, three phone calls per week, visits to law library, in-cell radios and televisions, and some jobs). *See Clark*, 918 A.2d at 164 (distinguishing *Wilkinson* on this basis).

Second, the Supreme Court found it significant that "placement [at OSP] disqualifies an otherwise eligible inmate for parole consideration." *Id.*, at 224. This likewise is not true of placement in Pennsylvania's CCUs. Prisoners who have been convicted of first-degree murder are sentenced either to death or to life imprisonment without parole. *See* Pa. Cons. Stat., tit. 61, § 6137(a)(1). Williams and Walker were thus never eligible for parole in the first place and never will be; they lost nothing in this regard by being placed in a CCU.

Finally, the Supreme Court pointed to the fact that placement in OSP was "indefinite" and was reviewed only annually. *Wilkinson*, 545 U.S. at 224. Confinement in a CCU is not "indefinite" in the same sense. While the exact date on which this confinement will end may not be known in advance, that it *will* come

28

to an end, one way or another, is certain. Unlike in *Wilkinson*, its duration depends not on the will or judgment of prison officials but on events and decisions outside of their control, including, as these cases illustrate, inmates' own decisions to press on with challenges to their convictions. [15] And when there is a material change in a prisoner's status – when the prisoner is no longer exposed to the death penalty – that prisoner need not wait for an annual review but is promptly released into the general population. *See supra* at 8-9.

The Supreme Court emphasized in *Wilkinson* that none of these three factors, standing alone, would necessarily constitute an "atypical condition" of confinement. *Id.*, at 224. Be that as it may, it is clear that in this case, as in *Fantone*, the *Wilkinson* factors "do not commix here analogously." *Fantone*, 780 F.3d at 189. In fact, none of them are present. It is thus highly misleading to suggest that the CCUs, restrictive as they may be, are *de facto* Supermax prisons or worse.

---

[15] In this connection, we note Williams' and Walker's claim that it was "unfair" and "simply unjust" to keep them in CCUs during this process, and that because doing so amounts to *de facto* additional punishment for pursuing their appellate rights. Br. of Appellants at 27.  Here again, this has nothing to do with *procedural* due process; it is rather the sort of language one would expect in the kind of *substantive* challenge that Williams and Walker have concededly abandoned.

Nor are the conditions in the CCUs any harsher than those that are imposed on inmates on administrative custody generally. Williams and Walker now assert that the conditions they experienced in the CCU "were *qualitatively* more extreme than those experienced by other inmates in administrative custody." Brief for Appellants at 26 (emphasis added). That is not the case.

The district court in Williams' case found that "the conditions of confinement for inmates held on death row are the same as those for inmates held in administrative custody for other reasons" (JA 22) (report & recommendation). [16] In fact, the record shows that, if anything, conditions in the CCUs are *more lenient* than those in administrative custody.[17] *See supra* at 7. Williams and Walker offer no evidence to the contrary.

Williams and Walker have thus failed to establish either of the necessary elements for the existence of a state-created liberty interest.

---

[16] This Court likewise has noted that CCU conditions are "similar to those of administrative or disciplinary custody." *See Jones v. Sec'y, Pa. Dep't of Corrections*, 549 Fed. Appx. 108, 112 (3d Cir. 2013) (non-precedential); *Williams v. Sec'y, Pa. Dep't of Corrections,* 459 Fed. Appx. 87, 88 (3d Cir. 2012) (non-precedential).

[17] Williams in particular is estopped from contesting this point, since he left it unchallenged in the district court. *See supra* at 6 n. 5.

## II.   To The Extent That They Had Any Liberty Interest At All, Williams And Walker Received The Process They Were Due.

As we have just discussed, Williams and Walker had no right to a "process" that would enable them to avoid the confinement mandated by state rules, the validity of which is unchallenged. What they *did* have was a right to have those rules applied to them correctly. *See, e.g., Montanez v. Secretary, Pa. Dept. of Corrections*, 773 F.3d 472, 486 (3d Cir. 2014) (prisoners subject to court-ordered deductions from prison account had right to hearing to prevent possibility of errors in application of policy). They had a right, in other words, not to be confined in a CCU unless they were in fact death-sentenced or death-eligible.

Williams and Walker, however, do not suggest that the processes in use by the DOC were inadequate to protect *this* right. They do not suggest, for example, that ascertaining a prisoner's status vis-à-vis the death penalty is a particularly difficult matter; or that material changes in a prisoner's status went unmarked or were not acted upon; or that the system was prone to error; or that in fact they, or anyone else, had ever been confined in a CCU by mistake.

Given this low risk of error, and the correspondingly low value of any additional safeguards, we therefore submit that the periodic review of the status of prisoners in the CCU conducted by the Program Review Committee, combined with the ordinary grievance process of the prisons, is sufficient to guard against any stray error that might theoretically occur. *Tillman*, 221 F.3d at 422 (where

31

deductions for prison housing costs involve "routine matters of accounting, with a low risk of error," prison grievance program was sufficient to correct any errors that might occur*).*

## III.    In The Alternative, The Prison Officials Are Entitled To Qualified Immunity.

Because any claims for injunctive relief became moot once Williams and Walker were transferred off death row, this is now solely a damages matter. In both of the cases below, the appellees raised the defense of qualified immunity from damages, but the two cases now stand on a slightly different footing.

### A.    Walker has waived the qualified immunity issue by failing to address it.

In Williams' case, the district court granted summary judgment to the appellees on the merits, without reaching the question of qualified immunity; and there was therefore no need for Williams to address qualified immunity in his opening brief to this Court. Appellees raise the issue now as an alternative ground for affirming the district court in his case, *see, e.g., Kabakjian v. United States*, 267 F.3d 208, 213 (3d Cir. 2001); and Williams is entitled to respond to our argument in his reply brief.

In Walker's case, however, the district court granted summary judgment solely on the basis of qualified immunity (*See* JA 45-48). Walker failed to address this issue in his opening brief. He has therefore waived the issue, and the judgment

against him can be affirmed on this ground alone. *See, e.g., United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

### B.    The prison officials did not violate "clearly established rights."

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015) (per curiam) (quoting *Reichele v. Howards*, 132 S.Ct. 2088, 2093 (2012)). This defense protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Analyzing qualified immunity typically entails two steps: the court must consider "whether the facts alleged by the plaintiff show the violation of a constitutional right" at all, and "whether the right at issue was clearly established at the time of the alleged misconduct." *Werkheiser v. Pocono Twp.,* 780 F.3d 172, 176 (3d Cir. 2015). If, as explained in Parts I and II above, Williams' and Walker's rights were not violated, the qualified immunity inquiry need go no further. *See, e.g., Saucier v. Katz*, 533 U.S. 194, 201 (2001). But even assuming *arguendo* that some violation occurred, no "clearly established" law put the appellees on notice that their conduct was improper.

When qualified immunity is at issue, the right allegedly violated must not be defined at "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S.Ct. at 308 (quoting *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). *Accord, Mammaro v. New Jersey Div. of Child Protection,* --- F.3d---, 2016 WL 683637, at *3 (3d Cir. 2016). Otherwise the rule would be converted into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) (citation omitted).   Thus:

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. … [T]here must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.

*Mammaro*, at *3 (internal quotation marks, brackets and citations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll v. Carman*, 135 S.Ct. 348, 350 (2014) (per curiam) (quoting *al-Kidd*, 563 U.S. at 741).

We need not belabor the application of these principles to this case. It simply cannot be said that "every reasonable official" in the appellees' positions would have understood that Williams and Walker had a state-created liberty interest in

34

avoiding confinement in a CCU; and that this right was established "beyond debate." To the contrary, the Pennsylvania courts have rejected the existence of such a state-created interest as to both death-sentenced inmates, *Lopez v. Pa. Dep't of Corrections*, 119 A.3d 1081, 1088-1089 (Pa. Cmwlth. 2015), and death-eligible inmates. *Clark*, 918 A.2d at 161-164.

At the federal level, we know of no appellate decision holding that a state has "created" a liberty interest in the face of state law that unambiguously forecloses that interest. Similarly, we know of no case holding that conditions of confinement that are expressly mandated by state law are "atypical" conditions that go beyond what an inmate could "reasonably expect" as the result of his conviction. Again, the case law is directly to the contrary. *See Prieto*, 780 F.3d at 252; *Smith*, 748 F.2d at 787; *Parker*, 642 F.2d at 874 n.7.

The prison officials are thus immune from any award of damages. On this ground also the district courts' judgments should be affirmed.

# CONCLUSION

For the foregoing reasons, the judgments of the district court in both

Williams' case and Walker's case should be affirmed.

Respectfully submitted,

BRUCE R. BEEMER
First Deputy Attorney General

By:    /s/ Kemal A. Mericli

KEMAL A. MERICLI
Senior Deputy Attorney General
Bar No. 27703 (Pa.)

CLAUDIA M. TESORO
Senior Deputy Attorney General

JOHN G. KNORR, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 565-5438
FAX:   (412) 565-3028

DATE:  March 14, 2016

# CERTIFICATE OF COUNSEL

I, Kemal A. Mericli, Senior Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That the following virus detection program – SYBARI ANTIGEN Version 8.00.1470 – was run on the file and no virus was detected.

4. That this brief contains 7,703 words within the meaning of Fed.R.App.Proc. 32(a)(7)(B).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.


/s/ Kemal A. Mericli

KEMAL A. MERICLI
Senior Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Kemal A. Mericli, Senior Deputy Attorney General, do hereby certify that

I have this day served the foregoing ***Brief For Appellees***, via electronic service, on

the following:

James J. Bilsborrow, Esquire
Weitz & Luxenburg, P.C.
700 Broadway
New York, NY 10003

*Counsel for Appellants*

I further certify that seven hard copies of this brief were sent by first class mail to

the Clerk of the United States Court of Appeals for the Third Circuit in

Philadelphia, Pennsylvania.

/s/ Kemal A. Mericli
_____
KEMAL A. MERICLI
Senior Deputy Attorney General

DATE:  March 14, 2016